**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08003
856-795-9002

**GREENFIELD & GOODMAN, LLC**
Richard D. Greenfield
7426 Tour Drive
Easton, MD 21601
410-745-4149

**Attorneys for Plaintiff**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PEARL E. LUCAS, individually and derivatively on behalf of COMMERCE BANCORP, INC.<br><br>Plaintiff,<br><br>v.<br><br>VERNON W. HILL, II,<br><br>Defendant<br><br>-and-<br><br>COMMERCE BANCORP, INC.,<br><br>Nominal Defendant. | CASE NO.:<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

1. Plaintiff, Pearl E. Lucas, ("Plaintiff"), by her undersigned counsel, brings the following Complaint upon knowledge as to her personal circumstances and, as to all other matters, upon information and belief based on the investigation made by and through her

1

counsel, against Vernon W. Hill, II, ("Defendant" or "Hill") and Commerce Bancorp, Inc. ("Commerce" or the "Company"), the parent of Commerce Bank, N.A. (the "Bank"). Commerce is a Nominal Defendant herein and no claims have been asserted against it. The investigation by Plaintiff's counsel included a review of Commerce's filings with the Securities and Exchange Commission ("SEC"), reviews of the Company's website, press releases issued and other public statements made by the Company, interviews of knowledgeable persons, actions taken in response to written demands served upon Commerce's Board of Directors, securities analysts' reports and advisories about the Company, news articles, and other reports concerning Commerce and other companies with which members of Commerce's Board of Directors were or are affiliated. The majority of evidence in support of Plaintiff's claims is in Defendant's and the Company's exclusive possession, custody and control. Plaintiff's allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2. This is a derivative action to recover damages and other relief for the benefit of the Company as a result of interested transactions involving the Company, and at least Defendant, and possibly others, including members of Defendant's family and various entities which he and/or family members control. Hill, as a director and officer of the Company, owed fiduciary duties to the Company, but breached those duties by engaging in self-interested transactions so he and members of his family could profit at the Company's expense. As a result of these transactions, the Company has suffered, and will continue to suffer harm, including from the financial costs of the transactions, and from the costs and loss of goodwill resulting from regulatory investigations of these transactions as well as other damages presently unknown.

3. This is a suit to vindicate Plaintiff's rights as a shareholder of Commerce on behalf of the Company and in its name. This stockholder's derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, under common law principles, on behalf of Nominal Defendant Commerce, against Defendant Hill for breaches of fiduciary duty, including the duties of good faith, loyalty and full disclosure, gross mismanagement, waste of corporate

assets and abuse of control, which have damaged Commerce as described below. On behalf of Commerce, Plaintiff seeks to recover the damages caused to it by Defendant and to cause him to account for and re-pay the Company for his direct and indirect unjust enrichment. Plaintiff also seeks by this suit injunctive relief to require the Company, by Order of the Court, to change its actual corporate governance so as to prevent a recurrence of the wrongdoing described herein and to cause the reconstitution of the Board so that the Company is truly under the control of disinterested and independent directors.

4. Hill, other directors, and certain of the senior officers of Commerce intentionally breached their fiduciary duties of care, loyalty and full disclosure by grossly mismanaging Commerce, wasting its assets, disguising its true operating performance through undisclosed and improper diversion of corporate assets improperly to friends, business associates and family members, as well as family trusts and businesses controlled by the Defendant as more specifically set forth below.

## PARTIES

5. Plaintiff Pearl E. Lucas, a citizen of the State of Florida, is and has been the owner of approximately 3,600 shares of Commerce common stock continuously and at all times relevant to this action.

6. Nominal Defendant Commerce is a New Jersey corporation with its principal executive offices located at Commerce Atrium, 1701 Route 70 East, Cherry Hill, New Jersey 08034-5400. No claims are asserted in this litigation against Commerce; rather, this litigation was commenced for its benefit and on its behalf.

7. Defendant Hill is a citizen of the State of New Jersey and serves as Chairman of the Board and President of Commerce.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action under and pursuant to § 1332(a) of the United States Judicial Code, 28 U.S.C. §1332(a), since this action is an action for, *inter alia*, damages in excess of $75,000, exclusive of interest and costs, arising

3

from breaches of duty and waste of corporate assets and there is complete diversity of citizenship between the Plaintiff and Defendant.

9. Venue is proper in this District because Commerce has its corporate headquarters and principal place of business in this District, Defendant resides in this District, and the wrongful acts alleged herein took place and/or were initiated by Defendant in this District.

## BACKGROUND OF PLAINTIFF'S CLAIMS

10. Commerce has evolved into a regional financial services leader anchored by its bank subsidiaries (principally "the Bank") and augmented by Commerce Banc Insurance Services, Inc. ("CBIS"), and Commerce Capital Markets, Inc. ("CCM"). Founded in 1973, the Company's first 33 years have been marked by rapid growth.

11. With assets in excess of $43 billion, the Bank is the largest bank headquartered in Southern New Jersey, serving Metropolitan Philadelphia, New Jersey, Delaware, Virginia, Washington, DC, Connecticut, Florida and New York. Among the Company's subsidiaries, CCM is the region's largest public finance underwriter and provides financial advisory services to major clients in the field of education and healthcare. Commerce has stated that it plans to continue to grow and reinforce its brand by increasing upon the 400+ branch offices of the Bank, both in its present markets as well as others where it has yet to expand. According to the Company's website, the Bank's retail approach uses a chain concept and features standardized facilities, standardized hours, standardized service and aggressive marketing.

12. The cornerstones of Commerce's profitability have been its high level of core deposits at the Bank, which have been generated in part by the relentless expansion of its branch network.

13. For many years, the public image of Commerce and its Board of Directors (the "Board") has deteriorated as a result of exposure of certain questionable business dealings of the Bank, CCM and CSIS, as well as those of certain of directors of Commerce. In part, to burnish its corporate image, the Board, has approved three documents which set forth what the Board wanted the public to think was the foundation of Commerce's business conduct (the

4

"Governance Codes"):

      (a) ***"Code of Business Conduct and Ethics"*** states the following:

- "Our Code is rooted in core Commerce principles: integrity, service, and value. It seeks to promote a culture of legal, regulatory and ethical compliance, guide behavior to maintain public trust and confidence, and expand our reputation as a good corporate citizen." (pg. 1).

- "The basic principles at the heart of our Code are . . . Avoid[ing] conflicts of interest between personal affairs and Commerce's interests." (pg. 2).

- "Team Members and Directors are expected to act in Commerce's best interests and to avoid conflicts of interest. Actions or transactions that involve a conflict of interest are strictly prohibited. Even the appearance of conflict can hurt the Commerce brand and reputation." (pg. 7).

- "Conflicts of interest arise in many ways. Some examples include when there is a substantial risk that Team Members or Directors will . . . Receive material, improper personal benefits as a result of their actions or position at Commerce. Misuse Commerce resources for personal gain. Take for personal benefit an opportunity discovered through Commerce's information or property." (pg. 7).

- "As we build and improve our legendary Commerce brand, Team Members and Directors have a duty to advance the Company's legitimate interest when opportunities arise. Do not: Take for yourself personally any opportunities that arise or are discovered through the use of Commerce information, property, technology resources, or position; Use Commerce information, property, technology resources, or position for personal gain; and Directly or indirectly compete with Commerce." (pg. 8).

- "Outside activities, while encouraged, must never interfere with the proper performance of Commerce duties or create a conflict of interest with Commerce. Specifically, outside activities ***must not***: Compete with Commerce; Damage Commerce's reputation; Interfere with Commerce's business; or be prohibited by law, regulation or any of Commerce policies." (pg. 13) (emphasis in original).

- "Exercise caution because even appearances of conflicts can hurt our brand and reputation for integrity." (pg. 13).

5

(b) ***"Corporate Governance Guidelines"*** states the following:

- "In addition to its general oversight of management, the Board and its committees also perform a number of specific functions, including: . . . Ensuring processes are in place for maintaining the integrity of [Commerce], the integrity of the Company's financial statements, the integrity of compliance with law and ethical business practices, the integrity of relationships with customers and suppliers, and the integrity of relationships with other stakeholders." (pg. 1-2).

- "Commerce directors should possess the highest personal and professional ethics, integrity and values, and be committed to representing the long-term interests of Commerce's shareholders." (pg. 2).

- "The Board expects its directors, as well as employees, to act ethically at all times and to acknowledge their adherence to the codes comprising Commerce's Code of Business Conduct and Ethics and, to the extent applicable, Commerce's Code of Ethics for Senior Financial Officers. . . . If an actual or potential conflict of interest arises for a director, the director will promptly inform the President. All directors must recuse themselves from any discussion or decision affecting their personal, business or professional interests." (pg. 5-6).

(c) ***"Code of Ethics for Senior Financial Officers"*** states the following:

- "Senior Financial Officers are expected to act at all times in the best interest of the Company." (pg. 1).

- "A conflict of interest exists when your personal interests interfere with, or give the appearance of interfering with, the interests of [Commerce]. In the best interests of [Commerce], including gaining improper personal benefits as a result of your position. In addition, you should not use corporate assets or information for your personal gain." (pg. 2).

- "Conflicts of interest may manifest themselves in many ways and may reach farther than just the person employed by the Company. In fact, conflicts may arise as a result of situations involving relatives." (pg. 2).

14. As described below, acting contrary to Commerce's Governance Codes as set forth above, Hill has engaged in transactions for his personal benefit and the benefit of his family at the expense of Commerce, resulting in regulatory investigations of the Company, which

6

expose the Company to costs and the loss of goodwill. In contravention of the Company's stated guidelines, Hill and the directors of Commerce have intertwined business, social and other dealings with one another. Because of such relationships, Hill was able to engage in these self-interested dealings with the Company without other members of the Board enforcing strict compliance with the Company's own rules.

15. Buried in Commerce's fourth quarter 2006 earnings statement that was publicly released on January 16, 2007, the Company disclosed that:

> Commerce has been advised that an investigation is being conducted by the Office of the Comptroller of the Currency, in conjunction with the Board of Governors of the Federal Reserve System. Commerce has further been advised that the scope of the investigation will include but not be limited to transactions with its officers, directors and related parties, including transactions involving bank premises. Commerce is fully cooperating with the OCC and the Federal Reserve with respect to the investigation.

16. The schemes and transactions that are presently under investigation by federal banking regulators were directed or approved by Hill with the active participation and/or acquiescence of the other directors of Commerce, all of whom knew or should have known that much of the Company's growth in retail branches was accompanied by self-dealing by Defendant including, *inter alia,* charging excessive rates to Commerce for the rental of company facilities, including Bank branches through Hill family-controlled trusts and partnerships, and by paying InterArch and other companies owned or controlled by Hill or members of his immediate family tens of millions of dollars in purported consulting, design and related fees and expenses, a significant portion of which was excessive, unjustified and/or otherwise wasteful of Commerce's assets. In particular, given the admitted standardized nature of Bank branches and the uniformity of design therein as referred to on the Company's website and in ¶11 above, even if the Bank needed consulting, design, and related services for its standardized branches, the Bank should have installed a competitive process for the award of contracts with architects, designers and others who provided professional services to Commerce and its subsidiaries.

17. The directors of Commerce, including more recently-appointed directors, John K.

7

Lloyd ("Lloyd") and Joseph S. Vassalluzzo ("Vassalluzzo"), both newly appointed members of a so-called "Special Committee" of purportedly independent members of the Board, have perpetuated the cover up of their breaches of fiduciary duty and those of others having such duty to Commerce by failing to timely cause the Company to sue Hill to recover its damages or even attempting to cause the Defendant to discontinue his direct and indirect improper looting of Commerce as described herein. This is especially true for Vassalluzzo who, as a member of the Audit Committee of Commerce's Board of Directors, is responsible for reviewing the transactions at issue.

18. Commerce's directors have, for many years, in exchange for the perquisites of office, abdicated their fiduciary duties to Commerce and its shareholders by "looking the other way" insofar as the conduct of Defendant and his family is concerned. While Commerce has created the Special Committee purportedly to investigate the wrongdoing alleged herein, given the track record of the Company's directors, their relationships with Hill, Hill's control and domination of the Company, and the directors' repeated failure to previously hold Hill accountable for such wrongdoing, even in the face of the Company's own Governance Code, the work of the so-called Special Committee cannot reasonably be expected to provide an independent, credible, and complete investigation of Defendant and the wrongdoing alleged. The Special Committee also cannot reasonably be expected to aggressively pursue, on behalf of Commerce, all of its valuable claims against Defendant or otherwise act to protect the Company's best interests.

19. (a) The Company's directors have long been aware of the self-interested dealings of Hill and his family with the Commerce, but have failed to take reasonable and adequate steps to protect the Company. For example in an August 1, 2004 article titled "*An 'Oops' at the Bank of 'Wow'*", The New York Times compared certain practices at Commerce to those frequently used in "the days before Enron and WorldCom collapsed." The article noted that "payments that Commerce made to entities controlled by Mr. Hill and his family – for everything from interior design to real estate consulting – give the operation the appearance of a piggy bank for insiders."

8

The article also reported that:

- Commerce and its subsidiaries did "quite a bit of business with its own executives, directors and other insiders." These included loans to various executives and directors totaling over $340 million between 2001 and 2003.

- In 2003, Commerce paid InterArch, an architectural and interior design firm owned by Hill's wife, "$6.4 million for design services and $3.8 million for project management on furniture and building purchases made by Commerce. These payments have risen every year [and] since 2000, they have totaled $26.1 million."

- "Real estate partnerships in which Mr. Hill is an investor also receive millions of dollars annually from Commerce in rents – approximately $2 million last year, or almost 6 percent of the total rent expense charged to the bank under its operating leases in the period. Since 2000, these partnerships have received almost $7 million in rents from Commerce."

- Defendant's son, Vernon W. Hill III, earned "brokerage commissions as an executive at Site Development Inc., a private company that Commerce uses to locate properties for new branches." The senior Hill founded Site Development in 1968 and as of April, 2006 served as Chairman of its Board of Directors.

- In 2002 and 2003, Commerce shareholders paid approximately $900,000 for the Company's use of Galloway National Golf Club, which is principally owned by Mr. Hill.

(b) Since the foregoing article appeared, the practices set forth above have continued unabated and at an ever-increasing cost to Commerce.

20. Also, in March 2003, as a result of a derivative demand made on the Board by another shareholder ("the 2003 Demand"), the Company's directors were on notice of shareholder concerns about, *inter alia*, the Company's transactions and practices with respect to the opening of new branches.

21. Despite its longstanding knowledge of the wrongdoing alleged herein, the Board is unable or unwilling to exercise disinterested business judgment to protect and prosecute the interests of Commerce and the shareholders who own the Company. The formation of the Special Committee, well after the fact, does nothing to remedy the Board's past and repeated

9

failures to control the actions that have now exposed the Company to harm. Further, given their ties to Hill, the Special Committee members, Lloyd and Vassalluzzo, who could not have functioned objectively in any event, are abdicating their responsibilities to Commerce by failing to cause the Company to take any action against Defendant, his family trusts, partnerships or other entities or persons which have enriched themselves unjustly at the Company's expense.

22. In connection therewith, in furtherance of their efforts to insulate Defendant from liability for the wrongdoing alleged herein, Lloyd, Vassalluzzo and their counsel caused and are causing Commerce to waste further corporate funds on legal fees, expenses and other charges related to such "investigation" and the functioning of the Special Committee and will use its existence and purported business judgment as a pretext to seek the dismissal of this and any other similar litigation commenced by the Company's shareholders.

23. The practices of Defendant as described above, as well as others presently unknown to Plaintiff, were approved either tacitly or affirmatively by all of Commerce's directors. As a result of the conduct of Hill as set forth in this Complaint, Commerce has sustained substantial damages in an amount that cannot be calculated at present. This action seeks, *inter alia*, such damages from Defendant as well as the injunctive relief sought in the Prayer for Relief set forth below.

## DEMAND ALLEGATIONS

24. The members of Commerce's Board of Directors are:

    (a) Defendant Hill, a director of the Bank since 1973 and Commerce since 1982, has been Chairman, President and/or Chief Executive Officer of Commerce since 1973 and Chairman, President and/or Chief Executive Officer of the Bank since 1982. Hill has been Chairman of Commerce North since January 1997.

    (b) Jack Bershad, ("Bershad") a director of the Bank and Commerce since 1987, is a retired partner of the law firm of Blank Rome LLP, Philadelphia, Pennsylvania and Cherry Hill, New Jersey, and was a partner in such firm from 1964 to 2002. Bershad was Chairman of the committee appointed in connection with the matters referred to in the 2003 Demand and, upon information and belief, was or is counsel to the

10

Company and Defendant.

(c) Joseph Buckelew, ("Buckelew") a director of Commerce since November 1996 and the Bank since June 1997, has been Vice Chairman of Commerce Insurance Services, Inc. since November 2000. Buckelew was Chairman of Commerce Insurance Services, Inc. from November 1996 through November 2000. Buckelew is also the Chairman of the New Jersey Sports and Exposition Authority and the former Chairman of the New Jersey Highway Authority and the Ocean County, New Jersey GOP.

(d) Donald T. DiFrancesco, ("DiFrancesco") a director of Commerce and the Bank since March 2002, was the Governor of New Jersey from January 31, 2001 through January 8, 2002, served as the President of the New Jersey Senate from 1992 through January 31, 2001 and has been a partner in the law firm of DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, P.C., Warren, New Jersey, from 1992 through January 31, 2001 and from January 8, 2002 to the present. Upon information and belief, DiFrancesco and his firm receive legal fees from Commerce.

(e) Morton N. Kerr, ("Kerr") a director of the Bank since 1973 and Commerce since 1982, has been Chairman of Markeim-Chalmers, Inc., Realtors, Cherry Hill, New Jersey, a real estate company, since 1965 and Markeim-Chalmers, Inc., Appraisal Firm, Cherry Hill, New Jersey, from 1965 through August 1, 2002 on which date Kerr resigned from the appraisal company and divested his interest in such company..

(f) Steven M. Lewis, ("Lewis") a director of Commerce and the Bank since 1988, has been President of U.S. Restaurants, Inc., Blue Bell, Pennsylvania, since 1985 and President of S. J. Dining, Inc., Blue Bell, Pennsylvania, since 1986.

(g) Lloyd has been a director of Commerce and the Bank since October 2004, has been President and CEO of Meridian Health, a leading integrated health system, since 1997. Lloyd was the President and CEO of Jersey Shore Medical Center from 1992 to 1997.

(h) George E. Norcross, III ("Norcross") a director of Commerce and the Bank since March 2002, has been Chairman and Chief Executive Officer of Commerce Insurance Services, Inc. since November 2000. Norcross was the President and Chief Executive Officer of Commerce Insurance Services, Inc. from November 1996 through November 2000. Before such time, he had (and is believed to still have) numerous business relationships with Defendant.

(i) Daniel J. Ragone, ("Ragone") a director of the Bank since 1981 and Commerce since 1982, was the former Chairman and/or President of

Ragone, Raible, Lacatena & Beppel, C.P.A., Haddonfield, New Jersey, and its predecessor firms from 1960 to 1996. Ragone is chairman of the Audit Committee.

(j) William A. Schwartz, Jr. ("Schwartz") a director of the Bank and Commerce since June 1997 has been Chairman, President and Chief Executive Officer of U.S. Vision, Inc., Glendora, New Jersey, an optical retailer, and its predecessor firms, since 1967. Schwartz is also a director of Mothers Work, Inc.

(k) Joseph T. Tarquini, ("Tarquini") a director of the Bank since 1973 and Commerce since 1982, was the Chairman and/or President of The Tarquini Organization, A.I.A., Camden, New Jersey, from 1980 to 2000. Tarquini is a member of the Audit Committee.

(l) Vassalluzzo, a director of the Bank and Commerce since May 2005, was the Vice Chairman of Staples, Inc., Framingham, Massachusetts from 2000 to 2005. Vassalluzzo is also a director of iParty Corporation, Life Time Fitness, Inc. and Federal Realty Investment Trust. Vassalluzzo is a member of the Audit Committee and is the chairman of the Special Committee.

25. In practical terms, any demand by Plaintiff herein would be a futile gesture since the Board would not cause the Company to sue Hill and a suit by Commerce against him would eliminate any ability of the Company to recover the proceeds of the various officers' and directors' liability insurance coverage, which Commerce purchased for its own benefit. Further, each member of the Board, including Lloyd and Vassalluzzo, owes his position and corporate emoluments to Hill's control over all of the Company's directors. Indeed, Hill caused each such director, either directly or through other directors controlled by him, to appoint, nominate and/or re-nominate every one of Commerce's directors, all of whom are beholden to him.

26. Also, as part of his duties as a member of the Board's Audit Committee, Vassalluzzo was responsible for reviewing any related party transactions with the Company. However, he will now be asked, as a member of the Special Committee, to investigate these very same transactions and the Audit Committee's oversight of them. Thus, an irreconcilable conflict of interest has been created.

27. In addition, a demand on the Board to bring this action on behalf of the Company

and its shareholders would have been a futile, wasteful and useless act due to the numerous conflicts of interest created by the various business and personal relationships between members of the Board, all of whom are tied, directly or indirectly, to Hill. These include, *inter alia*:

(a) In 2001 Hill donated $100,000 to Monmouth University for a scholarship fund to be named after Buckelew;

(b) Hill is a former business partner in Optical Equities with Schwartz;

(c) Hill owns stock in both S.J. Dining, Inc. and U.S. Restaurants, Inc., two companies that Lewis is president of;

(d) Hill was a business partner with Norcross in the development of Galloway National Golf Club. During 2005, the Company utilized the facilities of Galloway National Golf Club in the amount of approximately $482,000;

(e) A limited partnership, partially comprised of Bershad, Hill and Lewis and a corporation owned by Hill, leased land to Commerce prior to 2002. In the first quarter of 2002, the Company purchased all of the partnership interests;

(f) At one time, a firm formerly owned by Buckelew employed the wife of DiFrancesco as a part-time insurance broker;

(g) Kerr is the former chairman of Markeim-Chalmers, Inc., which in 2001 received approximately $235,000 in fees for real estate related services from the Company. Kerr has since resigned and divested his interest in Markeim-Chalmers;

(h) DiFrancesco's law firm has been retained by Commerce and its subsidiaries to do business on behalf of the Company;

(i) Bershad's former law firm has previously been retained by Commerce and its subsidiaries to do business on behalf of the Company;

(j) In 2002, the Company approved a $32.5 million line of credit for Norcross, Schwartz and others to buy U.S. Vision Inc.;

(k) Vassalluzzo has extensive experience in the field of real estate, much like Hill and, upon information and belief, is likely to have had business dealings with him; and

(l) Norcross is the chairman of the Board of Trustees of Cooper University Hospital, which Schwartz is also a member.

13

28. The actions and failures to act by the members of the Board amount to a waste of corporate assets. Such waste of assets cannot be blessed by the Board or by any committee thereof including the Special Committee and, as such, these activities are not capable of ratification in the context of either "investigating" Hill's or their wrongdoing and/or deciding what the appropriate course of action is with respect to any derivative litigation filed without shareholder demands upon the Board.

29. The Board has been on notice of the self-interested transactions that are the subject of the regulatory investigations, but failed to act to prevent the transactions or to require compliance with the Company's Governance Codes. Given these failures to act in the face of an obvious risk to Commerce, the Company's directors cannot be expected to take serious action now that it is too late.

30. The Board has continually demonstrated a conscious disregard for the interests of the Company's stockholders and has shown a gross unwillingness to protect Commerce's interests by recovering monies from its culpable directors and others and, in particular, Hill, members of his family, and entities controlled by them.

31. For the foregoing reasons, the Board has relinquished any right to exercise the business judgment normally accorded to a board of directors and this litigation should be allowed to proceed on behalf of the Company and for its benefit.

32. Given the Board's obvious conflicts of interest, there never is or was any likelihood that the Board would authorize an action against Defendant. The other members of the Board all have direct and/or indirect personal, business and/or professional relationships with Hill that clearly prevent them from exercising sound and independent judgment as to the merits of a suit by Commerce against Defendant or members of his family who have improperly profited from their dealings with the Company.

33. Given the relationships between members of the Board and the level of recklessness shown by them in the purported discharge of their duties as members of the Board or as committee chairs, it would be futile to expect any legitimate action against Defendant to be

forthcoming from the Board to protect the interests of the Company and its shareholders.

## COUNT I

### BREACH OF FIDUCIARY

34. Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

35. By reason of his positions and ability to control the business and corporate affairs of Commerce, at all relevant times, Hill, owed the Company and its shareholders fiduciary duties of loyalty, due care and full disclosure and was and is required to operate Commerce and conduct its business affairs in a fair, just and equitable manner and to act in furtherance of the best interests of Commerce and its shareholders.

36. Hill also owed Commerce and its shareholders a fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets.

37. Hill further owed Commerce and its shareholders a fiduciary duty to insure that Commerce operated in compliance with all applicable federal and state laws, rules and regulations, that Commerce did not engage in improper or illegal transactions with Defendant and his controlled entities, and that it did not waste its corporate assets.

38. To discharge his fiduciary duties to Commerce, Hill was and is required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Commerce. Among other things, Hill was and is required to:

> (a) manage, conduct, supervise and direct the employees, business and affairs of Commerce in accordance with applicable laws, rules and regulations;
>
> (b) not violate or permit any officer, director or employee of Commerce to violate applicable laws, rules and regulations;
>
> (c) exercise reasonable control and supervision over Commerce's officers and employees and the contracts entered into in the name of Commerce;

 (d) insure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Commerce and its officers and employees;

 (e) remain informed as to how Commerce was, in fact, operating, and, upon receiving notice or information of unsafe, imprudent or unsound practices, make reasonable investigation of such practices and take steps to correct such practices;

 (f) supervise the accurate and complete preparation, filing and dissemination of any SEC and other regulatory filings, press releases, audits, reports or other information disseminated by Commerce;

 (g) maintain and implement an adequate system of internal controls at Commerce, including financial, accounting and management information systems to protect against, *inter alia*, self-dealing on the part of officers and directors;

 (h) supervise the preparation and filing of any audits, reports or other information disseminated by Commerce to make full and accurate disclosure of all material facts to banking regulators, the SEC and the Company's shareholders including the extent and nature of the dealings between Commerce, Hill and his affiliated or controlled entities; and

 (i) preserve and enhance Commerce's reputation as a public corporation and maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

39. As described above, Hill breached his fiduciary duties to protect the rights and interests of Commerce and its shareholders

40. As described above, Hill failed in his fiduciary duties to Commerce and its shareholders to prudently supervise, manage and control the Company's operations and prudently manage its business and assets.

41. By subjecting Commerce to the unreasonable risk of substantial damages as a result of the practices described above and others presently unknown to Plaintiff and by failing responsibly and with due care to oversee and implement proper management and accounting, leasing and business contracting practices at Commerce, Hill breached his duties of due care and diligence in the management and administration of the Company's affairs and in the use and preservation of its assets.

42.     During the course of the purported discharge of their duties, all of Commerce's directors knew the unreasonable risks and expenses to Commerce associated with the wrongful conduct described in this Complaint, and either participated in or approved those activities or failed to supervise such activities in accordance with their duties to both Commerce and its shareholders. As a result, Hill, aided and abetted by Commerce's other directors, grossly mismanaged Commerce and, together with entities controlled by him, members of his family, or both, engaged in self-dealing with respect to its assets.

43.     As a proximate result of the defendant Hill's breaches of fiduciary duties Commerce has been damaged and will continue to suffer damages in an amount that is presently incapable of determination by Plaintiff.

## COUNT II

### WASTE OF CORPRORATE ASSETS BY DEFENDANT

44.     Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

45.     This claim is asserted derivatively on behalf of Commerce against Defendant Hill.

46.     Hill owes and owed to Commerce the obligation to protect the Company's assets from undue loss or waste.

47.     Hill tacitly or explicitly wasted Company resources by conducting himself and the Company's business affairs in a manner that was condoned by each and all of Commerce's directors.

48.     As a direct result of the foregoing, the Company has sustained and will continue to sustain serious damage in an amount which cannot presently be determined as a result of such waste of corporate assets, for which relief is sought herein.

## COUNT III

### UNJUST ENRICHMENT

49. Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

50. By acting as described above, Hill, directly and indirectly, has been unjustly enriched at the expense of the Company in an amount that cannot presently be determined by Plaintiff.

51. Hill has invested the proceeds of his direct and indirect unjust enrichment and realized earnings thereupon, all of which have been retained by him, his family and by entities that he controls.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims, issues or factual disputes subject to trial by jury.

### PRAYER FOR RELIEF

**Wherefore**, plaintiff demands judgment as follows:

A. A judgment finding that the Defendant has violated this fiduciary and other duties owed to the Company and its shareholders and has wasted the Company's assets;

B. A judgment against Defendant and in favor of the Company for the amount of damages sustained by the Company as a result of his breaches of fiduciary and other duties by each such defendant jointly and severally in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

C. An Order requiring Commerce, in consultation with Plaintiff's counsel and with the approval of the Court, to nominate sufficient numbers of independent directors so that such newly nominated directors constitute a majority of the Board and that a non-Management Chair of the Board is selected.

D. Orders requiring the development of appropriate Board oversight and internal control procedures and safeguards to protect against the repetition of the conduct described herein.

E. An Order requiring Defendant to account for his unjust enrichment of himself, members of his family and by entities controlled by him, at the expense of the Company and re-pay the amount thereof together with the earnings he and they have realized upon it;

F. An order awarding Plaintiff the costs and disbursements incurred in this action, including reasonable allowances for plaintiff's attorneys' and experts' fees and expenses; and

G. Granting such other or further relief as the Court may deem just and proper.

Dated: January 22, 2007    **TRUJILLO RODRIGUEZ & RICHARDS, LLC**

/s Lisa J. Rodriguez
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08003
(856) 795-9002

Richard D. Greenfield
**GREENFIELD & GOODMAN LLC**
7426 Tour Drive
Easton, MD 21601
(410) 745-4149

**Attorneys for Plaintiff**

# **VERIFICATION**

PEARL E. LUCAS, hereby verifies and says:

1. I am the plaintiff in the action represented by the attached Complaint.

2. The factual allegations contained in such Complaint are true and correct to the

3. best of my knowledge, information and belief.

January 18, 2007 *[signature]*
Pearl E. Lucas