**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08033
856-795-9002

Attorney for Plaintiff
*(Additional Counsel on Signature Page)*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PEARL E. LUCAS**, individually and derivatively on behalf of **COMMERCE BANCORP, INC.** for Counts I, II and III; individually for Count IV; and on behalf of herself and others similarly situated for Counts V through VII, | CASE NO.: 07-0349 (RBK) |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| **VERNON W. HILL, II**, for Counts I, II, III, and IV; **JACK R. BERSHAD, JOSEPH BUCKELEW, DONALD T. DIFRANCESCO, MORTON N. KERR, STEVEN M. LEWIS, JOHN K. LLOYD, GEORGE E. NORCROSS, III, DANIEL J. RAGONE, WILLIAM A. SCHWARTZ, JOSEPH T. TARQUINI, JR.,** and **JOSEPH S. VASSALLUZZO** for Counts IV, V, VI, **NICHOLAS A. GIORDANO FOR** Counts V AND VI, and **THE TORONTO-DOMINION BANK FOR** Counts VII, | |
| Defendants | |
| -and- | |
| **COMMERCE BANCORP, INC.** for Counts I, II, and III, | |
| Nominal Defendant. | |

## SECOND AMENDED COMPLAINT

1.     Plaintiff, Pearl E. Lucas, ("Plaintiff"), by her undersigned counsel, brings the following Amended Complaint upon knowledge as to her personal circumstances and, as to all other matters, upon information and belief based on the investigations made by and through her counsel, against defendants Vernon W. Hill, II, Jack R. Bershad, Joseph Buckelew, Donald T. DiFrancesco, Morton N. Kerr, Steven M. Lewis, John K. Lloyd, George E. Norcross, III, Daniel J. Ragone, William A. Schwartz, Joseph T. Tarquini, Jr., Joseph S. Vassalluzzo, and Nicholas A. Giordano ("Defendants") as current and former members of the Board of Directors (the "Board") of Commerce Bancorp, Inc. ("Commerce" or the "Company"). Plaintiff is also bringing a separate claim against The Toronto-Dominion Bank (Toronto-Dominion). Commerce is a Nominal Defendant as to Counts I through III only, and no claims have been asserted against it. The investigation by Plaintiff's counsel included a review of Commerce's filings with the Securities and Exchange Commission ("SEC"), filings with the Office of the Comptroller of the Currency ("OCC"), reviews of the Company's website, press releases issued and other public statements made by the Company, news articles, and other reports concerning Commerce. The majority of evidence in support of Plaintiff's claims is in Defendants' exclusive possession, custody and control. Plaintiff's allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     Plaintiff brings a derivative action solely (at this time, subject to the Court's Orders dated May 15, 2007 (Doc. 21) and September 24, 2007 (Doc. 26)) against Defendant Vernon W. Hill, III ("Hill") for violations of New Jersey common law; an individual claim against all Defendants (with the exception of Nicholas A. Giordano and Toronto-Dominion) for violations of federal law; and separate class action claims for violations of New Jersey common law against those Defendants who are currently members of the Commerce Board, in addition to Toronto-Dominion.

3.     First, this is a derivative action to recover damages and other relief for the benefit of the Company as a result of interested person transactions involving the Company, Hill, and

others, including members of Hill's family and various entities which he and/or family members control and/or have interests in. Hill, as a former director and officer of the Company, owed fiduciary duties to the Company, but breached those duties by engaging in self-interested transactions so he and members of his family and their respective affiliates could profit at the Company's expense. As a result of these transactions, the Company has suffered, and will continue to suffer harm, including those incurred as a result of the excessive financial costs of the interested person transactions (as described below), and from the costs and loss of goodwill resulting from regulatory investigations of these transactions as well as other damages presently unknown.

4.      The derivative claims are to vindicate Plaintiff's rights as a shareholder of Commerce on behalf of the Company and in its name, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, under common law principles, against Hill for breaches of fiduciary duty, including the duties of good faith, loyalty and full disclosure, gross mismanagement, waste of corporate assets and abuse of control, which have damaged Commerce as described below. On behalf of Commerce, Plaintiff seeks to recover the damages caused to it by Hill and to cause him to account for and re-pay the Company for his direct and indirect unjust enrichment. Plaintiff also seeks by this suit, injunctive relief to require the Company, by Order of the Court, to change its actual corporate governance so as to prevent a recurrence of the wrongdoing described herein and to cause the reconstitution of the Board so that the Company is truly under the control of disinterested and independent directors.

5.      Second, Plaintiff seeks to vindicate Plaintiff's personal rights as a Commerce shareholder against Defendants arising out of the preparation, issuance, and dissemination of the Company's April 12, 2007 Proxy Statement on behalf of the Board of Directors in connection with the Company's Annual Meeting of Shareholders scheduled and held May 15, 2007 (the "2007 Proxy Statement"), which is false, misleading, and in violation of § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

3

6.     Because the 2007 Proxy Statement failed to inform shareholders that the propriety of certain related party transactions by Hill and those related and/or affiliated with him was being actively investigated by federal authorities, and failed to fully disclose the scope and status of such investigations, Commerce shareholders did not have the benefit of all material information necessary for an informed vote on the issues presented at the 2007 Annual Meeting including, *inter alia*, when deciding whether or not to re-elect/elect individual Defendants as members of the Board.

7.     Third, Plaintiff seeks, on behalf of a Class consisting of most of the holders of Commerce common stock, to recover for violations of New Jersey common law by Defendants who are currently members of the Board (the "Current Director Defendants) and Toronto-Dominion arising out of their attempt to consummate a sale of the Company to Toronto-Dominion at a grossly inadequate price of $42 per share (the "Proposed Transaction") and only after the Current Director Defendants, who were not properly elected or holding office:

(a)     Rushed to sell the Company at any price they could while shares of Commerce stock were undervalued due to, *inter alia*, the recent investigations (including those by the OCC and otherwise) by, and agreement with, the OCC concerning, *inter alia*, certain interested person transactions involving, among others, former Chief Executive Officer, Hill;

(b)     Failed to await the OCC's permission for Commerce to proceed with highly-valuable new branch openings, which applications and openings have been suspended in the wake of the OCC's investigations; and

(c)     Failed to seek the election of truly independent Commerce directors to protect Plaintiff and the Class (as defined below) in considering strategic alternatives for the Company and in negotiating with potential purchasers, despite the current members of the

Board's clear and irremediable conflicts of interest and/or under the circumstances sought independent guidance from Commerce's shareholders before committing to this or any extraordinary transaction.

8.     As a result, the Current Director Defendants have failed to ensure that if the Company was to be sold, it would be done at the best possible price for the benefit of all shareholders, rather than a select few who wish to cut and run before Commerce's share price stabilizes following the recent turmoil at the Company.  Thus, the Current Director Defendants have breached their fiduciary duties of care, loyalty and full disclosure owed to Commerce shareholders.  Toronto-Dominion, well aware of the Current Director Defendants' fiduciary duties, and knowingly aided and abetted the breach of those duties.

9.     Since the 2007 Proxy Statement failed to disclose the material facts concerning the federal investigations into the systematic self-dealing by Hill and persons affiliated with him, as more specifically referred to below, the Current Director Defendants were able to retain their positions as Directors of Commerce and push though a sale of Commerce at a price well below its fair value.

10.     Thus, Plaintiff seeks, *inter alia*, injunctive relief pursuant to which the presently negotiated transaction between Toronto-Dominion and Commerce is nullified by the Court since the Company's directors who approved it had not been legally elected and further injunctive relief pursuant to which the Court shall appoint a Special Master or Trustee to consider all of Commerce's strategic alternatives including, *inter alia*, the possibility of remaining independent, being sold or otherwise.  Further, in the event that the proposed transaction with Toronto-Dominion is consummated under the extant terms, Plaintiff seeks for herself and the Class to recover, the monetary damages that will be incurred.

## PARTIES

11.     Plaintiff Pearl E. Lucas, a citizen of the State of Florida, is and has been the owner of a substantial quantity of Commerce common stock, including as of the dates of the dissemination of the Company's 2007 Proxy Statement and the ensuing Annual Meeting of shareholders, during all times relevant to this action.

12.     Nominal Defendant Commerce is a New Jersey corporation with its principal executive offices located at Commerce Atrium, 1701 Route 70 East, Cherry Hill, New Jersey 08034-5400.  No claims are asserted in this litigation against Commerce; rather, certain claims were commenced for its benefit and on its behalf.

13.     Defendant Hill is a citizen of the State of New Jersey, founded Commerce, and served as the Chairman of the Board and President of Commerce until his resignation in the Summer of 2007.  Hill is no longer a director of Commerce.

14.     Defendant Jack R Bershad ("Bershad") is a citizen of the State of New Jersey and a director of Commerce.

15.     Defendant Joseph Buckelew ("Buckelew") is a citizen of the State of New Jersey and a director of Commerce as well as Vice Chairman of Commerce Banc Insurance Services ("CBIS").

16.     Defendant Donald T. DiFrancesco ("DiFrancesco") is a citizen of the State of New Jersey and a director of Commerce.

17.     Defendant Morton N. Kerr ("Kerr") is a citizen of the State of New Jersey and a director of Commerce.

18.     Defendant Steven M. Lewis ("Lewis") is a citizen of the State of New Jersey and a director of Commerce.

19.     Defendant John K. Lloyd ("Lloyd") is a citizen of the State of New Hampshire and a director of Commerce.

20.     Defendant George E. Norcross, III, ("Norcross") is a citizen of the State of New Jersey and a director of Commerce, as well as Chairman and CEO of CBIS.

21.     Defendant Daniel J. Ragone ("Ragone") is a citizen of the State of New Jersey and a director of Commerce.

22.     Defendant William A. Schwartz ("Schwartz"), is a citizen of the State of New Jersey and a director of Commerce.

23.     Defendant Joseph T. Tarquini, Jr. ("Tarquini"), is a citizen of the State of New Jersey and a director of Commerce.

24.     Defendant Joseph S. Vassalluzzo ("Vassalluzzo") is a citizen of the State of New Jersey and a director of Commerce.

25.     Defendant Nicholas A. Giordano ("Giordano") is a citizen of the Commonwealth of Pennsylvania and a director of Commerce.

26.     Defendant Toronto-Dominion has headquarters located at 55 King Street West, Toronto, Ontario, M5K1A2, Canada.  Toronto-Dominion is a party to the Proposed Transaction.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under and pursuant to § 1332(a) of the United States Judicial Code, 28 U.S.C. §1332(a), since this action is an action for, *inter alia*, damages in excess of $75,000, exclusive of interest and costs, arising from breaches of duty and waste of corporate assets and there is complete diversity of citizenship between the Plaintiff and Defendant Hill.  Alternatively, this Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9.  The Court also has jurisdiction and under and pursuant to 28 U.S.C. § 1367(a) with respect to Plaintiff's common law claims asserted derivatively on behalf of Commerce and for those common law claims asserted on behalf of herself and the members of the Class.

28.     Venue is proper in this District because Commerce has its corporate headquarters and principal place of business in this District, the majority of Defendants reside in this District, and the wrongful acts alleged herein took place and/or were initiated by Defendants in this District.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings her claims in Counts V through VII for violations of New Jersey common law as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of:

> all persons and entities who owned Commerce common stock between October 2, 2007 and the estimated close of the sale of Commerce to Toronto-Dominion (which is currently estimated to be sometime in April, 2008) (the "Class"). Excluded from the Class are Defendants, current and former officers and directors of Commerce, and members of their immediate families and the heirs, successors or assigns of any of the foregoing (including trusts created by any of them).

30.     The members the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members thereof.  The following are questions of law and fact common to the members of the Class:

(a)     whether the Current Director Defendants, have breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)     whether the Current Director Defendants, are engaging in self-dealing in connection with the Proposed Transaction in order to, *inter alia*, avoid liability to Commerce in Plaintiff's and other shareholder derivative litigation;

(c)     whether the Current Director Defendants, have breached any of their other fiduciary duties to Plaintiff and other members of the Class in connection with the Proposed

Transaction, including the duties of good faith, diligence, honesty and fair dealing and otherwise failed to appropriately act in furtherance of maximizing the shareholder values of Plaintiff and the other members of the Class;

        (d)     whether the Current Director Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

        (e)     whether the Current Director Defendants, are able to meet their burden of proving that the Proposed Transaction is entirely fair to Plaintiff and the members of the Class; and

        (f)     whether Defendant Toronto-Dominion aided and abetted the Current Director Defendants in breaching their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction .

      32.     Plaintiff's claims are typical of the claims of the other members the Class, all of whom have sustained damages arising out of the wrongful conduct of the Current Director Defendants in violation of applicable law as complained of herein.

      33.     Plaintiff will fairly and adequately protect the interest of the members of the Class and has retained counsel competent and experienced in complex commercial litigation such as this case. Plaintiff has no interests antagonistic to, or in conflict with, those of the members of the Class as defined above.

      34.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable. Furthermore, because the damages suffered by the individual members of the Class may be

relatively small, the expense and burden of individual litigation makes it impracticable for the members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**BACKGROUND OF PLAINTIFF'S CLAIMS**

35.    Commerce has evolved into a regional financial services leader anchored by its bank subsidiaries (principally "the Bank") and augmented by CBIS, and Commerce Capital Markets, Inc. ("CCM").  Founded in 1973, the Company's first 34 years have been marked by rapid growth.

36.    With assets in excess of $47.4 billion, the Bank is the largest bank headquartered in Southern New Jersey, serving Metropolitan Philadelphia, New Jersey, Delaware, Virginia, Washington, DC, Connecticut, Florida and New York.  Among the Company's subsidiaries, CCM is the region's largest public finance underwriter and provides financial advisory services to major clients in the field of education and healthcare.  Commerce has stated that it plans to continue to grow and reinforce its brand by increasing upon the 400+ branch offices of the Bank, both in its present markets as well as others where it has yet to expand.  According to the Company's website, the Bank's retail approach uses a chain concept and features standardized facilities, standardized hours, standardized service and aggressive marketing.

37.    The cornerstones of Commerce's profitability have been its high level of core deposits at the Bank, which have been generated in part by the relentless expansion of its branch network.  However, recently, in the wake of the investigations of Commerce, it and its Board have been prohibited by the OCC from opening new branches despite pending applications therefore.

38.    For many years, the public image of Commerce and its Board has deteriorated as a result of exposure of certain questionable business dealings of the Bank, CCM and CSIS, as well as those of certain of directors of Commerce.  In part, to burnish its corporate image, the

Board, approved three documents which set forth what the Board wanted the public to think was the foundation of Commerce's business conduct (the "Governance Codes"):

      (a) ***"Code of Business Conduct and Ethics"*** states the following:

- "Our Code is rooted in core Commerce principles: integrity, service, and value. It seeks to promote a culture of legal, regulatory and ethical compliance, guide behavior to maintain public trust and confidence, and expand our reputation as a good corporate citizen." (pg. 1).

- "The basic principles at the heart of our Code are . . . Avoid[ing] conflicts of interest between personal affairs and Commerce's interests." (pg. 2).

- "Team Members and Directors are expected to act in Commerce's best interests and to avoid conflicts of interest. Actions or transactions that involve a conflict of interest are strictly prohibited. Even the appearance of conflict can hurt the Commerce brand and reputation." (pg. 7).

- "Conflicts of interest arise in many ways. Some examples include when there is a substantial risk that Team Members or Directors will . . . Receive material, improper personal benefits as a result of their actions or position at Commerce. Misuse Commerce resources for personal gain. Take for personal benefit an opportunity discovered through Commerce's information or property." (pg. 7).

- "As we build and improve our legendary Commerce brand, Team Members and Directors have a duty to advance the Company's legitimate interest when opportunities arise. Do not: Take for yourself personally any opportunities that arise or are discovered through the use of Commerce information, property, technology resources, or position; Use Commerce information, property, technology resources, or position for personal gain; and Directly or indirectly compete with Commerce." (pg. 8).

- "Outside activities, while encouraged, must never interfere with the proper performance of Commerce duties or create a conflict of interest with Commerce. Specifically, outside activities ***must not***: Compete with Commerce; Damage Commerce's reputation; Interfere with Commerce's business; or be prohibited by law, regulation or any of

Commerce policies." (pg. 13) (emphasis in original).

- "Exercise caution because even appearances of conflicts can hurt our brand and reputation for integrity." (pg. 13).

(b) *"Corporate Governance Guidelines"* states the following:

- "In addition to its general oversight of management, the Board and its committees also perform a number of specific functions, including: . . . Ensuring processes are in place for maintaining the integrity of [Commerce], the integrity of the Company's financial statements, the integrity of compliance with law and ethical business practices, the integrity of relationships with customers and suppliers, and the integrity of relationships with other stakeholders." (pg. 1-2).

- "Commerce directors should possess the highest personal and professional ethics, integrity and values, and be committed to representing the long-term interests of Commerce's shareholders." (pg. 2).

- "The Board expects its directors, as well as employees, to act ethically at all times and to acknowledge their adherence to the codes comprising Commerce's Code of Business Conduct and Ethics and, to the extent applicable, Commerce's Code of Ethics for Senior Financial Officers. . . . If an actual or potential conflict of interest arises for a director, the director will promptly inform the President. All directors must recuse themselves from any discussion or decision affecting their personal, business or professional interests." (pg. 5-6).

(c) *"Code of Ethics for Senior Financial Officers"* states the following:

- "Senior Financial Officers are expected to act at all times in the best interest of the Company." (pg. 1).

- "A conflict of interest exists when your personal interests interfere with, or give the appearance of interfering with, the interests of [Commerce]. In the best interests of [Commerce], including gaining improper personal benefits as a result of your position. In addition, you should not use corporate assets or information for your personal gain." (pg. 2).

- "Conflicts of interest may manifest themselves in many ways and may reach farther than just the person employed by the Company. In fact, conflicts may arise as a result of situations involving relatives." (pg.

2).

39.      As described below, acting contrary to Commerce's Governance Codes as set

forth above, Hill was able to engage in transactions for his personal benefit and the benefit of his

family at the expense of Commerce, resulting in regulatory investigations of the Company,

which expose the Company to costs and the loss of goodwill.  In contravention of the Company's

stated guidelines, Hill and the directors of Commerce have intertwined business, social and other

dealings with one another.  Because of such relationships, Hill was able to engage in these self-

interested dealings with the Company without other members of the Board enforcing strict

compliance with the Company's own rules.

40.      Buried in Commerce's fourth quarter 2006 earnings statement that was publicly

released on January 16, 2007, the Company disclosed that:

> Commerce has been advised that an investigation is being
> conducted by the Office of the Comptroller of the Currency, in
> conjunction with the Board of Governors of the Federal
> Reserve System.  Commerce has further been advised that the
> scope of the investigation will include but not be limited to
> transactions with its officers, directors and related parties,
> including transactions involving bank premises.  Commerce is
> fully cooperating with the OCC and the Federal Reserve with
> respect to the investigation.

41.      The schemes and transactions that were investigated by federal banking regulators

were directed or approved by Hill, with the active participation and/or acquiescence of the other

Defendants, all of whom knew or should have known that much of the Company's growth in

retail branches was accompanied by self-dealing by Hill including, *inter alia,* charging excessive

rates to Commerce for the rental of company facilities, including Bank branches through Hill

family-controlled trusts and partnerships, and by paying InterArch and other companies owned

or controlled by Hill or members of his immediate family tens of millions of dollars in purported

consulting, design and related fees and expenses, a significant portion of which was excessive,

unjustified and/or otherwise wasteful of Commerce's assets.  In particular, given the admitted

standardized nature of Bank branches and the uniformity of design therein as referred to on the Company's website and in ¶35 above, even if the Bank needed consulting, design, and related services for its standardized branches, the Bank should have installed a competitive process for the award of contracts with architects, designers and others who provided professional services to Commerce and its subsidiaries.

42.     As one analyst noted in reaction to the public disclosure of the OCC investigation, "[a] cloud will remain over [Commerce] stock for some time, at least until the results of the investigation are revealed." These results have never been fully revealed and the Company remains in a state of flux.

43.     The directors of Commerce, including more recently-appointed directors, Lloyd, Vassalluzzo and Giordano, each appointed members of a so-called "Special Committee" of purportedly independent members of the Board, have perpetuated the cover up of their breaches of fiduciary duty and those of others having such duty to Commerce by failing to timely cause the Company to sue Hill to recover its damages or even attempting to cause Hill to discontinue his direct and indirect improper looting of Commerce as described herein. This is especially true for Vassalluzzo who, as a member of the Audit Committee of Commerce's Board of Directors, is responsible for reviewing the transactions at issue. Giordano was elected a director of Commerce this past spring and has since been named the chair of the Board's Special Committee. While the Special Committee has been improved by the addition of Giordano, nothing has enhanced the Special Committee's ability to independently assess the derivative claims contained herein.

44.     Commerce's directors have, for many years, in exchange for the perquisites of office, abdicated their fiduciary duties to Commerce and its shareholders by "looking the other way" insofar as the conduct of Hill and his family is concerned. While Commerce has created the Special Committee purportedly to investigate the wrongdoing alleged herein, given the track

record of the Company's directors, their relationships with Hill, Hill's control and domination of

the Company, and the directors' repeated failure to previously hold Hill accountable for such

wrongdoing, even in the face of the Company's own Governance Code, the work of the so-called

Special Committee cannot reasonably be expected to provide an independent, credible, and

complete investigation of Hill and the wrongdoing alleged.  The Special Committee also cannot

reasonably be expected to aggressively pursue, on behalf of Commerce, all of its valuable claims

against Hill or otherwise act to protect the Company's best interests.

45.     (a) The Company's directors have long been aware of the self-interested dealings

of Hill and his family with the Commerce, but have failed to take reasonable and adequate steps

to protect the Company.  For example in an August 1, 2004 article titled "*An 'Oops' at the Bank

of 'Wow'*", The New York Times compared certain practices at Commerce to those frequently

used in "the days before Enron and WorldCom collapsed."  The article noted that "payments that

Commerce made to entities controlled by Mr. Hill and his family – for everything from interior

design to real estate consulting – give the operation the appearance of a piggy bank for insiders."

The article also reported that:

- Commerce and its subsidiaries did "quite a bit of business with its own executives, directors and other insiders."  These included loans to various executives and directors totaling over $340 million between 2001 and 2003.

- In 2003, Commerce paid InterArch, an architectural and interior design firm owned by Hill's wife, "$6.4 million for design services and $3.8 million for project management on furniture and building purchases made by Commerce. These payments have risen every year [and] since 2000, they have totaled $26.1 million."

- "Real estate partnerships in which Mr. Hill is an investor also receive millions of dollars annually from Commerce in rents – approximately $2 million last year, or almost 6 percent of the total rent expense charged to the bank under its operating leases in the period.  Since 2000, these partnerships have received almost $7 million in rents from Commerce."

- Hill's son, Vernon W. Hill III, earned "brokerage commissions as an

executive at Site Development Inc., a private company that Commerce uses to locate properties for new branches." The senior Hill founded Site Development in 1968 and as of April, 2006 served as Chairman of its Board of Directors.

- In 2002 and 2003, Commerce shareholders paid approximately $900,000 for the Company's use of Galloway National Golf Club, which is principally owned by Mr. Hill.

(b) Even after the foregoing article appeared, the practices set forth above have continued unabated at least until the OCC commenced its investigation, at an ever-increasing cost to Commerce.

46.     Also, in March 2003, as a result of a derivative demand made on the Board by another shareholder ("the 2003 Demand"), the Company's directors were on notice of shareholder concerns about, *inter alia*, the Company's transactions and practices with respect to the opening of new branches.

47.     Despite its longstanding knowledge of the wrongdoing alleged herein, the Board is unable or unwilling to exercise disinterested business judgment to protect and prosecute the interests of Commerce and the shareholders who own the Company. The formation of the Special Committee, well after the fact, does nothing to remedy the Board's past and repeated failures to control the actions that have now exposed the Company to harm. Further, given their ties to Hill, the Special Committee members, Lloyd, Vassalluzzo and Giordano, who could not have functioned objectively in any event, are abdicating their responsibilities to Commerce by failing to cause the Company to take any action against Hill, his family trusts, partnerships or other entities or persons which have enriched themselves unjustly at the Company's expense.

48.     In connection therewith, in furtherance of their efforts to insulate Hill from liability for the wrongdoing alleged herein, Lloyd, Vassalluzzo and Giordano and their counsel caused and are causing Commerce to waste further corporate funds on legal fees, expenses and other charges related to such "investigation" and the functioning of the Special Committee and will use its existence and purported business judgment as a pretext to seek the dismissal of this

and any other similar litigation commenced by the Company's shareholders.

49.    The practices of Hill as described above, as well as others presently unknown to Plaintiff, were approved either tacitly or affirmatively by all of Commerce's directors. As a result of the conduct of Hill as set forth above, Commerce has sustained substantial damages in an amount that cannot be calculated at present.

50.    During the months before and following the public disclosure of the OCC's investigation of Commerce, Hill and others, the Company was forced to incur substantial legal expenses in responding to the requests of the federal regulators, including retention of special legal counsel in Washington, D.C. Furthermore, as noted above, federal banking regulators refused to approve any applications by Commerce or the Bank for new branches during the course of the OCC investigations, effectively cutting off the lifeblood of the Bank's growth for months.

51.    On June 29, 2007, the Bank, agreed to a Consent Order with the OCC, which related to, among other things, corporate governance, related party transactions and policies and procedures for real estate related transactions that were perpetuated by, among others Hill, his family and their respective affiliates. In addition, on June 29, 2007, the Federal Reserve Bank of Philadelphia (the "FRB") and Commerce entered into a Memorandum of Understanding (the "MOU"). Pursuant to the MOU, Commerce's Board agreed to, among other things, take all actions necessary to ensure that the Bank complies fully with the Consent Order. Under the terms of the Consent Order, the Company was required to initiate certain governance changes to eliminate the related party transactions of the type that were prevalent throughout Hill's reign at Commerce and provide periodic reports to federal banking regulators. Notwithstanding the foregoing, Hill continues to have a substantial influence over Commerce and its Board given his personal relations with and appointment of the Current Director Defendants.

52.    In addition, on June 29, 2007, Commerce announced a restructuring of the

Company's management, promoting three officers to a newly created "Office of Chairman." The Company also announced that Hill was immediately departing the Bank as Chairman and CEO and retiring as Chairman, President and CEO of Commerce effective July 31, 2007.

53.     On October 2, 2007, following an all-night meeting of the Board and without sufficient investigation and time for Commerce's business to stabilize, the Company announced that it would be acquired by Toronto-Dominion, through a subsidiary, in an $8.5 billion deal. Under the Proposed Transaction, members of the Class will receive slightly over four-tenths of a share (0.4142) of Toronto-Dominion stock for each Commerce share held plus $10.50 per share in cash. The anticipated sale price, $42.37 per share, represents a 7% premium of Commerce stock's closing price, but was only slightly above Commerce's New York Stock Exchange peak in 2006, before the OCC investigation was disclosed publicly. In addition, under the terms of the Proposed Transaction, Defendant Norcross will purchase CBIS back from the Company at a price to be determined later. Given Norcross' influence with his fellow members of the Board, it is likely, that a "sweetheart" deal will be forthcoming preventing the Company from receiving the fair-market value of CBIS and denying Plaintiff and the Class less than the full value for their Commerce shares.

54.     The reaction to the terms of the Proposed Transaction was very negative since the terms were well below investors' expectations based upon the intrinsic and extrinsic value of Commerce and the very valuable retail franchise held by the Bank:

- Gary Townsend, an analyst with Friedman Billings Ramsey, was quoted as saying that institutional investors believed that Commerce had "given away the franchise." Townsend had previously projected a sales price of $43-$51 per share.

- Mark Fitzgibbon, an analyst for Sandler O'Neill & Partners, wrote that "[w]e suspect the reason that the deal price was a bit lower than we predicted was because Commerce was negotiating from a *position of weakness*." (emphasis added). This "position of weakness" was a direct result of the consent order with the OCC that Commerce had

entered just a few short weeks before the Proposed Transaction was finalized.

55.     Toronto-Dominion Banknorth's President and CEO, Gharat Masrani, also acknowledged that the Company's Board agreed to sell Commerce to Toronto-Dominion in part because it was "the first bank who called" following the resolution of the OCC investigation and the resignation of Hill.

56.     Furthermore, the day that the Proposed Transaction was announced publicly, Toronto-Dominion's President and CEO, Ed Clark ("Clark"), made a series of statements which demonstrate that Toronto-Dominion had taken advantage of Commerce's position of weakness to purchase the Company at a low price.

(a)     In one interview, Clark mentioned that due to the recent resignation of Hill, the Board was not in position negotiate the sale of Commerce at its optimal market price. "You've got to be lucky.  First off, [Commerce] lose[s] their leader, so they never were for sale, and all of a sudden, their leader, they lose their leader. So they weren't primed for sale.  They didn't do all of the things that people always do before they get to the sale to find some more earnings, to look good.  As it happens, we were able to avoid all the troubles that are bothering everybody else."

(b)     Clark further acknowledged in that same interview that "[the purchase of Commerce] was an accidental purchase, in a sense" because "[t]his was not a company primed for resale and so it was an accident that made it available."

(c)     During a conference call with investors, Clark also mentioned that "[a] great franchise became available unexpectedly."

57.     By rushing to complete a deal even though the effects of the OCC's investigation and Hill's resignation still weighed heavily on the Company, shares of Commerce stock were

undervalued, resulting in an inadequate price being paid for Commerce shares to members of the Class under the terms of the Proposed Transaction.

58.     During the time of the negotiations of the Proposed Transaction, the Current Director Defendants had the obligation of acting reasonably and prudently.  In connection therewith, the Current Director Defendants were required to and did not:

       (a)    act in the best interests of Plaintiff and members of the Class;

       (b)    act to maximize shareholder value; and

       (c)    act in accordance with their fundamental duties of good faith, fair dealing, due care and loyalty.

59.     Toronto Dominion was aware of these obligations to Plaintiff and members of the Class, but only furthered the damage to Commerce Shareholders by knowingly aiding the breach of these duties by Current Director Defendants.

60.     By the acts, transactions and courses of conduct alleged herein, the Current Director Defendants, in breach of their fiduciary duties to Plaintiffs and the other members of the Class, are depriving them of the true value of their investment in Commerce and the opportunity to have their shareholder values maximized, which does not occur if the presently proposed transaction with Toronto-Dominion is consummated.

61.     Plaintiff and the members of the Class have been deprived and are being deprived of the opportunity for the Company's operations to stabilize following the conclusion of the various pending investigations and to proceed with a possible sale of Commerce, particularly once its actual financial and operating condition can be reflected in the market prices of Commerce shares following disclosure of all material facts, many of which remain concealed.

62.     By reason of the foregoing acts, practices and course of conduct, the Current

Director Defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations to Plaintiff and members of the Class, and, as well, engaged in disloyal self-dealing.

63.     In light of the foregoing, the Current Director Defendants failed, *inter alia*, to act prudently and consistent with their fiduciary obligations to Plaintiff and the members of the Class.

64.     As a result of this failure to do so, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair and, indeed, optimized, value for their Commerce shares.

65.     The Current Director Defendants, who have failed to act loyally and in good faith toward Plaintiffs and the other members of the Class, are putting their own self-interests above those of most Commerce shareholders, and have breached and are continuing to breach their fiduciary duties to Plaintiffs and members of the Class.

66.     As a result of these unlawful acts, Plaintiffs and the other members of the Class will be irreparably harmed in that they will not receive fair value for Commerce's assets and business and will be prevented from obtaining the real value of their equity ownership in the Company.

## DEMAND ALLEGATIONS

67.     The members of Commerce's Board of Directors during the relevant time were:

> (a) Hill a director of the Bank from 1973 until 2007 and a director of Commerce from 1982 until 2007. He was also Chairman, President and/or Chief Executive Officer of Commerce from 1973 until 2007 and Chairman, President and/or Chief Executive Officer of the Bank from 1982 until 2007.

> (b) Bershad, a director of the Bank and Commerce since 1987, is a retired

partner of the law firm of Blank Rome LLP, Philadelphia, Pennsylvania and Cherry Hill, New Jersey, and was a partner in such firm from 1964 to 2002. Bershad was Chairman of the committee appointed in connection with the matters referred to in the 2003 Demand and, upon information and belief, was or is counsel to the Company and Hill.

(c) Buckelew, a director of Commerce since November 1996 and the Bank since June 1997, has been Vice Chairman of Commerce Insurance Services, Inc. since November 2000. Buckelew was Chairman of Commerce Insurance Services, Inc. from November 1996 through November 2000. Buckelew is also the Chairman of the New Jersey Sports and Exposition Authority and the former Chairman of the New Jersey Highway Authority and the Ocean County, New Jersey GOP.

(d) DiFrancesco, a director of Commerce and the Bank since March 2002, was the Governor of New Jersey from January 31, 2001 through January 8, 2002, served as the President of the New Jersey Senate from 1992 through January 31, 2001 and has been a partner in the law firm of DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, P.C., Warren, New Jersey, from 1992 through January 31, 2001 and from January 8, 2002 to the present. Upon information and belief, DiFrancesco and his firm received legal fees from Commerce.

(e) Kerr, a director of the Bank since 1973 and Commerce since 1982, has been Chairman of Markeim-Chalmers, Inc., Realtors, Cherry Hill, New Jersey, a real estate company, since 1965 and Markeim-Chalmers, Inc., Appraisal Firm, Cherry Hill, New Jersey, from 1965 through August 1, 2002 on which date Kerr resigned from the appraisal company and divested his interest in such company.

(f) Lewis, a director of Commerce and the Bank since 1988, has been President of U.S. Restaurants, Inc., Blue Bell, Pennsylvania, since 1985 and President of S. J. Dining, Inc., Blue Bell, Pennsylvania, since 1986.

(g) Lloyd, a director of Commerce and the Bank since October 2004, has been President and CEO of Meridian Health, a leading integrated health system, since 1997. Lloyd was the President and CEO of Jersey Shore Medical Center from 1992 to 1997.

(h) Norcross, a director of Commerce and the Bank since March 2002, has been Chairman and Chief Executive Officer of Commerce Insurance Services, Inc. since November 2000. Norcross was the President and Chief Executive Officer of Commerce Insurance Services, Inc. from November 1996 through November 2000. Before such time, he had (and is believed to still have) numerous business relationships with Hill.

(i) Ragone, a director of the Bank since 1981 and Commerce since 1982, was the former Chairman and/or President of Ragone, Raible, Lacatena & Beppel, C.P.A., Haddonfield, New Jersey, and its predecessor firms from 1960 to 1996. Ragone is chairman of the Audit Committee.

(j) Schwartz, a director of the Bank and Commerce since June 1997 has been Chairman, President and Chief Executive Officer of U.S. Vision, Inc., Glendora, New Jersey, an optical retailer, and its predecessor firms, since 1967. Schwartz is also a director of Mothers Work, Inc.

(k) Tarquini, a director of the Bank since 1973 and Commerce since 1982, was the Chairman and/or President of The Tarquini Organization, A.I.A., Camden, New Jersey, from 1980 to 2000. Tarquini is a member of the Audit Committee.

(l) Vassalluzzo, a director of the Bank and Commerce since May 2005, was the Vice Chairman of Staples, Inc., Framingham, Massachusetts from 2000 to 2005. Vassalluzzo is also a director of iParty Corporation, Life Time Fitness, Inc. and Federal Realty Investment Trust. Vassalluzzo is a member of the Audit Committee and is the chairman of the Special Committee.

68. In practical terms, any demand by Plaintiff herein would be a futile gesture since the Board would not cause the Company to sue Hill and a suit by Commerce against him would eliminate any ability of the Company to recover the proceeds of the various officers' and directors' liability insurance coverage, which Commerce purchased for its own benefit. Further, each of the Current Director Defendants, including Lloyd and Vassalluzzo, owes his position and corporate emoluments to Hill's control over all of the Company's directors. Indeed, Hill caused each such director, either directly or through other directors controlled by him, to appoint, nominate and/or re-nominate every one of Commerce's directors, all of whom are beholden to him.

69. Also, as part of his duties as a member of the Board's Audit Committee, Vassalluzzo was responsible for reviewing any related party transactions with the Company. However, he will now be asked, as a member of the Special Committee, to investigate these very same transactions and the Audit Committee's oversight of them. Thus, an irreconcilable conflict of interest has been created.

70.    In addition, a demand on the Board to bring this action on behalf of the Company and its shareholders would have been a futile, wasteful and useless act due to the numerous conflicts of interest created by the various business and personal relationships between members of the Board, all of whom are tied, directly or indirectly, to Hill.  These include, *inter alia*:

(a) In 2001 Hill donated $100,000 to Monmouth University for a scholarship fund to be named after Buckelew;

(b) Hill is a former business partner in Optical Equities with Schwartz;

(c) Hill owns or previously owned stock in both S.J. Dining, Inc. and U.S. Restaurants, Inc., two companies that Lewis is president of;

(d) Hill was a business partner with Norcross in the development of Galloway National Golf Club.  During 2005, the Company utilized the facilities of Galloway National Golf Club in the amount of approximately $482,000;

(e) A limited partnership, partially comprised of Bershad, Hill and Lewis and a corporation owned by Hill, leased land to Commerce prior to 2002.  In the first quarter of 2002, the Company purchased all of the partnership interests;

(f) At one time, a firm formerly owned by Buckelew employed the wife of DiFrancesco as a part-time insurance broker;

(g) Kerr is the former chairman of Markeim-Chalmers, Inc., which in 2001 received approximately $235,000 in fees for real estate related services from the Company.  Kerr has since resigned and divested his interest in Markeim-Chalmers;

(h) DiFrancesco's law firm has been retained by Commerce and its subsidiaries to do business on behalf of the Company;

(i) Bershad's former law firm has previously been retained by Commerce and its subsidiaries to do business on behalf of the Company;

(j) In 2002, the Company approved a $32.5 million line of credit for Norcross, Schwartz and others to buy U.S. Vision Inc.;

(k) Vassalluzzo has extensive experience in the field of real estate, much like Hill and, upon information and belief, is likely to have had business dealings with him; and

(l)  Norcross is the chairman of the Board of Trustees of Cooper University
Hospital, which Schwartz is also a member.

71.     The actions and failures to act by the members of the Board amount to a waste of
corporate assets.  Such waste of assets cannot be blessed by the Board or by any committee
thereof including the Special Committee and, as such, these activities are not capable of
ratification in the context of either "investigating" Hill's or their wrongdoing and/or deciding
what the appropriate course of action is with respect to any derivative litigation filed without
shareholder demands upon the Board.

72.     The Board has been on notice of the self-interested transactions that are the
subject of the regulatory investigations, but failed to act to prevent the transactions or to require
compliance with the Company's Governance Codes.  Given these failures to act in the face of an
obvious risk to Commerce, the Company's directors cannot be expected to take serious action
now that it is too late.

73.     The Board has continually demonstrated a conscious disregard for the interests of
the Company's stockholders and has shown a gross unwillingness to protect Commerce's
interests by recovering monies from its culpable directors and others and, in particular, Hill,
members of his family, and entities controlled by them.

74.     For the foregoing reasons, the Board has relinquished any right to exercise the
business judgment normally accorded to a board of directors and this litigation should be
allowed to proceed on behalf of the Company and for its benefit.

75.     Given the Board's obvious conflicts of interest, there never is or was any
likelihood that the Board would authorize an action against Hill.  The other members of the
Board all have direct and/or indirect personal, business and/or professional relationships with
Hill that clearly prevent them from exercising sound and independent judgment as to the merits
of a suit by Commerce against Hill or members of his family who have improperly profited from

their dealings with the Company.

76.     Given the relationships between members of the Board and the level of recklessness shown by them in the purported discharge of their duties as members of the Board or as committee chairs, it would be futile to expect any legitimate action against Hill to be forthcoming from the Board to protect the interests of the Company and its shareholders.

## COUNT I

### BREACH OF FIDUCIARY
### (Derivatively Against Hill)

77.     Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

78.     By reason of his positions and ability to control the business and corporate affairs of Commerce, at all relevant times, Hill, owed the Company and its shareholders fiduciary duties of loyalty, due care and full disclosure and was and was required to operate Commerce and conduct its business affairs in a fair, just and equitable manner and to act in furtherance of the best interests of Commerce and its shareholders.

79.     Hill also owed Commerce and its shareholders a fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets.

80.     Hill further owed Commerce and its shareholders a fiduciary duty to insure that Commerce operated in compliance with all applicable federal and state laws, rules and regulations, that Commerce did not engage in improper or illegal transactions with Hill and his controlled entities, and that it did not waste its corporate assets.

81.     To discharge his fiduciary duties to Commerce, Hill was required to exercise reasonable and prudent supervision over the management, policies, practices, controls and

financial and corporate affairs of Commerce. Among other things, Hill was required to:

(a) manage, conduct, supervise and direct the employees, business and affairs of Commerce in accordance with applicable laws, rules and regulations;

(b) not violate or permit any officer, director or employee of Commerce to violate applicable laws, rules and regulations;

(c) exercise reasonable control and supervision over Commerce's officers and employees and the contracts entered into in the name of Commerce;

(d) insure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Commerce and its officers and employees;

(e) remain informed as to how Commerce was, in fact, operating, and, upon receiving notice or information of unsafe, imprudent or unsound practices, make reasonable investigation of such practices and take steps to correct such practices;

(f) supervise the accurate and complete preparation, filing and dissemination of any SEC and other regulatory filings, press releases, audits, reports or other information disseminated by Commerce;

(g) maintain and implement an adequate system of internal controls at Commerce, including financial, accounting and management information systems to protect against, *inter alia*, self-dealing on the part of officers and directors;

(h) supervise the preparation and filing of any audits, reports or other information disseminated by Commerce to make full and accurate disclosure of all material facts to banking regulators, the SEC and the Company's shareholders including the extent and nature of the dealings between Commerce, Hill and his affiliated or controlled entities; and

(i) preserve and enhance Commerce's reputation as a public corporation and maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

82.     As described above, Hill breached his fiduciary duties to protect the rights and interests of Commerce and its shareholders

83.     As described above, Hill failed in his fiduciary duties to Commerce and its shareholders to prudently supervise, manage and control the Company's operations and

prudently manage its business and assets.

84.     By subjecting Commerce to the unreasonable risk of substantial damages as a result of the practices described above and others presently unknown to Plaintiff and by failing responsibly and with due care to oversee and implement proper management and accounting, leasing and business contracting practices at Commerce, Hill breached his duties of due care and diligence in the management and administration of the Company's affairs and in the use and preservation of its assets.

85.     During the course of the purported discharge of their duties, all of Commerce's directors knew the unreasonable risks and expenses to Commerce associated with the wrongful conduct described in this Complaint, and either participated in or approved those activities or failed to supervise such activities in accordance with their duties to both Commerce and its shareholders. As a result, Hill, aided and abetted by Commerce's other directors, grossly mismanaged Commerce and, together with entities controlled by him, members of his family, or both, engaged in self-dealing with respect to its assets.

86.     As a proximate result of the Defendant Hill's breaches of fiduciary duties Commerce has been damaged and will continue to suffer damages in an amount that is presently incapable of determination by Plaintiff.

## COUNT II

### WASTE OF CORPRORATE ASSETS BY DEFENDANT HILL
### (Derivatively Against Hill)

87.     Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

88.     Hill owed to Commerce the obligation to protect the Company's assets from undue loss or waste.

89.     Hill tacitly or explicitly wasted Company resources by conducting himself and the Company's business affairs in a manner that was condoned by each and all of Commerce's directors.

90.     As a direct result of the foregoing, the Company has sustained and will continue to sustain serious damage in an amount which cannot presently be determined as a result of such waste of corporate assets, for which relief is sought herein.

### COUNT III

### UNJUST ENRICHMENT
### (Derivatively Against Hill)

91.     Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

92.     By acting as described above, Hill, directly and indirectly, was unjustly enriched at the expense of the Company in an amount that cannot presently be determined by Plaintiff.

93.     Hill has invested the proceeds of his direct and indirect unjust enrichment and realized earnings thereupon, all of which have been retained by him, his family and by entities that he controls.

### COUNT IV

### FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT
### (Individually Against the Individual Defendants with the Exception of Giordano)

94.     Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

95.     Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the Commission may prescribe as necessary or appropriate in the

public interest or for the protection of investors, to solicit or to permit the use of his name to

solicit any proxy or consent or authorization in respect of any security (other than an exempted

security) registered pursuant to section 12 of this title [15 USCS §78l]." Rule 14a-9,

promulgated pursuant to Section 14(a) of the Exchange Act, provides that no Proxy Statement

shall contain "any statement which, at the time and in the light of the circumstances under which

it is made, is false or misleading with respect to any material fact, or which omits to state any

material fact necessary in order to make the statements therein not false or misleading or

necessary to correct any statement in any earlier communication with respect to the solicitation

of a proxy for the same meeting or subject matter which has become false or misleading." 17

C.F.R. §240.14a-9(a).

96.     This claim is asserted against the individual Defendants, as a result of their

violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 as controlling persons of

Commerce pursuant to Section 20 of the Exchange Act in connection with the Company's 2007

Proxy Statement disseminated on behalf of the individual Defendants on April 12, 2007 in

connection with the Company's Annual Meeting of Shareholders scheduled and held May 15,

2007.

97.     The 2007 Proxy Statement was drafted "By Order of the Board of Directors and

was signed by C. Edward Jordan, Jr., the Board's secretary. Thus, the statements contained

within the 2007 Proxy are attributable to Defendants. Furthermore, each of the individual

Defendants, acting collectively, were (and are) control persons of Commerce pursuant to Section

20 of the Exchange Act and, as such, are responsible for the actions taken in its name that are

and were in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated

thereunder.

99.     The 2007 Proxy Statement solicited the votes of Plaintiff and the other Commerce shareholders in connection with, *inter alia*, the re-election of sitting directors and recommended that they be retained.

99.     The 2007 Proxy Statement described certain Related Party Transactions including, but not limited to the following:

> Bancorp has nineteen operating leases, entered into during 2002 and prior, for land and bank premises with limited partnerships in which Mr. Hill is a partner or in which a corporation owned by Mr. Hill is a partner, or from the Hill Family Trust. The aggregate annual rents under these leases for 2006 was approximately $1.9 million. These leases expire periodically beginning in 2008 but are renewable through 2042. In addition, Bancorp has three operating land leases, entered into during 2004 and prior, with partnerships partially owned by family members of Mr. Hill. Two of the leases are with partnerships 30% owned by a brother of Mr. Hill. The other lease is with a partnership 30% owned by a son of Mr. Hill. The aggregate rents under these leases for 2006 was approximately $372,000. These leases expire between 2019 and 2024 but are renewable through 2044.
>
> **Management believes that the rents paid for each of the foregoing leases is and was comparable to the rents that would have been paid to non-affiliated parties in similar commercial transactions for similar locations, assuming that such locations were available.**
>
> During 2006, Bancorp obtained appraisal services from Markeim Chalmers Appraisals, an appraisal company whose president and 50% owner is a son-in-law of Mr. Kerr, director of Commerce Bancorp and Commerce NA. Bancorp paid approximately $119,000 to this firm in 2006. The Board did not approve services provided by this company. **Management believes amounts paid in 2006 were substantially equivalent to those that would have been paid to an unaffiliated company for the performance of similar services.**
>
> During 2006, Bancorp utilized Interstate Commercial Real Estate, Inc. ("Interstate Commercial"), a commercial real estate

development company/broker for all of its real estate transactions. Interstate Commercial received commissions paid by the seller for such services in 2006. A brother and son of Mr. Hill are executive officers and commissioned employees of Interstate Commercial. Based on information provided by Interstate Commercial, Mr. Hill's brother and son earned commissions from sellers of approximately $770,000 and $350,000, respectively, during 2006. **Management believes seller commissions earned by Interstate Commercial were substantially equivalent to those that would have been earned by unaffiliated companies for the performance of similar services.**

Bancorp obtained architectural design and facilities management services from InterArch, Inc., a business owned by the wife of Mr. Hill. Bancorp spent $9.2 million in 2006 for such services and related costs. **Management believes these disbursements were substantially equivalent to those that would have been paid to unaffiliated companies for similar services.**

During 2006, Bancorp and its subsidiaries utilized the facilities of Galloway National Golf Club for the purpose of business development. Bancorp paid approximately $643,000 in 2006 for the use of those facilities. Mr. Hill is a principal equity holder, and Messrs. Norcross and Lewis each are equity holders, of Galloway National Golf Club. **Management believes such expenses were substantially equivalent to those that would have been paid to unaffiliated companies for utilization of similar facilities.** [emphasis added]

100. The 2007 Proxy Statement contained written statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts. Specifically, the 2007 Proxy Statement failed to disclose the process, if any, which was utilized to determine whether or not the disbursements were in fact "substantially equivalent to those that would have been paid to unaffiliated companies." Particularly when they were not. Furthermore, the 2007 Proxy Statement also failed to disclose that as of the date the Proxy Statement was issued all of the related party transactions described therein and others were the subject of federal regulatory investigations and failed to disclose the status and results of the investigations.

101.    These facts were known to each of the individual Defendants prior to and/or at the time of the mailing of the Board's 2007 proxy solicitation. Specifically, *inter alia*, at some time prior to Commerce's January 16, 2007 earnings release, the individual Defendants had actual knowledge of the substance of the regulatory investigations described above and that the related party transactions referenced in the 2007 Proxy Statement as well as others were included within the scope of that and other regulatory investigations.

102.    As a result of the use and dissemination by the individual Defendants of the 2007 Proxy Statement to solicit votes of Commerce shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's nominees were approved. By utilizing such Proxy Statement, Plaintiff's suffrage rights have been violated, which is in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 and by having the Director supported nominees re-elected, Plaintiff has been and continues to be damaged.

## COUNT V

### BREACH OF FIDUCIARY
**(On Behalf of Herself and the Class Against the Current Director Defendants)**

103.    Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein. The claims asserted in this Count by Plaintiff on behalf of herself and the members of the Class are asserted against the Current Director Defendants. No claims are asserted herein against Commerce.

104.    By reason of their positions and ability to control the business and corporate affairs of Commerce, at all relevant times, all of the Current Director Defendants, owed the Company's shareholders fiduciary duties of, *inter alia*, loyalty, due care and full disclosure and were and are required to operate Commerce and conduct its business affairs in a fair, just and equitable manner and to act in furtherance of the best interests of Commerce's shareholders.

105.    The members of the Company's Board also owed Commerce and its shareholders

a fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets.

106.    As described above, the Current Director Defendants breached their fiduciary duties to protect the rights and interests of Commerce shareholders in connection with the proposed Toronto-Dominion transaction.

107.    As described above, the Current Director Defendants failed to fulfill their fiduciary duties to Commerce shareholders to prudently supervise, manage and control the process, which resulted in the Proposed Transaction.

108.    By failing to wait until the value of Commerce stock had recovered from the negative impact of the OCC's and related investigations of, *inter alia*, interested party transactions and Hill's resignation, the members of the Company's Board breached their duties of due care and diligence in the management and administration of the its affairs and in the use and preservation of its assets.

109.    As a proximate result of the Current Director Defendants' breaches of fiduciary duties, Plaintiff and members of the Class have been damaged and will continue to suffer damages in an amount that is presently incapable of determination by Plaintiff.

## COUNT VI

### UNJUST ENRICHMENT
### (On Behalf of Herself and the Class Against the Current Director Defendants)

110.    Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein. The claims asserted in this Count by Plaintiff on behalf of herself and the members of the Class are asserted against the Current Director Defendants. No claims are asserted herein against Commerce.

111.    By acting as described above, the Current Director Defendants, directly and

indirectly, have been and will be unjustly enriched at the expense of Plaintiff and members of the Class in an amount that cannot presently be determined by Plaintiff.

<strong><u>COUNT VII</u></strong>

<strong><u>KNOWINGLY AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES</u></strong><br><strong>(On Behalf of Herself and the Class Against Toronto-Dominion)</strong>

112.    Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein. The claims asserted in this Count by Plaintiff on behalf of herself and the members of the Class are asserted against Defendant Toronto-Dominion. No claims are asserted herein against Commerce.

113.    The Commerce Directors owe the Company's shareholders the fiduciary duties of, *inter alia*, loyalty, due care and full disclosure and were and are required to operate Commerce and conduct its business affairs in a fair, just and equitable manner and to act in furtherance of the best interests of Commerce's shareholders. That the Commerce Directors owed this duty to the Class was well known to Toronto-Dominion.

114.    As detailed above in the preceding paragraphs, the Current Director Defendants breached this fiduciary duty to the Class.

115.    Toronto-Dominion knowingly aided and abetted the Current Director Defendants' breaches of fiduciary duty. Toronto-Dominion acted with knowledge or reckless disregard that the other defendants are in breach of their fiduciary duties to the Class, and actively and knowingly induced the Current Director Defendants to breach their fiduciary duties.

116.    As a result of Toronto-Dominion's unlawful actions, the Class has suffered damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims, issues or factual disputes subject to trial by jury.

## PRAYER FOR RELIEF

**Wherefore,** plaintiff demands judgment as follows:

A.   A judgment finding that Hill has violated this fiduciary and other duties owed to the Company and its shareholders and has wasted the Company's assets;

B.   A judgment against Hill and in favor of the Company for the amount of damages sustained by the Company as a result of his breaches of fiduciary and other duties by each such defendant jointly and severally in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

C.   An Order requiring Commerce, in consultation with Plaintiff's counsel and with the approval of the Court, to nominate sufficient numbers of independent directors so that such newly nominated directors constitute a majority of the Board and that a non-Management Chair of the Board is selected.

D.   Orders requiring the development of appropriate Board oversight and internal control procedures and safeguards to protect against the repetition of the conduct described herein.

E.   An Order requiring Hill to account for his unjust enrichment of himself, members of his family and by entities controlled by him, at the expense of the Company and re-pay the amount thereof together with the earnings he and they have realized upon it;

F.   Declaring the 2007 Proxy Statement null and void and ordering a new Annual Meeting of Shareholders or Special Meeting of Shareholders under the supervision of a Trustee or Special Master after the preparation and distribution of a replacement proxy statement prepared in compliance with all federal disclosure rules;

G.   Pending a new election of directors, an injunction nullifying the proposed transaction between Commerce and Toronto-Dominion and appointing a Special Master or

Trustee with oversight responsibility for taking such actions as are necessary and appropriate to maximize shareholder value as more specifically described above;

     H.     A judgment finding that the Current Director Defendants have violated their fiduciary and other duties owed to Plaintiff and members of the Class;

     I.     A judgment finding that Toronto Dominion have aided and abetted the breaches of fiduciary duty by the Current Director Defendants;

     J.     A judgment against the Current Director Defendants and Toronto Dominion and in favor of the Plaintiff and members of the Class for the amount of damages sustained by members of the Class as a result of such Defendants' breaches of fiduciary and other duties by each such defendant jointly and severally in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

     K.     An order awarding Plaintiff the costs and disbursements incurred in this action, including reasonable allowances for plaintiff's attorneys' and experts' fees and expenses; and

     L.     Granting such other or further relief as the Court may deem just and proper.

Dated: December 7, 2007     **TRUJILLO RODRIGUEZ & RICHARDS, LLC**

     By:     <u>s/ Lisa J. Rodriguez</u>
     Lisa J. Rodriguez
     8 Kings Highway West
     Haddonfield, NJ 08033
     (856) 795-9002

     Richard D. Greenfield
     GREENFIELD & GOODMAN LLC
     7426 Tour Drive
     Easton, MD 21601
     (410) 745-4149

     Ira Neil Richards
     R. Andrew Santillo
     TRUJILLO RODRIGUEZ & RICHARDS, LLC
     1717 Arch Street, Suite 3838
     Philadelphia, PA 19103
     (215) 731-9004
     *Attorneys for Plaintiff Pearl E. Lucas*

Ann Kimmel Ritter
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29465
(843) 216-9166

Michael L. Testa
BASILE & TESTA, P.A.
424 Landis Avenue
Vineland, NJ 08360
(856) 691-2300

Seth D. Rigrodsky
Brian D. Long
RIGRODSKY & LONG, P.A.
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5304

*Attorneys for Plaintiff Sheetmetal Workers' National Pension Fund*

Ann Miller
ANN MILLER LLC
843 Chestnut Street, Suite 206
Philadelphia, PA 19107
(215) 238-0468

*Attorney for Plaintiff S.L. Lerner*