**<u>INVESTIGATIVE REPORT OF THE SPECIAL LITIGATION COMMITTEE
OF THE BOARD OF DIRECTORS OF COMMERCE BANCORP, INC.</u>**

**THE SPECIAL LITIGATION COMMITTEE**
NICHOLAS A. GIORDANO, CHAIRMAN
JOHN K. LLOYD
JOSEPH S. VASSALLUZZO

**COUNSEL TO THE SPECIAL LITIGATION
COMMITTEE**
MICHAEL R. GRIFFINGER, ESQ.
DAVID W. MARSTON, ESQ.
GIBBONS P.C.

**PRIVILEGED AND CONFIDENTIAL**

**FEBRUARY 2008**

## I.    INTRODUCTION

The Board of Directors (the "Board") of Commerce Bancorp, Inc. (the "Company") initially constituted the Special Litigation Committee (the "SLC") pursuant to the resolution of the Board dated February 7, 2007 (the "Resolution," a copy of which is attached hereto as Exhibit A).  Pursuant to the Resolution, the SLC's scope of purpose and authority was limited to the investigation of (i) the letters the Company received from counsel to certain of its shareholders demanding that the Company initiate legal action against certain members of the Board (the "Demands") and (ii) allegations made in certain shareholder derivative actions filed in the name of the Company against certain Company officers and directors (the "Derivative Actions"), which actions were then pending in the state and federal courts within the State of New Jersey (the "Suits").

On August 21, 2007, the Board resolved to amend the Resolution to expand the scope of the purpose and authority of the SLC, having determined that:

> in light of the several Demands and Suits, and in light of the possibility that future shareholder demands and/or shareholder derivative actions may … be submitted or filed (the "Potential Shareholder Derivative Claims") in connection with or related to the time period or conduct which are the subject of the Demand and Suits, or that other conduct warranting consideration by the [SLC] should come to its attention during the course of its investigation, it would be desirable to amend the function and authority of the [SLC] ….

Thus, the Board resolved "that the SLC be … authorized to exercise all lawful authority of the Board … in determining what action, if any, [the Company] should take with respect to the … Demands and Suits or Potential Shareholder Derivative Claims, or other conduct warranting consideration and/or action by the SLC …."  (A copy of the Board's August 21, 2007 resolution, the "Amended Resolution," is attached hereto as Exhibit B).

Accordingly, the SLC is duly empowered to investigate, report and make recommendations to the Board concerning the Demands, the Suits, the Potential Shareholder Derivative Claims and all other conduct the SLC deems as warranting consideration and/or action by the SLC.  This Report sets forth the SLC's findings pursuant to this mandate, following a brief recitation of the meetings and interviews held and other investigative steps taken by the SLC in reaching these findings.

Specifically, the SLC has investigated and made findings concerning:  (1) the Company's decision to indemnify InterArch, Inc. ("InterArch") with respect to the judgment obtained against it by DiMaria Construction, Inc. ("DiMaria") and for attorneys' fees incurred in defending the action (the "InterArch Indemnification"); (2) the allegation that Vernon W. Hill, II ("Mr. Hill"), the former Chairman and Chief Executive Officer of the Company, improperly used Company contractors at his personal residence, "Villa Collina," and/or at his shore house on Long Beach Island; (3) the fair market value of the rents under certain insider and/or insider-related party lease agreements as well as the fairness of the allocation of the property taxes and common area maintenance ("CAM") charges under the same lease agreements; and (4) the factors that caused the Office of the Comptroller of the Currency (the "OCC") to question the completeness of certain branch applications that Commerce Bank, National Association (the "Bank") and Commerce Bank/Pennsylvania, N.A. (the "Pennsylvania Bank," and together with the Bank, the "Banks") submitted to the OCC.

In addition, the SLC has thoroughly investigated, but has *not* made specific findings for the reasons hereafter set forth, with respect to:  (1) the relationship between the Bank and InterArch, and the appropriateness of the fees charged to the Bank by InterArch for its services, and (2) fees paid and/or reimbursed by the Bank relating to business entertaining conducted at

2

the Galloway National Golf Club ("Galloway"), in which several Commerce Bank directors have an ownership interest.

As discussed below in Section V, on January 4, 2008, a Memorandum of Understanding ("MOU") was executed by the relevant parties providing for the settlement and dismissal of the Derivative Actions. (A copy of the MOU is attached hereto as Exhibit C). On January 21, 2008, a Stipulation of Settlement ("Stipulation") was entered into between the relevant parties, which is now subject to approval or other action by the federal court. (A copy of the Stipulation is attached hereto as Exhibit D). Accordingly, the agreement to dismiss the Derivative Actions effectively makes moot many of the areas which the SLC would otherwise have investigated.

## II.   SPECIAL LITIGATION COMMITTEE MEMBERS

As a threshold matter, it should be noted that New Jersey courts impose an initial burden on a corporation to demonstrate that in deciding to reject or terminate a shareholder's suit the members of the board or Special Litigation Committee (1) were independent and disinterested, (2) acted in good faith and with due care in their investigation of the shareholder's allegations, and that (3) the board's decision was reasonable." In re PSE&G S'holder Litig., 173 N.J. 258, 286, 801 A.2d 295, 312 (2002).

Accordingly, one of the first actions taken in the current SLC investigation was the inquiry by Gibbons P.C. ("Gibbons"), counsel to the SLC, into whether the members of the SLC were sufficiently "independent and disinterested" such that they would be able to carry out their duties in investigating the allegations made in the Demand and the Suits.

"Directorial interest exists when divided loyalties are present, or where the director stands to receive a personal financial gain from the transaction not equally shared by the shareholders." PSE&G, 173 N.J. at 289-290, 801 A.2d at 314 (internal quotations and citations

omitted).  "A director is not to be viewed as being 'interested' merely because he or she may have approved the challenged transaction or because a shareholder alleges that the director would be reluctant to sue a fellow corporate decision-maker."  Id. (internal quotations and citations omitted).  "Directorial independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous consideration or influences."  Id. (internal quotations and citations omitted).

Where the directors' decisions in considering the merits of a shareholder derivative suit are based on "factors relating to the best interest of the corporation and not on extraneous considerations," the directors will likely be found to be disinterested and independent.  PSE&G, 173 N.J. at 290, 801 A.2d at 314.  On the other hand, where the directors have "divided loyalties," where they stand to receive any "improper personal gain," or were they are "unduly influenced by any improper motive," they are not likely to be found to be disinterested and independent.  PSE&G, 173 N.J. at 290-291, 801 A.2d at 314-315.  Notably, the level of disinterestedness and independence a director must possess if his or her decision to terminate a shareholder derivative suit is to be given effect is decidedly different from our "everyday" understanding of these concepts.  PSE&G, 173 N.J. at 297, 801 A.2d at 320.

Applying the foregoing standards, on September 12, 2007, Gibbons, through Michael R. Griffinger, Esq. and David W. Marston, Esq., extensively questioned each member of the SLC concerning their respective disinterestedness and independence.  The members of the SLC, and their business and professional affiliations, are set forth below:

- Chairman of the SLC Nicholas A. Giordano joined the Board of the Company and the Bank in or about May 2007.  Mr. Giordano has been a business consultant and investor since 1997.  Mr. Giordano was Interim President of LaSalle University from July 1998 to June 1999.  From 1981 to 1997, Mr. Giordano was President and Chief Executive Officer of the Philadelphia Stock Exchange.  In addition, Mr. Giordano serves as a trustee of W.T. Trust and Kalmar Pooled Investment Trust, mutual funds, and as a director of

4

Independence Blue Cross of Philadelphia, a health insurance company, The RBB Fund, Inc., a mutual funds company, and Intricon Corporation, a manufacturing company.

- John K. Lloyd has been a Director of Commerce and the Bank since October 2004, and has been President and Chief Executive Officer of Meridian Health since 1997. Mr. Lloyd was the President and Chief Executive Officer of Jersey Shore Medical Center from 1982 to 1997.

- Joseph S. Vassalluzzo was elected a director of the Company in May 2005. Mr. Vassalluzzo has been an independent advisor to retail organizations, with a primary emphasis on real estate, since August 2005. From 1989 until August 2005, he held executive and senior leadership positions with Staples, Inc. Previously, he held management, sales, operations and real estate positions with Mobil Corp., Amerada Hess Corp., and American Stores Company. Mr. Vassalluzzo is the Non-Executive Chairman of the Board of Trustees of Federal Realty Investment Trust, a publicly held real estate investment trust, and he also is a director of iParty Corporation, a publicly held retailer of party goods, and Life Time Fitness, Inc.

Upon completion of these inquiries, counsel to the SLC concluded that the members of the SLC are both disinterested and independent. Gibbons also determined that it is independent and disinterested under applicable standards.

## III.   INVESTIGATIVE PROCESS

The following section provides a brief recitation of the meetings, interviews, document examinations, and other investigative steps taken by the SLC. It should also be noted at the outset that the Company's current directors and officers have cooperated fully with the SLC in carrying out its investigation. As will be noted, however, the SLC did not receive full cooperation from Mr. Hill or from certain Blank Rome attorneys who previously represented the Bank. Lacking the subpoena power to compel testimony, and also the power to immunize witnesses to obtain reluctant testimony, the SLC was limited in its ability to counter such non-cooperation.

In order to frame its investigation, the SLC, through Gibbons,[1] has met (in some instances, numerous times) with the following individuals concerning the topics indicated:

- Michael Critchley, Sr., Esq. former acting general counsel of the Company, and Michael Critchley, Jr., Esq., both of Critchley and Kinum, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- Richard M. Alexander, Esq., of Arnold & Porter LLP, regulatory counsel to the Company, concerning the OCC's investigation of the Company, the Stipulation and Consent to the Issuance of a Consent Order ("Consent Order") dated June 28, 2007, the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- William M. Tambussi, Esq., of Brown & Connery, LLP, counsel to the Company, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- Certain counsel to the plaintiffs-shareholders in the Suits, including Richard Greenfield, Esq., of Greenfield & Goodman LLC, Ira N. Richards, Esq. and Lisa J. Rodriguez, Esq., both of Trujillo Rodriguez & Richards, LLC, Seth D. Rigrodsky, Esq. and Brian D. Long, Esq., both of Rigrodsky & Long P.A., Joseph F. Rice, Esq. and Martha H. Rhodes, Esq., both of Motley Rice LLC, concerning the allegations made in the Demands and the Suits; and

- OCC representatives, including Richard Stearns (Director, Enforcement and Compliance), Timothy Long (Senior Deputy Comptroller), Jennifer Kelly (Deputy Comptroller), and Kevin Lee (Enforcement Counsel), concerning the OCC's investigation of the Company, the Consent Order, the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC.

The SLC, again through Gibbons, has interviewed (either in person or telephonically) the following directors, officers, and/or employees of the Company and/or the Bank concerning the topics indicated:

- Robert D. Falese, President and Chief Executive Officer of the Bank, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

---

[1] During the course of this investigation, Messrs. Griffinger and Marston have met with the members of the SLC on numerous occasions. These meetings have been held to acquaint counsel to the SLC with the underlying issues, to report Gibbons' findings to the SLC as they are made, and to obtain the SLC's input and direction with respect to the investigation.

- Jack R. Bershad, a director of the Company since 1987 and a retired partner of the law firm of Blank Rome LLP, concerning the allegations made in the Demands and Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular, Mr. Bershad was questioned concerning the InterArch Indemnification;

- Dennis M. DiFlorio, Chairman of the Bank, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular Mr. DiFlorio was questioned concerning the InterArch Indemnification;

- George E. Norcross, III, Chairman and Chief Executive Officer of Commerce Insurance Services and a Director of the Company, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- Douglas J. Pauls, Executive Vice President/Chief Financial Officer, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- Andrew J. Logue, Senior Vice President, Chief Financial Officer - Lending Division, in his capacity as a custodian of documents and with respect to the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- Joseph T. Tarquini, Jr., A.I.A., a member of the Board and the Audit Committee, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC, including the InterArch Indemnification;

- Fred Graziano, the Company's President of Regional Banking, concerning the allegations made in the Demands and the Suits, as well as other warranting investigation that have come to the attention of the SLC, including the relationship between InterArch and the Bank;

- David Wojcik, Senior Vice President, Chief Regulatory Officer, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular, Mr. Wojcik was questioned concerning the branch applications that the Banks submitted to the OCC;

- Daniel J. Ragone, a member of the Board, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC, including the InterArch Indemnification;

- Robert D. Dunlop, Senior Vice President/Director, Corporate Security & Investigations, concerning the allegations made in the Demands and the Suits, as

7

well as other matters warranting investigation that have come to the attention of the SLC;

- James J. Power, Deputy Director/Vice President, Corporate Security & Investigations, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- Thomas H. Arasz, Senior Vice President, Community Reinvestment Officer, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular, Mr. Arasz was questioned concerning the branch development process and the appraisals commissioned by the Company in connection with certain insider and/or insider-related party transactions;

- Michael Carbone, Market President, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC;

- Susan U. Bredehoft, CBA, CRP, Senior Vice President, Compliance Management, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular, Ms. Bredehoft was questioned in her capacity as the administrator of the Company's "whistleblower" hotline;

- Jon A. Sandeen, Senior Vice President, Director of Development, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular, Mr. Sandeen was questioned concerning the branch development process at the Company, both historically and presently;

- Gerry S. Guidice, Senior Vice President, Facilities, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular, Mr. Guidice was questioned concerning the Company's branch development process and the relationship between InterArch and the Bank; and

- Mary Frayman, Senior Vice President, Real Estate, concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC; in particular, Ms. Frayman was questioned concerning the Company's branch development process.

Additionally, in the course of its investigation, the SLC, again through Gibbons, has interviewed the following individuals who are not affiliated with the Company or the Banks as directors, officers and/or employees, concerning the topics indicated:

8

- An attorney previously employed by Blank Rome LLP, regarding the legal issues related to the InterArch Indemnification;

- A principal in a mechanical contractor company, regarding work his company performed both for the Company and at Villa Collina, and the payment and terms regarding the same;

- A principal at a general contracting company, regarding work his company performed both for the Company and at Villa Collina, and the payment and terms regarding the same;

- A principal at a stone fabrication and installation contracting company, regarding work his company performed both for the Company and at Villa Collina, and the payment and terms regarding the same;

- A principal at a commercial glazing sub-contracting company, regarding work his company performed both for the Company and at Villa Collina, and the payment and terms regarding the same;

- A principal at an engineering firm, regarding work his company performed for the Company and the allegations made in the Demands and the Suits; and

- A real estate broker in New York, concerning fee issues relating to the Company's lease of property located in Thornwood, New York.

In addition to meeting with, and interviewing, the preceding individuals, the SLC's investigation has included the following:

- review and analysis of numerous documents concerning the Company, including the Company's SEC filings; the Demands; the complaints initiating the Suits and any amended complaints filed in the Suits; the complaints initiating certain class action lawsuits filed against the Company and certain of its directors in connection with Toronto-Dominion Bank's contemplated acquisition of the Company; the Consent Order, Company documents concerning the branch development process, including its real estate files, construction files and branch applications; documents concerning the Company's joint development projects and insider and insider-related party transactions; background information concerning Mr. Hill and his wife, Shirley Hill; and recent press reports concerning the Demands and the Suits, among other things;

- requested information from Mr. Hill regarding his use of Bank vendors at his personal residence.  This request was made through Andrew L. Sandler, Esq., of Skadden, Arps, Slate, Meagher & Flom LLP, counsel to Mr. Hill.  As described more fully below, Mr Hill's counsel did not provide any relevant information in response to this request from the SLC;

9

- requested by letter dated November 23, 2007 that certain Blank Rome attorneys, who participated in the Blank Rome Memorandum concluding that there was a legal and factual basis to indemnify InterArch, agree to be interviewed by counsel to the SLC; this request was made to Gilbert Greenman, counsel to Blank Rome LLP, of Williams & Connolly LLP; in a letter dated December 10, 2007, Mr. Greenman informed counsel to the SLC that the requested interviews were "unwarranted"; and declined to make the Blank Rome attorneys available for interviews.

- review and analysis of the Company's evaluation of the fair market value of the rents under certain insider and/or insider-related party lease agreements as well as the fairness of the allocation of the property taxes and CAM charges under the same lease agreements;

- review and analysis of documents concerning the InterArch Indemnification;

- review and analysis of the basis on which certain branch applications that the Banks submitted to the OCC were questioned by the OCC as to completeness;

- review and analysis of the Company's relationships with certain contractors that have performed work both for the Company and at the Hills' personal estate, Villa Collina, and at their shore house on Long Beach Island;

- legal research regarding whether a shareholder may assert a claim under section 14(a) of the Securities Exchange Act of 1934 in the context of a shareholder derivative suit, as is the case in at least one of the Suits; and

- legal research regarding how the citizenship of a trust is determined for purposes of evaluating whether the diversity jurisdiction of the federal court may be invoked inasmuch as one of the Suits was brought by a trust.

If the proposed settlement of the Derivative Actions had not been reached, the SLC had intended to interview a number of other individuals concerning the allegations made in the Demands and the Suits, as well as other matters warranting investigation that have come to the attention of the SLC. The proposed settlement, however, effectively moots the necessity for a number of these interviews and other avenues of investigation.

As described above, the SLC, through counsel, has had repeated communications and meetings with Richard M. Alexander of Arnold & Porter, the Bank's OCC counsel. Mr. Alexander has been generous with his time and counsel, and has described in detail the regulatory issues which have been raised and/or addressed in the Bank's recent history.

On November 27, 2007, following a brief meeting at Mr. Alexander's office in Washington D.C., counsel to the SLC met with OCC Deputy Comptrollers Timothy Long and Jennifer Kelly at the OCC.  There was a brief discussion of the origin and authority of the SLC, followed by a summary of the SLC's investigative priorities and techniques.  Counsel shared with Mr. Long and Ms. Kelly certain documents that the SLC discovered during the course of its investigation and which were of interest to the OCC.

Following that meeting, SLC counsel met with OCC Enforcement Counsel Kevin Lee (in person) and Rick Stearns (by phone).  There was a more comprehensive discussion of the SLC investigation, including a sharing of the results of the SLC inquiry into the InterArch Indemnification.  SLC counsel expressed a willingness to cooperate with the OCC inquiries, and a hope that the OCC would also suggest priorities for the SLC inquiry which might be fruitful.

As a result of these discussions, the SLC decided to seek access to certain public and non-public information in the possession of the OCC which might advance the SLC investigation by means of a "Part 4" request (similar to a Freedom of Information Act request) to the OCC.  Procedures for a Part 4 request are set forth at 12 C.F.R. Part 4, Subpart 4.  Counsel prepared and submitted such a request to the OCC on December 3, 2007.  On February 5, 2008, however, the OCC advised counsel to the SLC that it intended to deny the Part 4 request, on the grounds that any non-public information made available to the SLC might also be discoverable by other third parties.

## IV.     SLC FINDINGS

The following section discusses the SLC's findings.  Specifically, this section includes an analysis of: (1) the Company's decision to indemnify InterArch with respect to the judgment obtained against it by DiMaria and for attorneys' fees incurred in defending the underlying action; (2) the allegations that Mr. Hill improperly used Company contractors at the Hills'

personal residence, Villa Collina, and/or at their shore house on Long Beach Island; (3) the fair market value of the rents under certain insider and/or insider-related party lease agreements as well as the fairness of the allocation of the property taxes and CAM charges under the same lease agreements; and (4) the factors which have caused the OCC to question the completeness of certain branch applications submitted by the Banks to the OCC.

In addition, the SLC has thoroughly investigated, but has *not* made specific findings for the reasons hereafter set forth, (1) the relationship between the Bank and InterArch, and the appropriateness of the fees charged to the Bank by InterArch for its services, and (2) fees paid and/or reimbursed by the Bank relating to business entertaining conducted at Galloway, in which several Commerce Bank directors have an ownership interest.

### A.      **InterArch Indemnification**

The InterArch Indemnification issue stems from a dispute between InterArch and DiMaria. The Bank entered into two contracts with DiMaria in December 1993, one to supervise and manage the construction of the interior offices, and the other to install heating and air conditioning units in the Bank's commercial office building in Mount Laurel Township, New Jersey. DiMaria Constr. Inc., v. Interarch, et al., 351 N.J. Super. 558, 562 (App. Div. 2001). (A copy of this opinion is attached hereto as Exhibit E). The Bank hired InterArch to do the balance of the interior. Id. Raymond Klumb was the architect of the interior fit-out project, and Nancy Seifert was the manager of the project for the Bank. At trial, Seifert claimed that Mrs. Hill was actually "in charge" of the project and that orders were taken from Mrs. Hill, even though Mrs. Hill was not technically her supervisor. Id. at 563. Furthermore, Seifert described Mrs. Hill as a "difficult person to work for." Id.

During the course of the project, Mrs. Hill requested more than fifty (50) changes to the planned work for which DiMaria prepared change orders.  Id.  According to Seifert, this was a large number of change orders for a project of this size.  The Appellate Division's opinion thoroughly describes the dispute that ensued between the parties regarding the completion of construction phases and when phase one of the construction was to be completed.  Id. at 563-564.[2]  As a consequence of these disputes, in early April 1994, the Bank's Executive Vice President, Dennis DiFlorio, and Mrs. Hill began discussing terminating DiMaria from the project.  Seifert testified at trial that she was in the room with Mrs. Hill and Mr. DiFlorio when the decision to terminate DiMaria was made, and that the decision was made by Mrs. Hill.  On April 14, 1994, Klumb signed a certification stating that DiMaria had breached the contract terms by failing to complete phase one by the required date.  Id. at 564.  That same day, the Bank sent a notice to DiMaria terminating both of its contracts on the grounds that DiMaria had breached the interior office contract by failing to complete phase one of the project by the required date.  Id. at 564.  The letter also provided that the HVAC contract was terminated and explained that DiMaria had failed "to provide enough properly skilled workers or proper materials to complete phase 1, and to properly supervise and manage the job. . . ."  Id. at 564-65.

---

[2] The Appellate Division explained that:

> The parties disputed when DiMaria completed phase one.  According to Seifert, the completion of phase one was delayed by the poor quality of the plans prepared by Interarch from which DiMaria was working. . . .
>
> In early April, Hill and DiFlorio began discussing terminating DiMaria from the project and soon decided that DiMaria would be fired.  Seifert disagreed with DiFlorio's decision to fire DiMaria and discussed her opposition with them.  Seifert concluded that the change orders extended the contract completion date by approximately fifty working days and that therefore DiMaria was not late.  [Seifert] reported the results of her analysis to Hill, but Seifert had the impression that Hill had already made up her mind.

Id. at 564.

On October 21, 1994, DiMaria brought an arbitration action against the Bank with the American Arbitration Association ("AAA") for breach of contract. The arbitrators awarded DiMaria $205,270.00 for the interior office and HVAC contracts, $49,650 for "damages suffered by DiMaria related to all other contractual topics" and $69,554.66 for counsel fees.[3]

In February 1996, DiMaria filed a complaint in New Jersey Superior Court against InterArch, Mrs. Hill and Klumb alleging that they tortiously interfered with the prior construction contract and interfered with DiMaria's prospective economic advantage. DiMaria argued that Mrs. Hill and Klumb intentionally interfered with the contract by executing and publishing a certification providing that DiMaria had not completed phase one by the completion date. The jury awarded compensatory damages in the amount of $750,000.00 against InterArch and additional punitive damages -- against Shirley Hill in the amount of $75,000.00 and against Klumb for $75.00 -- for interference with the contractual relationship between DiMaria and the Bank. Id. at 566. After post-trial motions, the trial court supplemented the award by $155,388.75 in prejudgment interest. Id.

On appeal, the Appellate Division addressed the defendants' contention that the trial judge erred in refusing to dismiss the plaintiff's claim for tortious interference with a business relationship. The defendants' argument was twofold: (1) they could not be liable of tortious interference because they acted as agents of the Bank; and (2) there was insufficient evidence from which the jury could conclude they acted with malice. Id. at 567. In addressing this argument, the Appellate Division explained that, "[h]ere with regard to their roles in DiMaria's firing, the record could support either a finding that defendants acted within the scope of their

---

[3] The awards at arbitration were confirmed in the Law Division and affirmed on appeal. Commerce Bank v. DiMaria Constr., 300 N.J. Super. 9, 13, 21, 692 A.2d 54 (App. Div.), certif. denied, 151 N.J. 73, 697 A.2d 546 (1997), cert. denied, 522 U.S. 1116, 118 S. Ct. 1053, 140 L. Ed. 2d 116 (1998)).

agency or that they acted from personal interest and thus stepped outside of their agency."  Id. at

570.  The Court stated that there was:

> evidence to support DiMaria's thesis that Hill and Klumb acted in
> their own personal interest when they recommended firing
> DiMaria.  The project was delayed because of the abnormal
> number of changes that Hill requested and the poor quality of the
> plans drafted by Interarch.  Pressure was put on Hill and Klumb to
> complete the project in time for the May stockholder's meeting.
> Accordingly, these facts would support a finding that Hill and
> Klumb fired DiMaria in order to blame DiMaria for all the project
> delays.

Id. at 570.  The Appellate Division rejected the defendants' argument and agreed with the trial

judge's conclusion that "defendants Hill and Klumb had acted with malice and in bad faith when

they dismissed plaintiff and therefore had acted outside the scope of their agency."  351 N.J.

Super. at 572 ("we agree with Judge Chaiet that it was implicit in the jury's verdict that

defendants acted outside the scope of their agency").   Accordingly, the Appellate Division

concluded that no reversible error had occurred at trial and affirmed.  Id. at 576.  The Supreme

Court of New Jersey granted certification and affirmed.  172 N.J. 182 (2002).

To this point, then, DiMaria's claims against the Bank had been adjudicated and/or

reviewed in five separate tribunals, from the AAA arbitrators through the New Jersey Court

System, to the Supreme Court of the United States, and DiMaria's claims against InterArch,

Shirley Hill, and Raymond Klumb had been adjudicated in three separate tribunals in the New

Jersey Court System, from a jury trial to the Supreme Court of New Jersey.  DiMaria prevailed

in every forum.

## 2.    **InterArch Indemnification Demand**

Nevertheless, in a demand letter dated August 16, 2001, InterArch, Mrs. Hill, and Klumb,

all represented by L. Oliver Frey ("Frey") of Frey Petrakis Deeb & Blum P.C., sought

indemnification from Commerce for InterArch's payments to DiMaria (the "Frey demand letter";

15

a copy of this letter is attached hereto as Exhibit F).  Specifically, the letter states that "[s]ince the actions that Interarch, Shirley Hill and Ray Klumb undertook in regard to DiMaria Construction Company's presence at the Commerce University site were done at the specific request of Commerce Bank, it is Commerce Bank's responsibility and obligation to reimburse them the attorney's fees, costs, and ultimate verdicts."

Several elements of the Frey demand letter are highly unusual.  First, Frey states that his firm is "counsel to Commerce Bank, N.A. on many other matters . . ." and therefore " . . . we obviously are unable to do more than simply *request* indemnification on behalf of these parties . . ."  (emphasis added).  In short, Frey is a <u>*Bank lawyer asserting a demand, on behalf of the Bank's Chairman's wife, against the Bank, and his entire legal effort is paid for by the Bank*</u>.  If his indemnification demand were refused or even resisted, Frey makes clear in advance that he is not in a position to take any more aggressive action, such as filing a lawsuit.  Moreover, there was an inherent conflict of interest in Frey representing the defendants seeking indemnification but also representing the bank "in many other matters" because of the divergent interests of the parties; namely, the agent's (InterArch's) interest was to be indemnified while the principal's (the Bank's) interest theoretically would have been to avoid indemnification at all costs.

It is not clear whether anyone at the Bank or Blank Rome, the Bank's outside counsel for this matter, ever asserted Frey's conflict.  Frey states that any other law firm "…may be *much bolder* in its request and possible prosecution of such claims against Commerce Bank." (emphasis added).[4]

---

[4] Frey also provides in this letter that "while we are aware of the close twenty-seven year relationship of the Bank and InterArch, these issues of conflict on 'back door' claims may exist from time to time.  The Bank should endeavor to protect itself and its agents in an unified manner so that such claims are eliminated now and in the future."

Frey asserted that indemnification was proper since the actions relating to the commercial dispute were carried out only at the direction of the Bank.  And despite the repeated judicial determinations that InterArch was the liable party - even being responsible for punitive damages - the Bank did not dispute Frey's contention.  Rather, in a letter to Robert C. Beck of Parker McCay & Criscuolo and Jack Bershad dated August 23, 2001, Mr. DiFlorio stated that "[t]he facts are that InterArch interfaced with DiMaria on our behalf and as part of their contract with us for design services and contract administration."  This letter also stated that "[a]s it became clear to [DiFlorio] that DiMaria could not perform under his contract with us, I decided that he needed to be terminated.  I must honestly state that any steps taken by Interarch relating to DiMaria's termination were done at my direction and within the scope of Interarch's assignment." Id.

Whatever role DiFlorio played in terminating DiMaria, it was clearly based on information furnished to him by Shirley Hill, InterArch, and Raymond Klumb.  Moreover, the demand for indemnification was analyzed in a December 18, 2001 memorandum prepared by Blank Rome attorneys for a Company Special Committee consisting of Frank C. Videon, Sr., Daniel J. Ragone, and Joseph T. Tarquini, Jr.  That memorandum concluded that "[t]here was a legal and factual basis for the Bank to indemnify the Claimants for the judgment with respect to compensatory damages, interest thereon and cost of defense, including attorneys fees."

After reviewing the Blank Rome memorandum, David Wojcik ("Wojcik"), the Company's senior executive with responsibility for dealing with the OCC, expressed "serious reservations" about the proposed indemnification.[5]  (See Email from Wojcik to Jack Bershad at

---

[5] In his email to Bershad, Wojcik warned that:

> [w]hat Commerce pays Interarch is already a big number and it gets bigger every year.  I don't know how indemnification would have to be disclosed, but I

Blank Rome dated December 17, 2001; attached hereto as Exhibit G).  Wojcik questions whether indemnification would be approved for an "unrelated vendor," whether "our Blanket Bond carrier would want to fight vigorously not to pay," and also warns that "…I wouldn't want to give a union shareholder additional ammunition to shoot at the Commerce/Interarch relationship…."[6]

Jack Bershad forwarded Wojcik's email to Larry Wiseman, a Blank Rome attorney, with the note, "please look at this and call me."  There is no further reference made in any other emails or meeting minutes to the "serious reservations" expressed by Wojcik.  According to interviews conducted by the counsel to the SLC, Wojcik's email was never disclosed to the

---

> know that I wouldn't want to give a union shareholder additional ammunition to shoot at the Commerce/Interarch relationship.  Is indemnification something that might lead to a shareholder's suit over the relationship?  I don't know, but I see lots of risks to Commerce and to Interarch that don't seem worth taking given the money that Interarch has made off Commerce in the past and what they'll continue to make in the future. (I presume that Interarch has appropriate professional conduct insurance to offset some if not the brunt of the verdict.)
>
> I believe that the OCC would look at any indemnification of Interarch in a very circumspect manner and will likely be very judgmental in reviewing how the board handles the situation. Even the purest of relationships must continually prove itself as being above reproach.

[6] Wojcik further noted that:

> [t]o the extent that the verdict in favor of DiMaria withstands appeal and Interarch's actions are viewed as intentional interference and are apart from actions as agents in context with Commerce's lost arbitration case, why should Commerce pay for their actions?  Again, if I were an examiner reviewing the matter, I would ask how the bank might react to such a claim from an unrelated vendor, given that the bank already had to pay the contractor via the lost arbitration action, given that Interarch failed to give Commerce timely notice of its intent to hold Commerce liable for a jury's finding against them . . . and given the report's [prepared by Blank Rome attorneys] suggestion that compensatory damages were dictated from a finding that the actions of the claimants necessitated the award of punitive damages . . . . Would we be quick to pay under different circumstances?

Audit Committee, composed of Frank C. Videon, Sr., Daniel J. Ragone, and Joseph T. Tarquini, which ultimately recommended indemnification to the Board.

The Company's Audit Committee considered the indemnification issue on December 18, 2001. The minutes from that meeting provide that "the Committee concluded that it would recommend to the full Company Board that the Company should indemnify against and pay the compensatory damages and current and future interest and legal fees incurred by InterArch, Shirley Hill and Ray Klumb" in the DiMaria litigation, "but should not indemnify against and pay punitive damages." (December 18, 2001 Audit Committee Meeting Minutes, at p. 3). There is no analysis of the court opinions in the meeting minutes of the Audit Committee, and no mention of Wojcik's email or of the concerns expressed by Wojcik in his e-mail. The InterArch Indemnification was ultimately approved by the full Board at its meeting on January 15, 2002. We understand that Commerce indemnified the indemnitees in the amount of approximately $1,600,000.00 consisting of compensatory damages, prejudgment interest included in the judgment interest thereon, and for the legal fees and expenses incurred in the losing defense of DiMaria's claims provided by the firms of Frey Petrakis Deeb & Blum P.C. and Sterns & Weinroth.[7]

### 3.      Analysis of Propriety of the InterArch Indemnification

The SLC has attempted to determine the propriety of the InterArch Indemnification by assessing the fullness of disclosure made to the Special Committee and the Board, and also by analyzing whether the legal advice given to the Special Committee and the Board had as its

---

[7] Counsel to the SLC does not believe that the fact that InterArch was paid the indemnification monies was publicly disclosed with specificity. Rather, in Commerce's 2002 SEC filings, there is a $8.1 million figure disclosed as the total amount paid to InterArch in 2002, which appears to include the InterArch indemnification amount. The SEC filing describes the $8.1 million paid to InterArch in 2002 as $4.6 million in architectural/design fees and $3.5 million in "project management" fees - there is no mention of indemnification. It further appears that the 2002 total of $8.1 million is a very substantial increase from the past years.

primary objective the vigorous protection of the Bank's interests.  Viewed through this prism, the SLC has determined that the Special Committee and the Board were not fully apprised by their counsel of the full arsenal of legal defenses available to defeat the indemnification demand -- some of which may have been dispositive of the indemnification claim -- and consequently, the Special Committee and the Board could not have known that indemnification was improper.

### 4.      Commerce Defenses Not Asserted in the InterArch Indemnification

As stated above, an initial defense to the indemnification demand was the fact that it was asserted _against Commerce by a Commerce lawyer_, Oliver Frey.  It would be standard practice for a client to demand that its lawyer not bring a demand against it, or, in the alternative, to object to such representation, assert a disqualifying conflict and decline to engage that lawyer for future representations.  With respect to Oliver Frey, the Bank appears to have done nothing.

As to the claim itself, there are at least three obvious legal defenses the Bank should have asserted against InterArch.  The first and most obvious defense is based upon the specific findings of the trial court and the Appellate Division that the conduct of InterArch, Shirley Hill and Raymond Klumb was "malicious," "intentional," in "bad faith" and "outside the scope of their authority" as agents of the Bank.  As such, N.J.S.A. 14A:3-5(8) provides that "no indemnification shall be made to . . . a corporate agent if a judgment . . . establishes that his acts or omissions . . . (b) were not in good faith . . ."[8]  If indemnification is not permitted by New Jersey's Business Corporation Act, then it is not permitted under the Bank's by laws.

The second basic legal defense that was not asserted on behalf of the Bank is that a party against which a common law indemnity claim is asserted may defend against the claim by alleging and proving that the purported indemnitees were "at fault" whether by negligence, or other

---

[8] The memorandum prepared by Blank Rome and furnished to the Audit Committee, upon which it relied in recommending indemnifications, stated, curiously and without further explanation that the judgment in the DiMaria action "does not explicitly establish any of these factors."

tort (including tortious interference with contractual rights) or intentional wrongdoing.  Pursuant to cases discussing Rule 4:7-5(b) of the New Jersey Court Rules, an "indemnitee[] can only recover costs and counsel fees if the indemnitee is itself found free from fault."  Since punitive damages were assessed against defendants, <u>Mantilla v. NC Mall Associates</u>, 167 (N.J. 262 (2001), is informative.  In that case, the Supreme Court of New Jersey held that an indemnitee is entitled to recover costs and counsel fees as part of his damages *only* where the indemnitee is *<u>found to be free from fault</u>*.  The fact that $75,000.00 in punitive damages was awarded against InterArch would indicate, *prima facie*, that InterArch was at fault.  Moreover, the Appellate Division's and the trial court's findings that evidence in the record demonstrated that "defendants Hill and Klumb had acted with malice and in bad faith when they dismissed plaintiff and therefore had acted outside the scope of their agency" clearly demonstrated that defendants were not free from fault, and therefore, they were potentially precluded from indemnification. <u>See</u> 351 N.J. Super. at 572.

The last basic legal defense that was not asserted on behalf of the Bank is the "entire controversy" doctrine, which essentially requires that all parties to any litigation be included in the litigation from the beginning.  Counsel to the SLC has advised the SLC that there are technical legal reasons why this defense might have been challenged if asserted by the Bank, but that it certainly should have been presented to the Board and considered.  It was not.  At no time did InterArch, Shirley Hill or Raymond Klumb seek to join the Bank as a party in the multiple lawsuits.  The demand for indemnification was only made *after* the damages against the three defendants had been fully adjudicated and all appeals exhausted.

After extensive discussion of the "entire controversy" legal doctrine in various internal Blank Rome memoranda, the doctrine was not mentioned in the final legal memorandum.  A

Blank Rome attorney addressed this omission with another Blank Rome attorney, asking in an email: "was there a conscious decision to omit any discussion of NJ's entire controversy doctrine from the final memo?"  Someone responded by scribbling the single word "Yes" on the email.

     **5.**     **<u>Conclusion</u>**

As discussed above, it appears to the SLC that the Special Committee and the Board were not properly apprised of the legitimate -- and perhaps dispositive -- defenses that were available to the Company and which would have indicated to the Special Committee and the Board  that indemnification was improper.  Of particular concern to the SLC is the apparent absence of any attempt to resist the indemnification and/or any attempt to negotiate the indemnification payment in a situation where the indemnitee - as demonstrated by the final judgments of the Law Division, Appellate Division, and Supreme Court of New Jersey - was clearly <u>*not*</u> free from fault.

As a result of the inherent conflicts and failure to advise the Bank of viable legal defenses surrounding the InterArch Indemnification, it is our understanding that the Company has deducted, from amounts owed by it to InterArch, the amount of the indemnification payment.  In addition, on January 14, 2008 relying on the conclusions of the SLC investigation, the Company filed suit, in the Superior Court of New Jersey, Law Division, Camden County, against InterArch, Shirley Hill and Raymond Klumb, seeking a declaratory judgment that: (1) the Bank had no duty pursuant to <u>N.J.S.A.</u> 14A:3-5(8) to indemnify InterArch, Shirley Hill and Klumb; and (2) that the Bank is entitled to recoupment of approximately $1.6 million which it paid in connection with the indemnification.   In the complaint, the Bank also seeks damages for InterArch's breach of contract.  (A copy of the complaint filed by the Bank is attached hereto as Exhibit H).

B.    __Allegations Pertaining to Villa Collina__

The SLC investigated allegations to the effect that construction company vendors who did work for the Bank also did work at the Hills' Moorestown, New Jersey residence, Villa Collina, and/or at their shore house on Long Beach Island, either *gratis* or at discounted rates. Counsel to the SLC was advised that at least one vendor complained to a Company executive at being required to perform discounted work at Villa Collina as the price of continuing to do extensive work at the Bank branches.  In addition, counsel to the SLC has been advised that the OCC has made inquiries to the Bank regarding this subject.

This subject was also addressed in a Demand Letter to the Board dated March 20, 2007, in which counsel for derivative plaintiff S.L. Lerner alleged that "…certain architects, contractors and other entities which do business with the Company in consideration of the ability of Vernon Hill to direct such business, did and do provide construction materials and services to Mr. Hill and his wife, for their personal residences and other real estate owned by them, at below market rates and/or are provided *gratis*…."  (Lerner Demand Letter, page 10).  During various interviews with Company and non-Company employees, the SLC confirmed that contractors used by the Bank have also been used to provide services at Villa Collina, however, the SLC was repeatedly informed that any such work was performed for at least market value.

In an effort to determine the facts on this subject, counsel to the SLC, by letter dated November 9, 2007 (Exhibit I) requested that Mr. Hill supply the SLC with:

> …a comprehensive list of Commerce vendors, *if any,* which have also been employed for work at your "personal residences and other real estate owned" by you and your wife.  The inclusion of details such as dates and description of work done, basis and amount of payment, and any other explanatory information would, of course, assist the SLC in reaching a prompt resolution with regard to this allegation.

Mr. Hill's counsel replied stating that "Mr. Hill intends to cooperate with the investigation by the Special Litigation Committee…" but that the receipt of documents previously requested by Mr. Hill from Commerce was, in effect, a precondition for such cooperation.

Counsel to the SLC replied, on December 10, 2007, asserting that Mr. Hill had a fiduciary duty to cooperate with the SLC without preconditions, and renewed the SLC's request for the documents relating to Villa Collina.  Counsel to the SLC further stated that:

> If Mr. Hill declines to provide such information, the SLC will draw a negative inference from that decision, and will include such negative inference in its ultimate Report to the Court.

Despite these repeated requests by the SLC, no information was ever provided to the SLC by Mr. Hill, and the SLC is therefore forced to draw a negative inference.   (The exchange of correspondence between counsel to the SLC and counsel to Mr. Hill is set forth in Exhibit J).

The SLC has undertaken extensive efforts to determine the propriety of the work performed by Commerce contractors at the personal residences of the Hills.  In doing so, the SLC spoke with Commerce Chief Financial Officer Doug Pauls about the use by Mr. Hill of contractors at Villa Collina and/or at his Long Beach Island house.  Mr. Pauls reported to the SLC that Mr. Hill had directed him to scrupulously review any billings from these vendors to make sure that there was no question about the bank paying for any work done at Villa Collina or the LBI house.  Mr. Pauls indicated that he did so, and found no improprieties.  These findings were confirmed by various interviews conducted by counsel to the SLC.

Counsel to the SLC interviewed numerous contractors who performed work both for the Bank and for the Hills at their personal residences.  Every contractor interviewed confirmed that work was not done for free, and that the client was never the Bank and/or the Company.

Specifically, the SLC interviewed principals from: (1) a mechanical contracting company;[9] (2) a general contracting company; (3) a stone fabrication and installation contracting company; (4) a commercial glazing sub-contracting company; and (5) an engineering firm regarding the allegations that certain contractors which do business with the Company were directed to provide services for the Hills at below market rate in consideration of the ability to continue to do such work for the Company.

Every contractor interviewed regarding these allegations stressed that not only was the work not performed for below market rate, but that the work for the Hills was extraordinarily difficult.  In fact, many of the contractors noted that completion of their project(s) was impeded due to a large number of change orders submitted during the process.  Still, every contractor confirmed that they had been paid at least market rate for their work and that they were never asked to perform such work for below market value.  Accordingly, despite the negative inference drawn from Mr. Hill's non-cooperation, the SLC did not discover any evidence of wrongdoing to substantiate the allegations that certain contractors which do business with the Company were directed to provide services for the Hills at below market rate in consideration of the ability to continue to do such work for the Company.

---

[9] John Rihl, a principal in Costa & Rihl, Mechanical Contractors, advised counsel to the SLC in an interview on November 26, 2007 that he had done work both for the Bank and at Villa Collina since at least 2000.  Rihl typically priced the work through a general contractor and he acted as a sub-contractor.  In his most recent work at Villa Collina, InterArch acted as the general contractor.  Rihl stated that the Villa Collina work was "always slow pay" and that he sometimes felt as if he was "financing" the projects.  Once his interview with the SLC was scheduled, however, several days later he was paid in full by InterArch an amount (counsel to the SLC believes the amount to be $60,000.00) which had been outstanding for more than a year.  Counsel to the SLC believes that it is fair to draw the inference that the two events were not unrelated.

**C.   The Fair Market Value of the Rents Due Under Certain Insider / Insider-Related Party Lease Agreements, and the Allocation of Property Taxes and CAM Charges Under the Same Lease Agreements**

In connection with its mandate under the Consent Order, the Company's Real Estate Review Committee investigated the fair market value of the rents charged under certain insider and/or insider-related party lease agreements as well as the fairness of the allocation of the property taxes and CAM charges under the same agreements.  This section of this Investigative Report considers the analysis of the fair market value of the rents and the allocation of the property taxes and CAM charges in the subject leases that was performed by the Bank's Real Estate Review Committee, and the Bank's plan to seek restitution with respect to any unfairly allocated tax and CAM charges.

### 1.   The Mandate in the Consent Order

Article II(4)(b) of the Consent Order directs the Bank to include in its Transition Plan "a cost-benefit analysis evaluating, at a minimum," (i) the "[c]ontinuation of [related party leases]," including one or more extensions available to the Bank under the terms of the lease[s]," (ii) the "[c]ontinuation of such lease[s] only through the currently effective term[s] of the lease[s]," (iii) the "[t]ermination of such lease[s] by December 31, 2007," (iv) the "[t]ermination of such lease[s] at the end of the currently effective term of the lease[s]" and (v) the "[p]urchase of the property leased by the Bank."  As set forth in James L. Gertie's November 1, 2007 e-mail and letter to the OCC's Jennifer Kelly and others, the Bank undertook a "cost-benefit analysis" that included the "[t]esting of [t]ax and [c]ommon [a]rea maintenance allocations and charges" pursuant to Article II(4)(b) of the Consent Order.  By e-mail and letter dated November 1, 2007, the Bank, by James L. Gertie, the Bank's Senior Vice President / Chief Risk Officer, provided to the OCC's Jennifer C. Kelly, among others, the Bank's analysis pursuant to the aforementioned

26

mandate (the "Lease and Tax & CAM Charges Analysis," a copy of which is attached hereto as Exhibit K).

**2.     The Real Estate Review Committee's Analysis**

It should be noted at the outset that, in its November 1st correspondence, the Bank stated that "the Committee found rents to be very favorable as compared to the Cushman [& Wakefield] assessments at 65% of market rents." Thus, the Real Estate Review Committee found that the rents under the insider and/or insider-related party lease agreements that it analyzed were not only at fair market rates, but were propitious to the Bank.

As indicated above, in connection with its review of the related party lease agreements, the Real Estate Review Committee also investigated the allocation of property taxes and CAM charges under the same lease agreements. As set forth in the Lease and Tax & CAM Charges Analysis, the Bank concluded that the property taxes and CAM charges are fairly allocated in twenty-two of the twenty-eight lease agreements it analyzed. It should be noted, however, that the Bank identified relatively insignificant disparities in the apportionment of taxes in two of the twenty-two lease agreements that it found to be fair. Specifically, (i) with respect to the Burnt Tavern, New Jersey branch, the Bank determined that there "[m]ight be" a "$400/yr" differential on the tax allocation and (ii) with respect to the Ewing, New Jersey branch, the Bank determined that there "[m]ight be" a "$100/yr" differential on the tax allocation.

With respect to the six lease agreements that the Bank determined unfairly allocate tax and CAM charges,[10] in its November 1, 2007 correspondence to the OCC, the Bank stated as follows:

---

[10] Included in this group are the following branches: "English Creek" / Egg Harbor Township, New Jersey, "College Drive" / Blackwood, New Jersey; "Evesboro" / Marlton, New Jersey; Ramsey, New Jersey; Warminster, New Jersey and Willingboro, New Jersey.

> In their further due diligence the [Real Estate Review] [C]ommittee found issues with unwarranted tax allocations on 6 properties, two of which, Willingboro and Warminster are the most significant.  The Committee has determined to pursue corrective adjustments through negotiation of amendments to lease documents going forward and through holdbacks and offsets against prior excess amounts paid as outlined in the attached summary [*i.e.*, the Tax & CAM Charges Analysis].
>
> In pursuing those remedies, the Committee has determined that no action will be taken which would jeopardize the bank's lease rights as the beneficial aspects of the other lease terms outweigh the recovery value of the tax matters.

With respect to seeking restitution, in the same letter, the Bank noted that "[t]he Committee and Officers of the Bank will immediately initiate negotiations with representatives of the various partnerships to resolve these claims."  The Bank further stated that it "will provide more detail about [its] plans and the results of the negotiations as they unfold."

### 3.    The Bank's Real Estate Review Committee

The Bank prepared the Lease and Tax & CAM Charges Analysis "under the supervision of" the Bank's Real Estate Review Committee,[11] which was formed pursuant to Article III of the Consent Order.  Pursuant to the Consent Order, the members of the Real Estate Review Committee, which must be comprised of at least three directors, "shall possess the expertise necessary to assist the Committee in the performance of its duties."  The Committee members are appointed by the Board.  Before making these appointments, the Board members must "consider any Real Estate Related Activity between the directors and the Bank during the past ten (10) years and whether such Real Estate Related Activity would affect the director's ability to execute his duties ...."

---

[11] *See* the Bank's November 1, 2007 e-mail and letter to the OCC's Jennifer Kelly and others.

The duties of the Real Estate Review Committee -- as mandated by the Consent Order at Article III(3) -- include making the following decisions, which the Committee must present to the Board for ratification:

(i)    "[a]ll decisions relating to the purchase or lease of land or improvements by the Bank, including negotiations with RE Principals[12] and any modifications to contracts or agreements for the purchase or lease of land or improvements that amount to or involve a value of more than $100,000";

(ii)    "[a]ll decisions relating to any Coordinated Transactions[13] that amount to or involve a value of more than $100,000";

(iii)    "[a]ll decisions related to contracts and agreements with RE Service Providers[14] … that amount to or involve a value of more than $100,000, including any modifications or change orders to such contracts or agreements that amount to or involve a value of more than $100,000"; and

(iv)    "[a]ll decisions related to approval of or amendment to budgets for all types of Real Estate Related Activity,[15] by individual projects, that amount to or involve a value of more than $100,000."

Additionally, the Consent Order requires the Bank's Board of Directors to develop and provide to the OCC a "Real Estate Review Committee charter," which shall (i) "contain the policies and

---

[12] The Consent Order at Article VI defines "RE Principals" as "with respect to any land or real estate improvements, each entity that is the actual or proposed seller, buyer, lessor or lessee, and any party to a Coordinated Transaction [*see* note 13, *infra*] involving Real Estate Related Activity [*see* note 15, *infra*]."

[13] The Consent Order at Article VI defines "Coordinated Transaction" as "any transaction involving the sharing or division of costs or benefits with the Bank."

[14] The Consent Order at Article VI defines "RE Service Provider" as "any entity, which, pursuant to a contract, agreement or understanding with the Bank, performs or is proposed to perform work related to Real Estate Related Activity and is expected to receive more than $100,000 from the Bank in a calendar year, or who received more than $100,000 from the Bank in the immediately preceding calendar year."

[15] The Consent Order at Article VI defines "Real Estate Related Activity" as "any transaction by or with the Bank involving real estate or real estate improvements, whether relating to new or existing facilities, and includes, but is not limited to, the purchase by or lease to the Bank of land or real estate improvements, the sale by or lease from the Bank of land or real estate improvements, real estate brokerage activity, work relating to obtaining local approvals and permits, construction management, site development, real estate consulting services, all aspects of construction (*e.g.*, carpentry, roofing, electricity, lighting, water, sewage, utilities, painting, roads, driveways, sidewalks, parking lots), architecture, interior design, interior decoration, landscaping, surveys, appraisal services, escrow services, title services, real estate legal services, procurement and maintenance of furniture or fixtures, space planning and management and renovations."

procedures of the Real Estate Review Committee, consistent with [the Consent Order]" and (ii) "ensure that the Real Estate Review Committee is provided with adequate authority to require Bank management to produce such information, documentation and reports as the Real Estate Review Committee deems appropriate for its decisions."

### 4.   Conclusion

In view of the analysis performed by the Real Estate Review Committee pursuant to the Consent Order, particularly with respect to "Coordinated Transactions," the SLC will avail itself of that analysis, and hereby adopts the findings of such Committee as set forth above.

### D.   Analysis of Branch Application Process

The following section provides an analysis as to why the OCC has questioned the completeness of certain branch applications submitted to the OCC by the Banks (Commerce Bank, N.A. and Commerce Bank/Pennsylvania, N.A., as defined *supra*).

### 1.   The OCC's Allegations

The SLC understands that the OCC has questioned the Banks as to the completeness of certain branch applications submitted to the OCC by the Banks.  According to the Bank's senior executive with responsibility for OCC applications,  the OCC's concern as to the completeness of certain branch applications is based on the Banks' respective failures to disclose certain insider and insider-related party transactions in the "Management Interlocks" and "Management Interlocks/Insider Conflicts" sections of their branch applications.

It is the SLC's understanding that the OCC has specifically questioned the completeness of the following branch applications:

(i)      "New Britain" / Chalfont, Pennsylvania (April 2, 1997);

(ii)     "Upper Gwynedd" / North Wales, Pennsylvania (April 17, 1997);

(iii)    "English Creek" / Egg Harbor Township, New Jersey (February 17, 1998);

(iv)    Ewing, New Jersey (February 17, 1998);

(v)     Jenkintown, Pennsylvania (June 7, 1999);

(vi)    "Hulmeville" / Bensalem, Pennsylvania (January 24, 2000);

(vii)   Galloway, New Jersey (July 27, 2000);

(viii)  Warminster, Pennsylvania (February 2, 2001);

(ix)    Chadds Ford, Pennsylvania (March 16, 2001);

(x)     Willingboro, New Jersey (August 3, 2001); and

(xi)    Warrington, Pennsylvania (December 21, 2001).

Furthermore, it is the SLC's understanding that Mr. Hill had a 30% interest in the "Landlord" for branches (i) through (ix) and a 45% interest in the "Landlord" for branches (x) and (xi).[16]

Counsel also understands that the following branch applications may be current subjects of interest to the OCC:   (xii) Richboro, Pennsylvania, (xiii) Thornwood, New York, (xiv) Dumfries, Virginia, (xv) North Miami (Osheroff), Florida, (xvi) Devon, Pennsylvania, (xvii) Boynton Beach, Florida and (xviii) Riviera Beach, Florida.

---

[16] This understanding is seemingly confirmed by the "Related Party List" for the second quarter of 2007 (submitted by the Bank to the OCC pursuant to Article I, ¶ 5 of the Consent Order) with respect to "New Britain" / Chalfont, Ewing, Warminster and Warrington.  As to Galloway, the "Related Party List" indicates that Hill has an interest in Galloway Equities, LLC, but the amount of his interest is not indicated.  As to Willingboro, the "Related Party List" indicates that Hill has a 40% interest in Willingboro Equities LLC, but the SLC understands that Hill may have a 45% interest in the landlord for this branch.  The "Related Party List" does not appear to indicate that Hill presently has an interest in any of "Upper Gwynedd" / North Wales, "English Creek" / Egg Harbor Township, Jenkintown, "Hulmeville" / Bensalem or Chadds Ford.

2.     **The Three Branch Application Forms Used by the Banks Relevant to this Analysis**

From 1988 through the present, the Banks submitted three different forms of branch applications to the OCC in connection with their expansion efforts:  (a.) the '88 Thru '98 Application, (b.) the April '98 Application and (c.) the July '02 Application  (each as defined, *infra*) (Copies of these application forms are attached hereto as Exhibits L, M, and N, respectively.)  Since the Banks used each of these three application forms at some point during the period between 1997 through 2006, which, the SLC understands, is the target period of the OCC's investigation -- they are all discussed, in relevant part, below.

a.      **The '88 Thru '98 Application**

From at least 1988 through year end 1998, the Banks used the same form of branch application that was submitted on July 27, 1995 in connection with the establishment of a branch in Absecon, New Jersey (the "'88 Thru '98 Application Form," Exhibit L).[17]  Of the three applications discussed in this report, only the '88 Thru '98 Application, at section two titled "Bank Premises," contains the following queries and mandates:

> (a)     Will property be purchased or leased from a director, officer, principal shareholder (one owning 10 percent or more of any class of voting stock) or associate or interest thereof?

> If Yes:     (i)     Name of individual/interest: _____.
> Relationship to bank: _____.

> (ii)     Attach copy of recent independent appraisal or a survey of recent comparable purchases or leases in the market area which supports that the terms of the proposed insider transaction are not more favorable than those that would be available with a party not affiliated with the bank.

---

[17] *See* Wojcik's June 21, 2007 Memorandum to Michael Critchley, Sr., Esq. and Richard Alexander, Esq., the "June '07 Wojcik Memo," p. 1.

(iii)    Attach copy of the board resolution approving details of the transaction with the individual/interest.  The interested party should abstain from the vote and this abstention should be reflected in the certification.

(iv)    If a lease transaction, attach an executed copy of the lease.  The terms of the lease should be contingent on approval of the branch application.

NOTE:  Provide adequate information to show that terms and conditions are not more favorable than would be available in a comparable transaction with unrelated parties otherwise similarly situated.

The same section 2 of the '88 Thru '98 Application further includes subsections (b) through (d), which subsections, generally, address (i) whether the projected cost of the proposed branch will result in an investment in bank premises that exceeds the total balance in the bank's capital stock account (citing 12 U.S.C. § 371d and related regulations) and (ii) whether the bank will own the building in which the branch is housed and lease space to others for non-bank use.[18]

It is also notable that the '88 Thru '98 Application includes a section titled "Management Interlocks," which solicits information concerning whether the establishment of the proposed branch will create a violation of the Depository Institution Management Interlocks Act (the "Interlocks Act").[19]  This is because, as is discussed in greater detail, *infra*, according to Bank officials, the OCC deems certain of the Banks' branch applications to be incomplete for failure to disclose related party and insider transactions in the April '98 and July '02 Applications under

---

[18] In later versions of the OCC's branch applications, this "Bank Premises" section was essentially streamlined to include only the queries set forth in these subsections.

[19] *See* 12 U.S.C. § 3201 *et seq.*; *see also* 12 C.F.R. Part 26 (the regulations that the OCC promulgated pursuant to the Interlocks Act).

this heading.  There are no other sections in the '88 Thru '98 Application relevant to this analysis other than those noted above.

### b.     The April '98 Application

In or about April 1998, the OCC updated its branch application form (the "April '98 Application," Exhibit M).[20]  The Banks first used the April '98 Application on January 22, 1999 in connection with the establishment of a branch in Delran, New Jersey,[21] and the Banks continued to use the same form through mid-December 2006.[22]  It is not clear whether either of the Banks used the recently outdated '88 Thru '98 Application at any time during the period from approximately April 1998 (when, it seems, the April '98 Application was first made available by the OCC) and January 22, 1999 (when the Banks first began using the April '98 Application).  However, as is discussed in greater detail in Part D(2)(c), *infra*, it is clear that during the period from either July 2002 to mid-December 2006, the Banks improperly used the April '98 Application; during this interim the Banks should have used the July '02 Application.

As noted above, the April '98 Application does not include the same section 2 that is set forth in the '88 Thru '98 Application (and quoted in pertinent part, *supra* at pages 33-34).  While section 2 of the April '98 Application is entitled "Bank Premises" -- as it was in the '88 Thru '98 Application -- its substance is far more streamlined, consisting of only the following two queries (both of which require only a "Yes" or "No" response):

> Will the projected cost of the branch or relocation result in an
> investment in bank premises that requires an application or notice
> under 12 USC 371d?

---

[20]  The April '98 Application can be found at pages 20 through 26 of the Comptroller's Corporate Manual concerning "Branches and Relocations" dated April 1998, which is annexed as Exhibit IV to the June '07 Wojcik Memo.  The April '98 Application is also independently annexed as Exhibit IV(a) to the June '07 Wojcik Memo.

[21]  A copy of the Delran, New Jersey branch application is annexed as Exhibit V to the June '07 Wojcik Memo.

[22]  *See* June '07 Wojcik Memo, p. 3.

> If yes, or if not prior approval has been granted, is an investment request included with this application or filed with the supervisory office (see the "Investment in Bank Premises" booklet)?

There is no specific reference to insider or insider-related party transactions, conflicts of interest or anything similar in contrast to the prior section 2 in the '88 Thru '98 Application.

Nevertheless, counsel for the SLC believes that prudent business practice would have dictated that the Banks continue to disclose insider or insider-related party transactions, consistent with its established historical practice. Especially in view of the number and variety of such transactions in connection with the Banks' branches, it defies logic to conclude that the OCC would have suddenly lost interest in the Banks' disclosures of such transactions. If in fact the Banks did believe that such disclosures were no longer required, it should, at a minimum, have confirmed that belief in writing with the OCC.

Instead, reportedly at Mr. Hill's prompting, Mr. Wojcik states that he confirmed with an analyst, whose name he cannot now recall, in the corporate applications division of the OCC's Northeastern District Office that applicants were not required to disclose "information regarding insider related transactions" in the "current application," *i.e.*, the April '98 Application.[23] Specifically, on or about March 15, 2001, Mr. Hill reportedly directed Mr. Wojcik to make this inquiry when Mr. Wojcik advised Mr. Hill -- after Mr. Hill asked him to submit to the OCC an appraisal concerning the Warminster, Pennsylvania branch (an insider transaction) -- that the April '98 Application did not require disclosures concerning insider transactions.[24] Mr. Wojcik contends that the OCC analyst informed Mr. Wojcik that he or she would review the matter with

---

[23] *See* Wojcik's Memorandum to Michael Critchley, Sr., Esq. dated May 17, 2007 (the "May '07 Wojcik Memo").

[24] *See* May '07 Wojcik Memo, p. 2 (the document has no page numbers).

Tony DosSantos, the Licensing Manager, and get back to him.[25]  The same analyst reported back to Mr. Wojcik "in a day or so," indicating that Mr. Wojcik was correct in his assessment that the April '98 Application does not require the disclosure of insider related transactions.[26]   Mr. Wojcik, however, did not ask the analyst to confirm his or her response in writing, nor did Mr. Wojcik himself confirm it in writing.

As was the case with the '88 Thru '98 Application, the April '98 Application includes a section entitled "Management Interlocks."   Again, this section is notable since the OCC apparently  bases its contention that the Banks' branch applications were "misleading" on the Banks' failure to disclose related party and insider transactions here.  There are no other sections in the April '98 Application relevant to this analysis other than those noted above.[27]

### c.      The July '02 Application

By letter dated December 18, 2006, Deputy Comptroller Lawrence E. Beard advised Commerce "that the branch application form now being used by the Bank [i.e., the April '98 Application] was changed in July 2002,"[28] and it appears that the Banks did in fact begin using the July '02 Application in mid-December 2006 pursuant to Mr. Beard's directive.

As with the April '98 Application, the July '02 Application (Exhibit N) likewise does not include direct questions concerning whether the subject bank's premises will be purchased or leased from an insider or insider-related party; this is in contrast to the '88 Thru '98 Application, which  included  direct  questions  concerning  the  same  subject  under  the  heading  "Bank

---

[25] Significantly, Wojcik claims that during this call he indicated that he "began using the form in January of 1999 and had submitted three other applications in addition to the Warminster application without identifying the transactions as being related to an insider and without an independent appraisal as had been the previous practice."

[26] *See* May '07 Wojcik Memo, p. 2.

[27] Note that the following question, however, was included in the April '98 Application under the heading "Legality":  "Are there any other legal issues involved in this proposal?"

[28] *See* Mr. Beard's December 18, 2006 letter to Wojcik.

Premises."  The "Bank Premises" section of the July '02 Application is, relative to the '88 Thru '98 Application, streamlined in a manner similar to the April '98 Application.  As is the case with the two previous versions of the branch application, the July '02 Application includes a section concerning the Interlocks Act, though in the July '02 Application it is titled "Management Interlocks/Insider Conflicts."   There are no other sections in the July '02 Application relevant to this analysis other than those noted above.[29]

**d.    The OCC's Handbooks on the Branch Application Process, Insider Activities and Management Interlocks**

The OCC publishes numerous handbooks and booklets apparently designed to guide both OCC personnel and the entities the OCC regulates with respect to various subjects, including the branch application process, the OCC's oversight of insider activities and its administration of the Interlocks Act.   None of these documents, however, provide any guidance on the subject of disclosing related party / insider transactions.

**i.    The Comptroller's Handbook Concerning "Insider Activities"**

The Comptroller's Handbook concerning "Insider Activities" dated March 1995 does not refer to the OCC's branch applications or to the disclosures required to be made in the same applications.  Rather, it appears to be a document intended to (i) inform banks on the goals and procedures of the OCC's annual examination of banks' insider activities, (ii) provide a basic

---

[29] Note, however, that the following questions and mandates are included in the July '02 Application under the heading "Legality":

- "Are there any other legal issues involved in this proposal (and, if a relocation application, if the proposed branch will be jointly owned, check 'yes' and list joint owners in the textbox below)?  If yes, please provide a legal analysis and discuss the issues fully."

- "Are there any other legal issues involved in this proposal (for instance, if the proposed branch will be a nontraditional branch - such as a mobile branch, part-time branch, limited service or temporary branch - or if this is a branch relocation and the branch will be jointly owned, check 'yes' below and include a list of joint owners in the textbox below)?  If yes, please provide a legal analysis."

outline of prohibited and permissible insider activities and (iii) advise banks on the required substance of their written insider related policies.[30]   There are only a few references in this handbook to insider and/or insider-related party transactions concerning the lease, purchase or co-development of real property or the provision of services.[31]

### ii.   The Comptroller's Licensing Manuals Concerning "Branches and Relocations"

Each of the Comptroller's Licensing Manuals concerning "Branches and Relocations" dated April '98, June '02, September '02, October '06 and June '07 contain general references to "conflicts of interests" in the introductory section of each such manual under the heading "Special Conditions":

> The OCC may impose appropriate special conditions on approvals to protect the safety and soundness of the bank; *prevent the risk of conflicts of interest*; assure compliance with applicable law; or for other supervisory, compliance, or policy considerations.[32]

Counsel to the SLC believes that this language, taken together with the established historical practice of requiring specific disclosure of related party transactions, should have alerted the

---

[30] Considering the substance of the Comptroller's Handbooks concerning "Insider Activities," portions of it may be useful as a touchstone for analyzing the propriety of the insider and insider-related party transactions that the OCC is investigating and which are at issue in the shareholder Derivative Suits.

[31] The following items, which are set forth in the "Examination Procedures" outline / questionnaire of the handbook under the heading "Other Transactions with Insiders," are among the few references to these subjects:

- "Review purchases or sales of securities or other property to or from directors or to a director's firm and determine if they are on terms that are not less favorable to the bank than those available to other parties (12 U.S.C. 375)" and

- "Review fees paid to insiders and determine if they have a direct relationship to, and are based solely upon, the fair value of goods and services received and compensate the servicer only for providing goods and services that meet the legitimate needs of the bank."

[32] *See* June '07 Wojcik Memo, Exh. IV, p. 6; Exh. IX, p. 6; Exh. X, p. 2; Exh. XVI, p. 4; Exh. XVII, p. 4 (the document has no page numbers).   The language used in each of the April '98 and the June '02 "Branches and Relocations" manuals is the same and differs from the September '02, October '06 and June '07 "Branches and Relocations" manuals only slightly and in an insignificant way.

Banks that _specific_ _written_ permission should have been sought from the OCC prior to changing historical disclosure practices.

      **3.**      **The Merits of the OCC's Allegations Concerning the Banks' Branch Applications**

In addition to the general allegations set forth in Part D(1), the OCC "contends" that (i) "information regarding transactions with insiders should have been included under Section 3, Management Interlocks," in the April '98 Application and (ii) "subsequent to the [July '02 Application] becoming available for use, Commerce's failure to provide information on insider transactions was even more egregious."[33]  The OCC further contends, particularly with respect to the July '02 Application, "that Commerce failed to provide material information regarding, principally, InterState Commercial Real Estate, LLC, InterState Realty Development, LLC, and InterArch, LLC, all three of which the OCC considers 'Insiders' for branch application purposes."[34]

Despite the technical argument that revisions to the OCC application form removed the specific requirement to disclose insider and insider-related party transactions, counsel to the SLC believes that if there were any question whatsoever concerning this requirement, the Banks should either have obtained written guidance from the OCC, or continued their historical practice of full disclosure.  Undisclosed insider or insider-related party transactions would potentially undermine the integrity of the entire regulatory process, and accordingly, the OCC's focus on this subject is entirely predictable.

---

[33] _See_ June '07 Wojcik Memo, p. 4.  As to item (ii), presumably the OCC's contention is based upon the revised title of the relevant section in the July '02 Application -- "Management Interlocks / _Conflicts of Interest_" (formerly "Management Interlocks").  (Emphasis added.)

[34] _See_ June '07 Wojcik Memo, p. 5.

Nevertheless, the SLC has concluded that the OCC has specifically questioned the completeness of the eleven branches referred to above, as well as the other applications listed above that the SLC understands may be current subjects of interest to the OCC, primarily to provide a "context" for its current concerns about a particular branch.  As such, it is unnecessary for the SLC to reconstruct these applications (some of which are nearly ten years old) on a case-by-case basis to try to reach some conclusion as to whether any "misleading" element was intentional or simply a good faith mistake.  Rather, it is sufficient to note that the insider or insider-related party aspects of each of these branch applications has now been fully disclosed to the OCC by the Banks, and there is no current ambiguity about the OCC's requirement that such relationships be fully disclosed on a going-forward basis.

###### E.        The Relationship Between the Bank and InterArch

As discussed above, the SLC has thoroughly investigated, but has *not* made specific findings as to the relationship between the Bank and InterArch, and the appropriateness of the fees charged to the Bank by InterArch for its services.

According to the January 14, 2008 Complaint and Jury Demand filed on behalf of the Hills and InterArch (the "Hill Complaint"), "Mrs. Hill founded InterArch, Inc. ("InterArch") a full-service architectural and design firm, in 1973," and "[o]ver the past 35 years, InterArch has provided extensive services to Commerce …."  (Hill Compl., ¶ 4).  It has been noted that InterArch "designed the interior of Commerce's first location in 1973 …."  (Smart & Associates LLP's August 24, 2004 Analysis of Services Provided by InterArch, Report and Exhibits, the "Smart Report," p. 2).  The Company has made no secret of its decades-long relationship with InterArch, or of Mrs. Hill's sole ownership of InterArch.  Since as early as 1975, the Company has disclosed its dealings with InterArch to the regulatory agencies that oversee its operations as

well as in its SEC filings.[35]  Included in its SEC filings were the amounts the Company paid to

InterArch -- $62 million during the period from 1994 through 2006 -- as well as statements

concerning the Board's belief that "this arrangement has been an important factor in the success

of the Commerce brand."  (*See*, *e.g.*, Commerce's Form 10-K filed on March 15, 2006).

Notwithstanding the Company's disclosures concerning InterArch since approximately

the inception of this relationship, it was not until early 2002 that it came under intense scrutiny.

On March 4, 2002, *Fortune* magazine published an article titled, "Family Banking At

Commerce,"[36] which, among other things, detailed the apparent improprieties surrounding the

---

[35] According to the Hill Complaint, "Commerce and the banking regulators have been monitoring the affiliated-party transactions and relationships at Commerce since 1975."  (Hill Compl., ¶ 5).  The Hill Complaint further specifically discloses that "[t]he role of InterArch and Mrs. Hill in Bank [Commerce Bank, N.A.] transactions was the subject of disclosure to the Board of Directors of the Holding Company [Commerce Bancorp, Inc.], as well as to the OCC and the Fed."  (Hill Compl., ¶ 4).  The Hill Complaint reports the OCC's and the Fed's findings in the following manner:

> "At no time during this period have the banking regulators issued any finding that the above-described activities of Mr. Hill, Mrs. Hill, or InterArch violated any laws or regulations.  Indeed, upon information and belief, from 2002 to 2006, the OCC and the Fed examined these affiliated-party transactions and found that they complied with prevailing regulations and guidance, did not disclose any cost disadvantage to Commerce and in some cases resulted in cost advantages, were made at predominantly market rates, and were consistent with arms-length guidelines."

(Hill Compl., ¶ 6).

Additionally, press reports indicate that "[t]he bank has disclosed … that it had bought services from InterArch, a Mount Laurel, New Jersey, architectural design firm run by Hill's wife, Shirley, since 1973."  Jonathan Stempel, "Commerce Bancorp says Fed, OCC expect settlements" (June 12, 2007), http://www.reuters.com/article/governmentFilingsNews/idUSN1223682320070612.

[36] Andy Serwer, "Family Banking At Commerce" (March 4, 2002), http://money.cnn.com/magazines/fortune/fortune_archive/2002/03/04/319124/index.htm

It should be noted that the Smart Report came to the following conclusion with respect to press reports critiquing the relationship between Commerce and InterArch:

> The press has been skeptical and often critical of the close business relationship between Commerce and InterArch.  Many of these press accounts retrieved independently by Smart appear to be based on partial information.  They do not accurately portray the strategic relationship between Commerce and InterArch and do not convey the fact that InterArch and its personnel are qualified to perform the services for Commerce.

41

Company's relationship with InterArch, given that the latter company was founded and is wholly

owned by Shirley Hill, the wife of the founder of the Company.   (Hill Compl., ¶ 2).   After

highlighting certain of the disclosures in Commerce's 2000 annual report as to the monies paid

to InterArch between 1991 and 2000 -- "$18.1 million in contracts and commissions," according

to the article -- and the nature of the relationships between Mr. Hill, Mrs. Hill and InterArch, the

article noted:

> Now, this isn't illegal. But it looks funny. Would, for instance,
> Commerce shareholders be better served if another contractor --
> possibly a less expensive one -- did this work?  I asked Vernon
> Hill about his wife's firm's work.  "The rules require that this is
> done on an arm's-length basis with competitive pricing, which it
> is," he says.  "It really is no different from any other contractor."
>
> ….
>
> I find this tempest in a bank vault a little sad really.  If Commerce
> is such a great story, why muck it up with what could be perceived
> as a conflict of interest?  How important is that income to Mrs.
> Hill's company?

The *Fortune* article and related news coverage of Commerce triggered a joint "Target

Inspection" of Commerce insider transactions by the Federal Reserve Bank of Philadelphia and

the OCC.

More recently, however, a central criticism of the Commerce-InterArch relationship,

made by the OCC and others is the allegation that the fees charged for InterArch's design

services were not the result of an open and fair bidding process.  Implicit in this criticism is the

charge that InterArch's fees were above market rates.  Accordingly, the SLC initially resolved to

investigate these claims by, among other things, comparing InterArch's fees and services with

the fees and services of the vendor(s) that ultimately replaced InterArch.  However, as is detailed

---

(Smart Report, p. 7).  See note 37, *infra*, with respect to the genesis of the Smart Report.

below, a meaningful comparison of the fees and services offered by InterArch and those of the vendors that replaced it cannot be made, chiefly because the myriad services that InterArch performed for the Company are now being performed not only by two different outside vendors, but also by newly hired, in-house personnel at the Company.

In addition to fee-related issues, the use of shared facilities by InterArch and the Bank raises a different set of issues.  Specifically, prior to its termination by Commerce, InterArch sublet from the Bank approximately 8,000 square feet of space in the 11000 Horizon Way building (in which Commerce is the only other tenant).  After a review of the Master Lease and Sublease in June 2007, it was determined that InterArch's rent payments should have been increased (and adjusted back) by $22,565.69 for the period from November 1, 2004 through May 31, 2007.  In addition, it was determined that the Common Area Maintenance ("CAM") charges and utility charges to InterArch had "inadvertently" not been adjusted on an annual basis, and that an additional $347,149.57 was payable to Commerce by InterArch for the period April 1, 2000 through May 31, 2007.  The sum of those two amounts was subsequently paid by InterArch to Commerce.

### 1.     The Company's Termination of its Relationship with InterArch, and InterArch's Replacements

The OCC's investigation resulted in the entry of the Consent Order, and Article II of the Consent Order required the termination of contracts with insider and/or insider related-parties (specifically including InterArch) no later than December 31, 2007.  Accordingly, pursuant to the Company's "Transition Plan" made pursuant to the Consent Order, by an undated letter from Fred Graziano to Shirley Hill, the Company terminated "any agreements, both written and verbal with Interarch, Inc., effective October 31, 2007."  The Transition Plan further states:

> [M]anagement has been actively exploring numerous alternatives to InterArch. … The Bank believes at this time that the optimum solution is to find one firm that can provide all of the services provided by InterArch. … Five firms were asked to present to a Bank Management team …. All firms did so and will shortly be given a formal request for proposal. ... All firms will be asked to provide a proposed solution / recommendation for each of the services now provided by InterArch.

> It is likely that the Bank will need to hire two, possibly three of these firms to handle the workload and gear work towards each firm's specialization, as none of the firms appear to have the necessary capacity to handle all aspects of the services required.

As it anticipated in the Transition Plan, the Company has since contracted with two replacement firms, namely, H2L2, LLC ("H2L2") and Bergmann Associates, Inc. ("Bergmann").

The SLC, by its counsel, interviewed representatives of the Company who are familiar with the Company's relationship with InterArch and who were tasked with locating replacement firms. They explained that the Company, in fact, could not locate a vendor that could provide all of the services that InterArch provided for the Company, since no such companies are known to exist. This assertion is substantiated by the Smart Report, which the Company commissioned in response to the OCC's 2002 investigation of the Company.[37]  Specifically, following a recitation of the services provided by InterArch, the Smart Report notes that, in their "survey of comparable companies, it was unusual to find all of these services offered by one firm." (Smart Report, p. 5).  InterArch personnel, according to the Smart Report, "provide a 'turnkey service' for the bank, working on projects from concept to design and documentation up to obtaining engineering permits." (Smart Report, p. 5).

It appears that InterArch was decidedly unique in that it tailored its services precisely to the Company's needs. In addition to interior and exterior design services, InterArch provided the

---

[37] According to the Hill Complaint, "at the urging of the OCC and the Fed, Commerce retained an independent third party -- Smart and Associates LLP -- to analyze the services provided by InterArch …." (Hill Compl., ¶ 7).

following services to the Company, which are not customarily offered by architectural and design firms:  move coordination, managing the Company's CAFM system (Computer Aided Facility Management), landscape design services, project management, contract negotiation, administrative services, auditing the Company's 400+ branches to ensure that they are in good repair (e.g., monitoring when the carpet needs to be replaced), brand stewardship (e.g., designing the Company's vans and various point-of-sale merchandise such as water bottles and coin banks) and furnishing what the Company refers to as its "spices of life" (e.g., artwork procurement).

In contrast, H2L2 and Bergmann -- the two firms that partially replaced InterArch -- are only equipped to perform interior and exterior design services for the Company.  To fill the gaps that existed after the Company terminated InterArch and replaced it with H2L2 and Bergmann, the Company now has a staff of ten (10) design, architectural and/or engineering professionals -- some of whom were formerly employed by InterArch.  Additionally, while InterArch performed project management services for the Company for many years, the Company elected to bring this function in-house in approximately 2003.  Similarly, the Smart Report discloses that, "[i]n the fourth quarter of 2002 the Board approved the transfer of facility functions, including furniture purchases, into the Bank, with InterArch continuing to provide architectural and design services."  (Smart Report, p. 2).

## 2.   <u>Conclusion</u>

For the foregoing reasons, it is difficult -- and in many cases, it is impossible -- to assign a reliable value to each of the discrete services that InterArch performed for the Company, and to then compare these values, depending on the service at issue, to either (i) the fees charged by one of the two outside firms for similar services or (ii) the cost of recruiting and employing the Company's in-house personnel who now provide such services.  Moreover, representatives of the

45

Company have indicated that the Company's relationships with the replacement firms and its in-house architectural, design and engineering professionals are too new to be used as a benchmark against which to measure the relative value of InterArch's services.

Finally, while the SLC, through counsel, systematically asked a number of relevant Commerce executives and employees whether they believed that InterArch was overpaid or provided full value for its fees received, all persons questioned--with a single exception--replied that Commerce received full value for its fees paid to InterArch. The exception, a Senior Vice President at Commerce, created a detailed memo recounting events during his employment at the Bank, together with his views and opinions concerning such events. Counsel to the SLC has thoroughly investigated the allegations in this memo that fall within its jurisdiction. As to InterArch, counsel has determined that despite making various criticisms about InterArch, the same Senior Vice President *subsequently* wrote: "I find InterArch's overall fee structure to be extremely competitive as it compares to similar services in the retail industry"….[and] "In summary, InterArch's 2007 Proposal is fair and gives the bank the best architectural services at a very competitive price." In view of these contradictory statements, the SLC found the credibility of this person to be questionable.

In conclusion, then, while the overwhelming majority of Bank personnel who dealt with InterArch thought their charges were fair, the absence of "comparable" service providers renders the SLC unable to reach a definitive conclusion as to whether the fees the Company paid to InterArch were fair under the totality of the circumstances.

**F.**     **The Propriety of Fees Paid by the Bank to Galloway**

As discussed above, the SLC has thoroughly investigated, but has not made specific findings as to the fees paid and/or reimbursed by the Bank relating to business entertaining

conducted at Galloway, in which several Commerce Bank directors have an ownership interest. The SLC has reviewed the Vendor Payment History and individual invoices paid by the Bank to Galloway from the period of January 1, 2005 through December 31, 2007.  From these financial records, it appears that, while the Bank has paid significant monies to Galloway, the majority of these payments reflect a systematic business entertainment plan.  Specifically, the invoices demonstrate that the Bank has, at times, utilized Galloway on an almost weekly basis to host golf outings for large groups.  In addition, it is apparent that the Bank has paid for the memberships and related expenses for a number of Bank executives.

The SLC inquired of Commerce CFO Doug Pauls with respect to payments by Commerce Bank to Galloway.  Doug Pauls indicated that he had reviewed the payments that were made and that Galloway was paid by the Bank in a proper manner for use of its facilities. Moreover, the SLC has been informed that the business generated for the Bank as a result of the golf outings at Galloway was substantial.  The SLC believes that it is neither an uncommon nor an improper business practice for a company to cover the costs of an executive's membership at a golf club.  At this point, however, the SLC does not have any basis for evaluating whether the expenses paid in connection with Galloway were proportionate to the Bank business generated by the use of Galloway, and accordingly, makes no finding in this regard.  Had the proposed settlement of the Derivative Actions not made this issue moot, however, the SLC would have made additional inquiry into this subject.

## V.    PENDING AND SETTLED LITIGATION

As discussed above, on January 4, 2008, a MOU was executed by the relevant parties providing for the settlement and dismissal of the Derivative Actions, and on January 21, 2008, the relevant parties entered into a Stipulation, which is now subject to approval or other action by

the federal court. As stated above, the agreement to dismiss the Derivative Actions effectively makes moot many of the areas which the SLC would otherwise have investigated. In particular, the Stipulation expressly releases the Directors from the claims asserted by the Derivative Plaintiffs, and therefore, this Investigative Report does not address director liability for director self-dealing and/or related allegations.

In addition, also on January 14, 2008, Mr. Hill, Shirley Hill, and InterArch filed a complaint in the United States District for the District of Columbia against the Bank, the Company, a number of officers and directors, and a former employee of InterArch. Specifically, the complaint seeks: (1) payment of damages arising from the alleged breach of an employment contract between the Bank and InterArch; (2) indemnification and reimbursement of expenses against the Company; (3) payment of damages against director Defendants for alleged conduct undertaken jointly with the OCC in violation of Plaintiffs' constitutional rights; and (4) an injunction and damages arising out an alleged violation of federal copyright laws.

## VI.   CONCLUSION AND RECOMMENDATION FOR DISSOLUTION

The foregoing Investigative Report, findings and discussion complete the investigation of the Special Litigation Committee. The SLC and its counsel express their appreciation to everyone who has assisted the SLC in its investigation and in reaching judgments about the complex subjects which it considered. It is the unanimous view of the SLC that this Investigative Report should be adopted as the Investigative Report, findings and discussion of the SLC, and further, that this Investigative Report should be filed of record with the federal court, and circulated to the full Company Board of Directors.

Finally, upon completion of the foregoing actions, it is our unanimous recommendation that the full Company Board of Directors take appropriate action to dissolve the Special Litigation Committee.

Respectfully Submitted,

_____
Nicholas A. Giordano, Chairman
John K. Lloyd
Joseph S. Vassalluzzo

February 12, 2008