**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08003
856-795-9002

**Liaison Counsel for Plaintiffs**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PEARL E. LUCAS, individually and derivatively on behalf of COMMERCE BANCORP, INC. for Counts I, II and III; individually for Count IV; and on behalf of herself and others similarly situated for Counts V and VI, : : : : : : | Case No. 07-00349 (RBK/JS) |
| Plaintiff, : | |
| v. : | |
| VERNON W. HILL, II, for Counts I, II, III, and IV; JACK R. BERSHAD, JOSEPH BUCKELEW, DONALD T. DIFRANCESCO, MORTON N. KERR, STEVEN M. LEWIS, JOHN K. LLOYD, GEORGE E. NORCROSS, III, DANIEL J. RAGONE, WILLIAM A. SCHWARTZ, JOSEPH T. TARQUINI, JR., and JOSEPH S. VASSALLUZZO for Counts IV, V, VI, NICHOLAS A. GIORDANO for Counts V and VI, and TORONTO-DOMINION BANK for Counts VII, : : : : : : : : : : : | |
| Defendants, : | |
| and : | |
| COMMERCE BANCORP, INC. for Counts I, II, and III, : : | |
| Nominal Defendant. : | |

Additional Captions Follow.

| | | |
|---|---|---|
| SHEETMETAL WORKERS' NATIONAL PENSION FUND, Derivatively on behalf of COMMERCE BANCORP, INC., | : : : | Case No. 07-cv-2269 (RBK) |
| Plaintiff, | : : | |
| v. | : : | |
| VERNON W. HILL, II, et al., | : : | |
| Defendant, | : : | |
| and | : : | |
| COMMERCE BANKCORP, INC., | : : | |
| Nominal Defendant. | : : | |
| S.L. LERNER, Individually and derivatively on behalf of COMMERCE BANCORP, INC., | : : : | Case No. 07-cv-3295 (RBK) |
| Plaintiff, | : : | |
| v. | : : | |
| VERNON W. HILL, II, et al., | : : | |
| Defendant, | : : | |
| and | : : | |
| COMMERCE BANCORP, INC., | : : | |
| Nominal Defendant. | : : | |

| | | |
|---|---|---|
| POLICE & FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT and LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | : : : : : : : | Case No. 07-cv-5905 |
| Plaintiffs, | : : : | |
| v. | : : | |
| COMMERCE BANCORP., INC., DENNIS M. DIFLORIO, ROBERT D. FALESE, JR., JACK R. BERSHAD, JOSEPH E. BUCKELEW, DONALD T. DIFRANCESCO, MORTON N. KERR, STEVEN M. LEWIS, JOHN K. LLOYD, GEORGE E. NORCROSS, III, DANIEL J. RAGONE, WILLIAM A. SCHWARTZ, JR., JOSEPH T. TARQUINI, JR., JOSEPH S. VASSALLUZO, and THE TORONTO-DOMINION BANK, | : : : : : : : : : : : : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR FINAL APPROVAL OF SETTLEMENT</u>

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

BACKGROUND .................................................................................................2

    I.      THE FEDERAL DERIVATIVE CLAIMS ...................................................2

    II.     THE FEDERAL CLASS CLAIMS ARISING OUT OF THE MERGER.................................................................................................4

    III.    THE STATE COURT CLASS ACTIONS ARISING OUT OF THE MERGER.................................................................................................7

    IV.    THE MEDIATION AND SETTLEMENT ...................................................9

    V.     ADDITIONAL PROCEEDINGS RELATING TO THE SETTLEMENT.........................................................................................12

    VI.    PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT .............................................................................12

    VII.   NOTICE OF THE PROPOSED SETTLEMENT.....................................13

ARGUMENT......................................................................................................13

    I.      THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT.........13

    II.     THE SETTLEMENT IS ENTITLED TO A PRESUMPTION OF FAIRNESS.................................................................................................14

    III.    THE PROPOSED SETTLEMENT SATISFIES EACH *GIRSH* CRITERIA FOR FINAL APPROVAL ......................................................16

          A.     The Complexity, Expense, and Likely Duration of the Litigation.....................................................................................16

          B.     The Reaction of the Class to the Settlement ...................................17

          C.     The Stage of the Proceeding and the Amount of the Discovery Completed.....................................................................................18

          D.     The Risk of Establishing Liability.................................................20

E.   The Risks of Proving Damages .......................................................23

F.   The Risks of Maintaining the Class Through the Trial ................25

G.   The Ability of the Defendants to Withstand a Greater
     Judgment .....................................................................................25

H.   The Range of Reasonableness of the Settlement in Light of the
     Best Possible Recovery ...............................................................25

I.   The Range of Reasonableness of the Settlement Fund in Light
     of All the Attendant Risks of Litigation ......................................27

IV.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ....................27

V.   THE NOTICE PLAN SATISFIED THE REQUIREMENTS OF DUE
     PROCESS, AND THE FEDERAL RULES OF CIVIL PROCEDURE ...............30

CONCLUSION ...............................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Amchem Products v. Windsor,*
   521 U.S. 591 (1997)..................................................................................27

*Bell Atlantic Corp. v. Bolger,*
   2 F.3d 1304 (3d Cir. 1993).........................................................................26

*Berlin v. Emerald Partners,*
   552 A.2d 482 (Del. 1988) ..........................................................................28

*Bokat v. Getty Oil Co.,*
   262 A.2d 246 (Del. 1970) ..........................................................................22

*Bristen v. Schinger Fund,*
   469 F. Supp. 2d 371 (E.D. La. 2007).........................................................22

*Cohn v. Nelson,*
   375 F. Supp. 2d 844 (E.D. Mo. 2005)........................................................14

*Doe v. Delie,*
   257 F.3d 309 (3d Cir. 2001).......................................................................14

*Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12*
   *Litigation,* 447 F. Supp. 2d 612 (E.D. La. 2006) ......................................18

*First State Orthopedics v. Concentra, Inc.,*
   2007 U.S. Dist. LEXIS 77557 (E.D. Pa. Oct. 16, 2007).............................27

*Firstcom, Inc. v. Qwest Corp.,*
   2006 U.S. Dist. LEXIS 66787 (D. Minn. Sept. 18, 2006) ..........................22

*Girsh v. Jepson,*
   521 F.2d 153 (3d Cir. 1975)..................................................................14, 16

*Goodwin v. Live Entertainment, Inc.,*
   1999 Del. Ch. LEXIS 5 (Del. Ch. 1999)....................................................23

*Hynson v. Drummond Coal Co.,*
   601 A.2d 570 (Del. Ch. 1991)....................................................................29

*In re 3COM Corp.,*
   1999 Del. Ch. LEXIS 215 (Del. Ch. Oct. 25, 1999)...................................28

*In re Aetna Inc. Security Litigation,*
   2001  U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) ...................................25

*In re Cardizem CD Antitrust Litigation,*
  218 F.R.D. 508 (E.D. Mich. 2003) ............................................................15

*In re Cendant Corp. Sec. Litig.,*
  109 F. Supp. 2d 235 (D.N.J. 2000) ...........................................................16

*In re Cendant Corp. Sec. Litig.,*
  264 F.3d 201 (3d Cir. 2001)...............................................16, 18, 24, 25

*In re Cendant Corp. Sec. Litig.,*
  232 F. Supp. 2d 327 (D.N.J. 2002) ....................................................25, 26

*In re Cigna Corp. Security Litigation,*
  2007 U.S. Dist. LEXIS 51089 (E.D. Pa. July 13, 2007)............................15

*In re Dayco Corp. Derivative Securities Litigation,*
  102 F.R.D. 624 (S.D. Ohio 1984)..............................................................28

*In re Diet Drugs Products Liability Litigation,*
  226 F.R.D. 498 (E.D. Pa. 2005)................................................................30

*In re Electric Carbon Products Antitrust Litigation,*
  447 F. Supp. 2d 389 (D.N.J. 2006) ...........................................................18

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,*
  55 F.3d 768 (3d Cir. 1995)..............................................14, 20, 25, 26

*In re Golden State Bancorp Inc. S'holders Litigation,*
  2000 Del. Ch. LEXIS 8 (Del. Ch. Jan. 7, 2000) ......................................26

*In re Independent Energy Holdings PLC Security Litigation,*
  2003 U.S. Dist. LEXIS 17090 (S.D.N.Y. Sept. 29, 2003)..........................15

*In re Lorazepam & Clorazepate Antitrust Litigation,*
  205 F.R.D. 369 (D.D.C. 2002)..................................................................19

*In re Prudential Insurance Co. of America Sales Practices Litigation,*
  148 F.3d 283 (3d Cir. 1998)..............................................................17, 25

*In re Rent-Way Securities Litigation,*
  305 F. Supp. 2d 491 (W.D. Pa. 2003)........................................................27

*In re Safety Components, Inc. Securities Litigation,*
  166 F. Supp. 2d 72 (D.N.J. 2001) .............................................................25

*In re Schering-Plough Corp. S'holders Derivative Litigation,*
  2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008).................................26

*In re Syncor International Shareholder Litigation,*
  857 A.2d 994 (Del. 2004) ................................................................24

*In re Triarc Cos., Inc. Class and Deriv. Litigation,*
  791 A.2d 872 (Del. Ch. 2001)...........................................................26

*In re Tyson Foods, Inc.,*
  919 A.2d 563 (Del. Ch. 2007)...........................................................28

*In re Warfarin Sodium Antitrust Litigation,*
  391 F.3d 516 (3d Cir. 2004)...............................................14, 15, 17, 27

*Keyser v. Commonwealth National Financial Corp.,*
  120 F.R.D. 489 (M.D.Pa. 1988).........................................................28

*Lazy Oil Co. v. Witco Corp.,*
  95 F. Supp. 2d 290 (W.D. Pa. 1997).....................................14, 25, 26

*Lenahan v. Sears, Roebuck & Co.,*
  2006 U.S. Dist. LEXIS 60307 (D.N.J. July 10, 2006).....................14, 16

*Lewis v. Great W. United Corp.,*
  1978 Del. Ch. LEXIS 723 (Del. Ch. Mar. 28, 1978).........................28

*McMillan v. Intercargo Corp.,*
  768 A.2d 492 (Del. Ch. 2000)...........................................................23

*Mehling v. New York Life Insurance Co.,*
  246 F.R.D. 467 (E.D. Pa. 2007).........................................................29

*Meijer, Inc. v. 3M,*
  2006 U.S. Dist. LEXIS 56744 (E.D. Pa. Aug. 15, 2006)....................23

*Miller v. Fisco,*
  63 F.R.D. 132 (E.D.Pa. 1974)...........................................................28

*Neff v. Via Metropolitan Transit Authority,*
  179 F.R.D. 185 (W.D. Tex. 1998) .....................................................18

*Noerr v. Greenwood,*
  2002 Del. Ch. LEXIS 134..................................................................29

*Nottingham Partners v. Dana,*
  564 A.2d 1089 (Del. 1989) ...............................................................29

*Perry v. FleetBoston Finance Corp.,*
  229 F.R.D. 105 (E.D. Pa. 2005).........................................................20, 25

*Rankin v. Rots,*
    220 F.R.D. 511 (E.D. Mich. 2004) ............................................................29

*Ressler v. Jacobson,*
    822 F. Supp. 1551 (M.D. Fla. 1992) ........................................................18

*Srebnik v. Dean,*
    2006 U.S. Dist. LEXIS 59232 (D. Colo. Aug. 22, 2006) ...........................28

*Turner v. Bernstein,*
    768 A.2d 24 (Del. Ch. 2000).....................................................................29

*Unite National Ret. Fund v. Watts,*
    2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005).........................16, 26

*West Virginia v. Chas. Pfizer & Co.,*
    314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ...................20

*Zimmer Paper Products, Inc. v. Berger & Montague, P.C.,*
    758 F.2d 86 (3d Cir. 1985)........................................................................30

## FEDERAL STATUTES

Fed. R. Civ. P. 23 ..........................................................................28, 29, 30

Fed. R. Civ. P. 23.1 .............................................................................2, 30

## OTHER AUTHORITIES

5 MOORE'S FED. PRACTICE (3d) §23.100[4] (2007) ....................................30

Grahm Bowley & Jenny Anderson, *Where Did The Buck Stop at Merrill?*, The
    New York Times, Nov. 4, 2007...............................................................21

**INTRODUCTION**

The Court should approve the proposed settlement of this litigation (the "Settlement") which provides substantial benefits to the Class. As a result of the Settlement, Class[1] members made an informed, un-coerced decision regarding the merger (the "Merger") of Commerce Bancorp, Inc. ("Commerce" or the "Company") with The Toronto-Dominion Bank ("TD Bank"). Based on the final Proxy Statement ("Proxy"), which, due to the Settlement, included substantial additional disclosures about the Merger and the process leading up to it and a description of the Settlement's terms, Commerce shareholders overwhelmingly approved the Merger. The Settlement also improved the terms of the Merger through a reduction of the break up or "termination" fee from $332 to $255 million, and a reduction of the "tail" from 15 months to 12 months. In addition, Class members benefit from the settlement of derivative claims brought on behalf of Commerce, which have helped spur significant changes to Commerce's corporate governance and related procedures, and have identified and preserved potential claims against former Commerce Chairman Vernon Hill, II ("Hill").

Counsel for Plaintiffs[2] and Settling Defendants'[3] negotiated the Settlement at arms' length, ably assisted by retired United States Magistrate Judge Joel Rosen acting as Mediator,

---

[1] The Class is defined as: All record and beneficial holders of common stock of Commerce at any time from October 2, 2007 through the consummation of the Merger, and their respective heirs, executors, administrators, representatives, agents, successors, transferees and assigns (except Settling Defendants and Mr. Hill, and any person, firm, trust, corporation or other entity who is an affiliate of the Settling Defendants as the term "affiliate" is defined in the Securities and Exchange Act of 1934 and SEC Rule 12b-2 promulgated thereunder).

[2] "Plaintiffs" include Pearl E. Lucas, Sheetmetal Workers' National Pension Fund and S.L. Lerner (the "Lead Federal Plaintiffs"), the Louisiana Municipal Police Employees' Retirement System ("LAMPERS") and Police & Fire Retirement System of the City of Detroit ("Detroit Police & Fire") (the "Institutional Plaintiffs").

[3] "Settling Defendants" include defendants Commerce, TD Bank, Jack R. Bershad, Joseph E. Buckelew, Dennis M. DiFlorio, Donald T. DiFrancesco, Robert D. Falese, Jr., Nicholas A. Giordano, Morton N. Kerr, Steven M. Lewis, John K. Lloyd, George E. Norcross III, Daniel J. Ragone, William A. Schwartz, Jr., Joseph T. Tarquini, Jr., and Joseph S. Vassalluzzo.

fully appreciating the strengths and weaknesses of their clients' positions.  The negotiations

followed expedited discovery focusing on key issues.  Based on their informed analysis of the

discovery, including consultation with an experienced economist, their thorough evaluation of

publicly available information about Commerce, TD Bank, other potential bidders, and

substantial risks and uncertainties in the current economy, and through consideration of

information exchanged about the derivative claims during the course of the litigation, Plaintiffs'

counsel were in a position to assess the potential risks or rewards from continued litigation.  In

their collective judgment, based on the facts, the Settlement is fair, reasonable, and adequate, and

warrants the Court's approval.

## BACKGROUND

### I.    THE FEDERAL DERIVATIVE CLAIMS

On January 16, 2007, Commerce revealed that the Office of the Controller of Currency (the

"OCC"), in conjunction with the Board of Governors of the Federal Reserve System, had opened

an investigation into the Company's transactions with bank insiders.  On January 22, 2007,

Commerce shareholder Pearl E. Lucas ("Lucas") commenced a derivative action against Hill

pursuant to Fed. R. Civ. P. 23.1 on behalf of Commerce.  *See* Declaration of Ira Neil Richards in

Support of Motion for Final Approval of in Support of Petition of Plaintiffs' Counsel for Fees

and Reimbursement of Expenses ("Richards Decl.") at ¶4.

Shortly thereafter, counsel for Lucas began discussions with counsel for Commerce about

managing the litigation in order to avoid, *inter alia*, unnecessary and burdensome motion

practice.  *See* Richards Decl. at ¶5.  On May 11, 2007, the parties filed a Stipulation to Stay the

Proceedings ("Stipulation").  *Id.* at ¶7.  Under the terms of the Stipulation, which the Court

approved on May 15, 2007, Commerce agreed to provide Lucas's counsel with certain

documents and the opportunity to meet with the so-called Special Litigation Committee ("SLC") Commerce's Board had formed, purportedly to review the related party transactions at issue in the OCC's investigation and Lucas's action, as well as to deal with other issues raised by certain other Commerce shareholders. *Id.*; *see also* Doc. 85.

Consistent with the terms of the Stipulation, the parties exchanged information and documents about the claims, including through Commerce's production of real estate and related party transaction policies to Lucas's counsel. As part of the exchange of information about the claims, there were also meetings with the SLC's counsel. *See* Richards Decl. at ¶13.

On May 15, 2007, Commerce shareholder Sheetmetal Workers' National Pension Fund ("Sheetmetal Workers") filed a derivative Complaint against Hill, and other Commerce directors, seeking recovery on behalf of Commerce under New Jersey common law. The allegations in the Sheetmetal Workers' Complaint addressed the same subject matter as plaintiff Lucas's Complaint. *See* Richards Decl. at ¶8.[4]

On June 29, 2007, Commerce announced that it had entered into a Consent Order with the OCC. In addition, it announced that the Federal Reserve Bank of Philadelphia and Commerce entered into a memorandum of understanding, pursuant to which Commerce's Board agreed to, among other things, take all actions necessary to ensure that the Company complied with the Consent Order. Under the terms of the Consent Order, the Company was required to initiate certain governance changes to eliminate the related party transactions that were prevalent throughout Hill's reign at Commerce and provide periodic reports to federal regulators. The Company also announced that Hill would relinquish the positions he held at Commerce.

---

[4] On June 19, 2007, Sheetmetal Workers filed an amended complaint that provided, among other things, more definitive statements of citizenship for purposes of establishing diversity jurisdiction. *Id.*

Following the announcement of Hill's departure, Lucas's counsel raised with Commerce's counsel the possibility that Commerce might become a target for a takeover, pointing out that it would be in the best interest of Commerce to ensure that procedures were in place to assess strategic alternatives. *See* Richards Decl. at ¶18.

On July 17, 2007, Commerce shareholder S.L. Lerner ("Lerner") filed a third derivative Complaint on behalf of Commerce. The Complaint asserted an individual claim under Section 14(a) of the Exchange Act of 1934, in addition to derivative claims based upon the same underlying wrongdoing as alleged by Lucas and Sheetmetal Workers. Lerner had previously made a pre-suit demand on Commerce's Board to commence litigation against the alleged wrongdoers. *See* Richards Decl. at ¶9.

On August 7, 2007, Sheetmetal Workers filed a motion for a temporary restraining order, seeking to prevent Commerce from making substantial severance payments to Hill. On September 6, 2007, the Court denied the motion. Significantly, Commerce's counsel represented that Commerce had not made the payments at issue and that it believed that the payments required regulatory approval. Commerce's counsel agreed to provide notice to Lead Federal Plaintiffs if Commerce was going to make the disputed payments. Soon thereafter, the Court entered an order staying the actions pending completion of a report on the derivative claims by the Gibbons Firm, on behalf of the SLC. These orders also consolidated, for discovery purposes, the three derivative actions. *See* Richards Decl. at. ¶11.

## II.   THE FEDERAL CLASS CLAIMS ARISING OUT OF THE MERGER

On October 2, 2007, two months after the Company announced the resolution of the regulatory investigations and Hill's departure, Commerce announced that it was being acquired by TD Bank for a combination of cash and TD Bank stock. Under the terms of the Agreement

and Plan of Merger ("Merger Agreement"), Commerce stockholders would receive slightly over four-tenths of a share (0.4142) of TD Bank stock, plus $10.50 in cash, for each Commerce share held. The value of the deal at the time of the announcement was approximately $8.5 billion. *See* Richards Decl. at ¶19. The value has declined since then, as have stock values generally, given the unsettled economic circumstances.

On November 13, 2007, the Company filed a Schedule 14A Preliminary Proxy Statement (the "Preliminary Proxy") with the United States Securities and Exchange Commission ("SEC") to solicit Commerce shareholders' votes on the Merger. The Preliminary Proxy contained a copy of the Merger Agreement as well as a narrative that supposedly detailed the process by which the Merger was negotiated. Under the terms of the Merger Agreement, Commerce agreed to pay TD Bank a termination fee of $332 million if the Merger was not completed, and if Commerce consummated a different strategic transaction within a "tail period" of 15 months.[5] *See* Richards Decl. at ¶32.

On October 19, 2007, Lucas filed a Motion for Leave to File an Amended Complaint. Lucas continued to assert her derivative claims against Hill on behalf of Commerce, but added an individual claim similar to Lerner's under Section 14(a) and Class claims relating to the negotiation and approval of the Merger.[6] See Richards Decl. at ¶¶20-21. On November 21, 2007, the Court (Schneider, M.J.) allowed Lucas to file her proposed Amended Complaint, which she did the same day. *Id.* at ¶20. Magistrate Judge Schneider further ordered that the stay,

---

[5] Such a termination fee is commonly used in transactions such as the Merger in order to compensate the acquirer if the negotiated transaction were not to be consummated and, as well, to deter other prospective bidders from making a counter-proposal to the acquiree since the fee payable to the acquirer would increase the price to the prospective late bidder.
[6] On December 21, 2007, Lucas filed a Second Amended Complaint which included a separate class claim against TD Bank for knowingly aiding and abetting defendants' breach of fiduciary duty with regard to the Merger. *See* Richards Decl. at ¶21.

previously extended until the SLC rendered its report, would be lifted with regard to the Class

claims in connection with the Merger. *Id.* at ¶21.

On December 4, 2007, Lucas filed a motion for a preliminary injunction to prevent

Defendants from soliciting shareholder approval of the Merger using a materially false and

misleading proxy statement. Lucas's motion alleged that Defendants failed to fully disclose

material facts that would enable reasonable stockholders to make informed decisions about the

Merger. These alleged disclosure failures included, *inter alia*, inadequate disclosures regarding

the role of George Norcross, chair of the Commerce Special Committee, in the Merger

negotiations, and inadequate disclosures concerning the process undertaken by Commerce's

Board in evaluating the terms of the Merger. *See* Richards Decl. at ¶33.[7]

In connection with the injunction motion, the parties in the federal actions agreed to a

schedule for expedited discovery. The Court approved the schedule, setting a hearing on the

motion for January 11, 2008. Consistent with the schedule, the parties engaged in significant

expedited discovery on key issues. This discovery included three depositions during the week of

December 17, 2007, along with the production and review of approximately 7,400 pages of

documents. Discovery focused on information relevant to acquiring an understanding of the

Merger and the process that led to it. Commerce, TD Bank, and Commerce's financial adviser

Goldman Sachs produced, *inter alia*, business plans, board minutes, reports to the Board, reports

reflecting Goldman Sachs's analyses, and emails and communications. The parties contested the

scope of the document discovery, negotiated extensively over its scope, and turned to Magistrate

Judge Schneider when issues arose. *See* Richards Decl. at ¶¶34-36.

As part of the discovery, and in anticipation of presenting evidence at the scheduled

---

[7] A supplemental identification of disclosure deficiencies in the Preliminary Proxy was also filed
on December 26, 2007, after the parties completed their expedited discovery. *Id.*

January 11, 2008 hearing, Plaintiffs took depositions of three key witnesses: (1) Norcross, chair

of Commerce's Special Committee and lead negotiator for Commerce; (2) Riaz Ahmed, head of

TD Bank's Corporate Development deal team for the transaction; and (3) Peter Enns, senior

member of the Goldman Sachs team advising Commerce. Each witness was involved integrally

in the negotiation and evaluation of the Merger. The depositions covered, *inter alia*, TD Bank's

valuation of Commerce, the rationale behind the Merger, Norcross's role in the Merger, the sale

of Commerce Bank Insurance Services, Inc. ("CBIS") to Norcross, Goldman Sachs's

presentations to the Commerce Board, and the process that led to the Merger. *See* Richards

Decl. at ¶37; *see also* Affidavit of R. Andrew Santillo ("Santillo Aff."), Volume II, at Ex. A-C

(attaching deposition excerpts).[8]

### III.   THE STATE COURT CLASS ACTIONS ARISING OUT OF THE MERGER

Beginning the day the Merger was announced, Commerce shareholders filed ten separate

class actions in New Jersey state court alleging that the Commerce Board had breached their

fiduciary duties in connection with the Merger, with several complaints also alleging TD Bank

aided and abetted these breaches (the "State Court Actions"). Several of the state court

complaints specifically alleged that one of the reasons for the Merger was to extinguish the

derivative claims pending in this Court. Institutional Plaintiffs LAMPERS and Detroit Police &

Fire were among the Plaintiffs filing in State Court. Institutional Plaintiffs asked the State Court

to consolidate all pending actions and to appoint them as Lead Plaintiffs and their counsel as

Lead Counsel. Other State Court Plaintiffs contested Institutional Plaintiffs' motion and

countermoved for lead status. After a hearing on the issues, by Order dated November 12, 2007,

---

[8] Because Volume II of the Santillo Aff. includes deposition testimony and documents
designated as confidential by the producing parties under a stipulated Confidentiality Order, it is
being filed under seal.

the Hon. John Fratto appointed Institutional Plaintiffs as the Lead Plaintiffs, and their counsel as

Lead Counsel, for the State Court Actions.[9]  Institutional Plaintiffs served discovery and sought

to proceed on an expedited basis in the State Court Actions.  *See* Richards Decl. at ¶¶23, 25-26.

Defendants, for their part, sought a stay of the State Court Actions.  On December 11,

2007, the State Court granted Defendants' motion to stay in deference to the litigation in this

Court.[10]  In his opinion, Judge Fratto concluded, *inter alia*, that no conflict under the specific

facts of this case prevented Lucas, Sheetmetal Workers, and Lerner from bringing both

derivative claims on behalf of Commerce as a nominal defendant and Class claims challenging

the Merger.  In this regard, Judge Fratto concluded that the derivative claims enhanced the class

claims.  *See* Santillo Aff., Volume I, at Ex. B.

Immediately after Judge Fratto issued his stay ruling, on December 11, 2007, Institutional

Plaintiffs re-filed their class claims in federal court.  *See* Richards Decl. at ¶30.  On December

19, 2007, Institutional Plaintiffs' federal action was consolidated for discovery purposes with the

*Lucas*, *Sheetmetal Workers*, and *Lerner* cases, but even prior to that date counsel for the parties

had reached agreement to allow counsel for Institutional Plaintiffs to participate fully in the

expedited federal discovery.  *Id.* at ¶¶30-31, 36.  Counsel for Institutional Plaintiffs obtained

copies of all documents produced in the Federal Action and participated fully in the depositions.

*Id.*  To ensure effective, thorough analysis of the issues, counsel for all Plaintiffs regularly

exchanged views on the issues, the documents, and the depositions.  *Id.*  Also, counsel for all

Plaintiffs consulted regularly with an experienced economist.  *Id.* at ¶¶39-44.

---

[9] A true and correct copy of Judge Fratto's November 12, 2007 order is attached as Exhibit A to
the Santillo Aff., Volume I.
[10] A true and correct copy of Judge Fratto's December 11, 2007 opinion is attached as Exhibit B
to the Santillo Aff., Volume I.

## IV.  THE MEDIATION AND SETTLEMENT

In advance of the scheduled injunction hearing, the parties began seriously discussing the possibility of settlement. *See* Richards Decl. at ¶47. The parties selected retired United States Magistrate Judge Joel B. Rosen, an experienced and well-respected mediator, to oversee arms' length discussions regarding a potential settlement. *Id.*

Before the first scheduled mediation session, but after the expedited depositions had been completed, Plaintiffs' counsel made a demand on Defendants. Richards Decl. ¶48. Defendants rejected Plaintiffs' demand and made a counter proposal. *Id.* There were a number of sometimes contentious discussions involving various attorneys on each side as the parties explored possible settlement terms. *Id.*

Judge Rosen presided over a mediation session with the parties on December 28, 2007. *See* Richards Decl. at ¶49. Counsel for Lucas, Sheetmetal Workers, and Institutional Plaintiffs represented the Plaintiffs at the mediation. *Id.* Plaintiffs' counsel sought to negotiate a settlement that would be acceptable to *all* Plaintiffs' counsel, believing that would best serve the interests of the Class.[11] *Id.* In preparation for this mediation, Plaintiffs' counsel prepared and submitted a written mediation statement for Judge Rosen's review, which addressed various liability and damages issues concerning both the Class and derivative claims. *Id.* In short, the mediation proceedings were conducted based on a well-developed understanding of the strengths and weaknesses of the claims at issue.

During the mediation session, the parties exchanged additional information about their positions, and Defendants provided additional information about the negotiations of the Merger

---

[11] Institutional Plaintiffs' role in the negotiation provided a "belt and suspenders" approach to ensuring fairness to the Class in settlement negotiations in that (a) Judge Fratto had already concluded that there was no "class" and "derivative" conflict, and (b) neither Institutional Plaintiff had asserted any derivative claims.

and its structure. *Id.* at ¶49. The mediation session ended without an agreement. *Id.* However, with Judge Rosen's encouragement, the parties continued their arms' length negotiations on December 29th, 30th, and 31st. *Id.* at ¶50. Ultimately, on December 31, 2007, the parties reached an agreement-in-principle to settle both the Federal Actions and the State Court Actions. *Id.* at ¶¶51-54. Only after the parties agreed to the terms of the Settlement did the parties begin to address the issue of the amount of attorneys' fees. *Id.* at ¶¶54-55. After communicating the terms of the Settlement to Magistrate Judge Schneider on January 2, 2008, the parties negotiated a memorandum of understanding, which they executed on January 4, 2008. *Id.* at ¶¶56-57. On January 22, 2008, the parties agreed upon and executed the Stipulation of Settlement.

The Settlement resolves the derivative and Class claims. Due in part to the derivative actions, Commerce has, among other things, reviewed certain transactions between Commerce and Hill. Commerce has also taken various actions regarding its corporate governance, including actions to change and improve its internal procedures related to interested and related party transactions. These changes include the establishment of a Real Estate Committee of the Board and a review of all transactions with InterArch, Inc., a corporation controlled by Hill's wife.

In this regard, Commerce, based on information supplied by Lead Federal Plaintiffs, has asserted its right against InterArch and others to recover an alleged $1.6 million overpayment. Also, the derivative actions have helped identify and preserve potential claims against Hill, members of his family, and family affiliates. Under the terms of the Settlement, TD Bank will assume control of these claims. Since Hill has sued Commerce and certain of its directors, this part of the Settlement provides an important benefit.[12]

---

[12] In addition, the $77 million reduction in the potential termination fee and shortening of the tail period reduced the Company's potential financial exposure. Likewise, Commerce benefits from the enhanced disclosures in the Proxy.

The parties also agreed that the Proxy would include significant additional material disclosures.[13] The disclosures provided transparency necessary for shareholders to make informed choices about the Merger. For example, they amplified the role that Norcross played in negotiating the Merger and his interest in purchasing CBIS. The Settlement also enhanced disclosures about:

- The timing of Commerce's Board's consideration of certain strategic options, who they consulted with, and when they met to discuss these alternatives;
- The fact that the Board's adviser on strategic alternatives, Goldman Sachs, had previously provided investment banking services to a number of institutions on a regular basis, including, among others, TD Bank;
- The timing and manner in which Norcross expressed his personal interest in purchasing Commerce's insurance subsidiary, CBIS;
- The identity of members of the Board comprising the special committee charged with evaluating Norcross's bid to purchase CBIS;
- The identity of members of the Special Committee of the Board who were responsible, along with Norcross, for overseeing the process in which a possible strategic transaction with TD Bank would be explored;
- The per share range contained in TD Bank's preliminary indication of interest in purchasing Commerce;
- The effect of the regulatory actions on Commerce's deposit growth; and
- The existence of concern about retaining senior management given the regulatory hurdles Commerce had to overcome following Hill's termination and that this concern was the basis behind the renegotiation of employment agreements with 21 members of Commerce's upper management.

In addition, the Merger Agreement was modified to reduce the termination fee by $77 million from $332 million to $255 million and the 15-month tail period was reduced to a 12-month period.

On January 4, 2008, the Proxy was filed with the SEC and subsequently mailed to Commerce shareholders eligible to vote on the Merger. During a special meeting of Commerce shareholders on February 6, 2008, over 97.5% of those shareholders who voted did so in favor of the Merger. *See* Transcript of 2/20/08 Hearing ("Tr.") at 23:23-24:02.

---

[13] A redlined version of the edits made to the Preliminary Proxy is attached hereto as Exhibit C to the Santillo Aff., Volume I.

11

## V.     ADDITIONAL PROCEEDINGS RELATING TO THE SETTLEMENT

On the evening of January 10, 2008, lawyers claiming to represent two small Commerce

shareholders, Catherine Rubery and Marilyn Clark ("Rubery and Clark") filed a motion for an

order to show cause to permit them to intervene in the Federal Action, to have their lawyers

named "lead counsel," to permit them to take their own discovery, and to then file a motion to

enjoin the Merger. After a hearing on this motion, in which the Court found, *inter alia*, that there

is not "a shred of evidence" to support the allegation that the Settlement is the product of

collusion, the Court denied the motion. The Third Circuit dismissed Rubery and Clark's appeal

of this denial for lack of jurisdiction, because this Court's order was not appealable under settled

law.

## VI.  PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT

On February 20, 2008, the Court held a hearing on Plaintiffs' motion for preliminary

approval of the Settlement. Although Rubery and Clark filed a "Notice of Intent to Object"

before the hearing, their counsel wrote to the Court on February 15, 2008, stating that they did

not intend to contest preliminary approval. *See* 2/15/08 Letter from J. Whipple to Court at 1.

Hill filed an objection to the derivative aspect of the Settlement. *See* Doc. 83. Following oral

argument, the Court denied Hill's objection and granted Plaintiffs' motion for preliminary

approval of the Settlement. *See* Tr. at 12:23-13:21. The Court specifically observed that:

- The Settlement is the product of "arms-length negotiations" and "[c]learly the negotiations were conducted at arms-length." Tr. at 33:03-33:04; 33:10-33:14;
- "[The Settlement] has no obvious deficiencies and falls within the range of approval." Tr. at 34:03-33:04;
- "The Class is treated absolutely equally. There's no undue preferential treatment to any segment of the Class or any members of the Class." Tr. at 34:19-34:21;
- "The litigation had gone on long enough for plaintiffs' counsel to make an informed decision about [litigation risks]. They did take discovery in this case. And I know there are certain parties who believe it was insufficient, but I'm not willing to make

that conclusion. . . . And I do find that there was sufficient discovery." Tr. at 34:21-35:03;

- The notice plan was "reasonable as to all Class members who would be bound by the proposed settlement dismissal and compromise," was "reasonably calculated under the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present any objections they might have," and "does inform the Class members of the nature of the litigation, the general terms of the Settlement . . . and it will inform them of a time and place of the fairness hearing and the rights of the objectors to appear and be heard." Tr. at 35:05-35:15; and

- "[T]he standards under Rule 23 have been met, and I do appoint and approve the appointment of lead counsel as requested by the plaintiffs and liaison counsel as requested by plaintiffs." Tr. at 37:03-37:05.

That same day, the Court signed an Order granting Plaintiffs' motion for preliminary approval and conditionally certifying the Class pursuant to Rule 23(b)(1) and 23(b)(2). *See* Prelim. Approval Order, Doc. 88. The Court also set a deadline of April 18, 2008 for all briefs objecting or opposing final approval of the Settlement. *Id.*

## VII.  NOTICE OF THE PROPOSED SETTLEMENT

Under the Court approved notice plan, notice was mailed to all members of the Class and all Commerce stockholders as of February 25, 2008 at their last know address appearing in the stock transfer records maintained by or on behalf of Commerce. *See, generally*, Affidavit of Kathleen Logan, Exhibit F to the Santillo Aff., Volume I. In addition, a summary of the notice was published once in The Wall Street Journal, The New York Times, The Philadelphia Inquirer, and the Camden Courier-Post. *See id.* Further, Plaintiffs' Liaison Counsel and Commerce placed copies of the *Lucas* Second Amended Complaint, the Stipulation of Settlement (including exhibits), and all submissions by the parties in support of the Settlement on their websites.

## ARGUMENT

## I.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT

The Settlement, which created significant benefits and facilitated informed, uncoerced

choices about the Merger, is fair, reasonable, and adequate. The same rationale that supported

the Court's preliminary approval now supports the Court's final approval.

The decision to grant or deny approval to a settlement is committed to the discretion of

the Court. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004). The

Settlement is entitled to a presumption of fairness given that it is the result of arms' length

negotiations between experienced counsel before a well-regarded mediator after meaningful

discovery. Further, the Settlement fully satisfies the factors for final approval of settlement. *See*

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).

"[T]here is an overriding public interest in settling class action litigation, and it should

therefore be encouraged." *Warfarin*, 391 F.3d at 535.[14] Similarly, "settlements of shareholder

derivative actions are particularly favored because such litigation is 'notoriously difficult and

unpredictable.'" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (*quoting In re Xcel*

*Energy, Inc.*, 364 F. Supp. 2d 980 (D. Minn. 2005)). Based on their collective experience,

Plaintiffs' counsel believe that the Settlement should be approved. *See* Richards Decl. at ¶58.

## II.    THE SETTLEMENT IS ENTITLED TO A PRESUMPTION OF FAIRNESS

A district court should "apply an initial presumption of fairness when reviewing a

settlement where: '(1) the settlement negotiations occurred at arm's length; (2) there was

sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation;

---

[14] *See also Doe v. Delie*, 257 F.3d 309, 322 (3d Cir. 2001) ("The law favors settlement, particularly in class actions and other complex cases. . ."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (holding that "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *Lenahan v. Sears, Roebuck & Co.*, 2006 U.S. Dist. LEXIS 60307, *36 (D.N.J. July 10, 2006) ("Settlement of class action litigation has long been favored and encouraged."); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 330 (W.D. Pa. 1997) ("Class actions, with their notable uncertainties, difficulties of proof, and length, make application of this policy in favor of settlement particularly appropriate.").

and (4) only a small fraction of the class objected.'" *Warfarin Sodium*, 391 F.3d at 535 (*quoting*

*In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).  The presumption is

particularly strong where the negotiations benefited from the involvement of an experienced

mediator.  *See In re Cigna Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 51089, *12 (E.D. Pa. July

13, 2007) ("[I]t is clear that negotiations for the settlement occurred at arm's length, as the

parties were assisted by a retired federal district judge who was privately retained and served as a

mediator."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003)

(involvement of mediator or other third parties in settlement discussions is "further evidence of

the arm's length . . . nature" of the settlement); *In re Indep. Energy Holdings PLC Sec. Litig.*,

2003 U.S. Dist. LEXIS 17090, *13 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the Settlement

was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator

experienced in complex litigation, is further proof that it is fair and reasonable.").

These elements are satisfied here, as the Court noted during the February 20, 2008

hearing, because:

- Settlement negotiations "were conducted at arms-length.  There were four days of mediation before [] retired Federal Judge Rosen over the holidays … which culminated in a memorandum of understanding signed January 4th which was put on the record before Judge Schneider." Tr. at 33:10-33:14.
- "The litigation had gone on long enough for the plaintiffs' counsel to make an informed decision about this.  They did take discovery in this case.  . . . Therefore, the plaintiffs made an informed decision to settle based on the merits of their case.  And I do find that there was sufficient discovery." Tr. at 34:21-35:03.
- "And certainly the counsel for the Class are competent to conduct class actions.  They're all very experienced in class actions.  All having gotten extraordinary results in some cases and not so extraordinary results in other cases.  But that's good, too, because it gives the Class counsel a certain perspective on how class action cases go and when is best to settle those cases." Tr. at 36:10-36:17.

Settlements negotiated by experienced counsel that result from arms' length negotiations

are entitled to great deference from the Court.  *See In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.") (citations and quotations omitted).

### III.   THE PROPOSED SETTLEMENT SATISFIES EACH *GIRSH* CRITERIA FOR FINAL APPROVAL

Courts in this Circuit use a nine-factor test to evaluate both class and derivative settlements.  *See Girsh v. Jepson*, 521 F.2d at 157; *see also Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246, **7-8 (D.N.J. Oct. 28, 2005) (applying *Girsh* factors to settlement of a derivative action).  These "*Girsh* factors" include:  (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceeding and the amount of the discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  *See Id.* Applying these factors to the Settlement demonstrates that it is fair, reasonable, and adequate.

### A.   The Complexity, Expense, and Likely Duration of the Litigation

The first factor "captures 'the probable costs, in both time and money, of continued litigation.'"  *In re Cendant*, 264 F.3d 201, 233 (3d Cir. 2001) (*quoting Gen. Motors*, 55 F.3d at 812).

> The Court must balance the Proposed Settlement against the time and expense of achieving a potentially more favorable result through further litigation. Where the complexity, expense and likely duration of litigation are significant, the Court will view this factor as weighing in favor of settlement.

*Lenahan*, 2006 U.S. Dist. LEXIS 60307, at **36-37 (*citing In re Prudential Ins. Co. of America Sales Practices Litig.*, 962 F. Supp. 450, 536 (D.N.J. 1997)).

Absent the Settlement, this indisputably complex case would have involved expensive, time consuming litigation with an uncertain outcome. This litigation involves complex issues of corporate governance, bank regulation, and the structuring and valuing of a corporate merger in the context of New Jersey law, the application of which the parties surely would dispute. These complex legal and factual issues all arise against a backdrop of unsettled economic conditions, particularly for financial institutions.

A trial of this case, which would require significant time and expense, including the cost of experts, would be a long and arduous process, with an end result that may be no better, and perhaps worse, than what has already been achieved in the Settlement. Trial would most certainly lead to appeals, adding even more complexity and uncertainty. *See* Tr. at 33:21-33:23 (noting the length of time necessary to litigate this case and address any subsequent appeals).[15]

### B.      The Reaction of the Class to the Settlement

The second factor "attempts to gauge whether members of the class support the settlement." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998). As an initial matter, the overwhelming shareholder vote in favor of the Merger evidences strong support for the Settlement. The Proxy described the Settlement's terms fully, so shareholders voting on the Merger were able to take the Settlement into consideration. Further, two independent services that analyze proposed transactions and provide shareholder vote recommendations both came out in favor of the Merger, after analyzing the Merger and the Proxy, including the Settlement's terms. *See* Santillo Aff., Volume I, at Ex. D.

---

[15] *See also Warfarin*, 391 F.3d at 536 ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of recovery to the class."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998) ("[T]he trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement.").

Further, although the time to object has not yet passed, only two small shareholders,

owning a total of 176 shares out of a class of approximately 50,000 shareholders, collectively

holding in excess of 195 million shares, have filed a "notice of intention to object to the

Settlement." The record already establishes that their purported objections are baseless.[16]

### C.   The Stage of the Proceeding and the Amount of the Discovery Completed

The third factor "'captures the degree of case development that class counsel [had]

accomplished prior to settlement. Through this lens, courts can determine whether counsel had

an adequate appreciation of the merits of the case before negotiating.'" *Cendant*, 264 F.3d at

235 (*quoting Gen. Motors*, 55 F.3d at 813). For this factor, courts have looked toward the

quality of the discovery and the information obtained rather than the quantity of discovery.[17]

---

[16] Plaintiffs will more fully respond to any specific assertions these objectors make in a reply brief. Likewise, Plaintiffs will respond in a reply brief to any other objections they receive. It does appear, however, that at least one of the firms involved with these two objectors often files objections to settlements. *See, e.g.*, Robbins Umeda & Fink, LLP Press Release dated March 21, 2008 ("Attention Applied Micro Circuits Corporation, Inc. Shareholders: Robbins Umeda & Fink, LLP Announces a Pending Shareholder Action Settlement May Impact Your Rights," <available at http://biz.yahoo.com/pz/080321/138707.html>); *compare with* January 18, 2008 Tr. at 14:13-14:16 ("Our firm and the firm we're associated with have never taken it upon ourselves to intervene in this type of case in this type of fashion at this stage of the proceeding.") *and with* Affidavit of John T. Whipple dated March 14, 2008 at ¶5 (asserting RUF never objected to a case of this type). Their positions in this case appear to be inconsistent with prior positions.

[17] *See In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620-21 (E.D. La. 2006) ("Thus, the question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it."); *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 400 (D.N.J. 2006) (Simandle, J.) ("Where [the] negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent."); *Ressler v. Jacobson*, 822 F.Supp. 1551, 1555 (M.D. Fla. 1992) ("The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations."); *see also Neff v. Via Metro. Transit Auth.*, 179 F.R.D. 185, 209 (W.D. Tex. 1998) ("Sufficiency of information does not depend on the amount of formal discovery that has been taken because other sources of information may be available to show the settlement may be

Through expedited discovery, Plaintiffs' counsel obtained an understanding of key issues. *See* Richards Decl. at ¶37.  To provide examples of issues covered in discovery, Plaintiffs are submitting under seal excerpts of the deposition transcripts. *See* Santillo Aff., Volume II, at Ex. A-C.  Discovery on these issues allowed experienced Plaintiffs' counsel to evaluate the strength and weaknesses of the claims.  To ensure an informed assessment, Plaintiffs' counsel retained and consulted with an experienced economist. *See* Richards Decl. at ¶¶39-44.[18]

Through discovery, Plaintiffs' counsel were able to explore, among other things, the process by which strategic alternatives available to Commerce were reviewed, in addition to the negotiation of the terms of the Merger.  Plaintiffs' counsel targeted discovery at the adequacy and structure of consideration provided under the Merger; the decision to appoint Norcross as the primary negotiator with TD Bank and Norcross's role in the process; the decision not to remain a stand-alone company; the solicitation and, ultimately, the lack of competing offers; the negotiation of the termination fee; the inclusion of a process for negotiating the sale of CBIS in the Merger Agreement; the sale of CBIS to Norcross; the disclosures in the Preliminary Proxy; and Commerce's use of Goldman Sachs as financial adviser.

The foundation for Plaintiffs' counsel's assessment of the claims was not limited to information obtained in discovery.  Rather, Plaintiffs' counsel evaluated other available information, including publicly available analysts' reports, data on stock prices, information on Commerce, TD Bank, and other potential bidders for Commerce, and of course, relevant case law. *See* Richards Decl. at ¶¶38, 61.  As a result, Plaintiffs' counsel had a full appreciation for

---

approved even when little or no formal discovery has been completed.").  Thus, the Court need only determine if "counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." *In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 377 (D.D.C. 2002).

[18]  Also, during the mediation, counsel exchanged additional information relevant to an evaluation of the claims. *See* Richards Decl. at ¶49.

the potential risks of continued litigation.

Similarly, there was sufficient information exchanged to allow for an appreciation of the derivative claims.  Counsel exchanged documents and information about these claims over the course of about a year, including in meetings with the SLC's counsel. *See id.* at ¶¶13, 15, 65.

In short, the record shows that discovery "had gone long enough for plaintiffs' counsel to make an informed decision about" the Settlement.  Tr. at 34:21-35:03; *see also id.* at 33:07-33:09 ("[The l]itigation is sufficiently advanced to allow for adequate evaluation of a proposed settlement based on all the risks and other costs and benefits and concerns.").  In fact, Plaintiffs' counsel collectively devoted over 5,000 hours to this case. *See* Richards Decl. at ¶72.  Thus, this factor favors final approval.

### D.    The Risk of Establishing Liability

The fourth *Girsh* factor "examine[s] what the potential rewards (or downsides) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *Gen. Motors*, 55 F.3d at 814.  As one court explained:

> In examining this factor, the Court need not delve into the intricacies of the merits of each side's arguments, but rather may "give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action."

*Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (*quoting Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997)).  "It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).

While Plaintiffs believe they had meritorious claims, they faced considerable risks in

20

pursuing their claims.  For example, Plaintiffs' counsel thoroughly examined the risks of proving

that the Merger consideration was inadequate.  This included consulting with an experienced

economist, who confirmed that there were substantial challenges in proving that the price was

not fair.  Among other things, Plaintiffs' financial expert confirmed that Commerce's pre-Merger

stock price was affected by takeover speculation and that, as a result, the stock price was already

elevated.  *See* Richards Decl. at ¶41.  His work also confirmed that key metrics supported the

conclusion that the price was in the range of fairness.  *Id.* at ¶43.  While Plaintiffs would have

attacked the valuation and attempted to provide an analysis contradicting Goldman Sachs's

opinion, this "battle of the experts" would have been difficult, and certainly not risk free.

     In this regard, factors specific to Commerce and conditions in the economy in general

made proving that the consideration was inadequate, and that the predicate decision to merge

with TD Bank was a breach of fiduciary duty, risky endeavors.  First, the overall economy has

experienced substantial difficulties that have hit financial institutions particularly hard.[19]

Second, in the context of a challenging economic environment, Commerce was faced with

regulatory scrutiny and a discontented management team, who would have had to execute its

business model.  Defendants would certainly argue that in the wake of these developments, it

was prudent to consider strategic alternatives, with the aid of experienced advisers from

Goldman Sachs and noted banking attorney Rodgin Cohen of Sullivan & Cromwell.

     Defendants would have also argued, as the discovery process disclosed, that the

consideration for the Merger was arrived at through negotiations after TD Bank proposed a lower

range; that Commerce's Board continued to consider the option of remaining an independent

---

[19] *See, e.g.*, Graham Bowley & Jenny Anderson, *Where Did the Buck Stop at Merrill?*, THE NEW YORK TIMES, Nov. 4, 2007, at 1 ("The market clearly believes that credit market problems will continue to hammer banks.").

entity throughout the negotiation process until they obtained a fair price for the shareholders; that the price was a significant multiple over key metrics, such as the ratio of price to core deposits; and that Goldman Sachs provided the Commerce Board with an opinion that the price was fair from a financial point of view.

In attempting to prove a breach of fiduciary duty in connection with the Merger, Plaintiffs would have highlighted the role of Norcross as principal negotiator on behalf of Commerce, combined with his interest in acquiring CBIS. Defendants, on the other hand, likely would have argued that it made sense for the Board to select Norcross to negotiate the Merger given his business experience and role in negotiating a resolution with the federal regulators. Defendants also would have argued that Norcross's large stock holding aligned his interest with the interests of public shareholders. With respect to Norcross's acquisition of CBIS, Defendants undoubtedly would have argued that it was immaterial since TD Bank valued Commerce as a whole, including CBIS; that CBIS's sale terms were negotiated after the Merger Agreement was signed by a special committee of the Commerce Board and ultimately approved by TD Bank; and that the value of CBIS has to take into consideration the business lines that Commerce and ultimately TD Bank retained, as well as Norcross's role as a significant business producer in a relationship driven business. Further, Defendants would argue that any claim as to CBIS is a derivative claim, not a class claim.[20]

With respect to the other terms of the Merger, Defendants would argue their position that fixed exchange ratio transactions are common in the banking industry and that reductions in TD

---

[20] *See Firstcom, Inc. v. Qwest Corp.*, 2006 U.S. Dist. LEXIS 66787, **9-10 (D. Minn. Sept. 18, 2006) (sale of corporate assets constitutes waste and thus properly characterized as derivative action); *Bristen v. Schinger Fund*, 469 F.Supp.2d 371 (E.D. La. 2007) (suit challenging transfer of company's assets to other entities controlled by defendants was derivative, not direct); *Bokat v. Getty Oil Co.*, 262 A.2d 246 (Del. 1970) (suit against parent company director for wasteful investment of subsidiary's assets derivative, not direct).

Bank's stock price since the Merger was announced are the result of the overall economic declines during that period, and even a result of poor results reported by Commerce whose stock, after the Merger announcement, traded in tandem with TD Bank stock.

Defendants would also argue that a "collar" on the stock price was not required and that the original termination fee of 3.9% was reasonable. *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 505 (Del. Ch. 2000) (noting that it is "difficult to see how a 3.5% fee would have deterred a rival bidder who wished to pay materially more ..."); *Goodwin v. Live Entertainment, Inc.*, 1999 Del. Ch. LEXIS 5, *69 (Del. Ch. 1999) (finding a 3.125% termination fee plus $1 million in expenses (representing 4.16% of the transaction) was in the range of reasonableness).

The derivative claims likewise faced significant liability risks. Among other things, Defendants would have argued that the related party transactions were fully disclosed. Also, Defendants would have contested the viability of the derivative claims based on the outcome of the SLC investigation, and the ability of the TD Bank Board to evaluate the report. For example, the SLC concluded that Commerce had not been financially disadvantaged by related party leases that it reviewed. *See* Doc. 85 at 27. Plaintiffs would have disputed the SLC's independence and conclusions, but succeeding on these challenges certainly are risky propositions.

Given the liability risks, the derivative settlement is in the Company's best interests. The Settlement not only preserves potential claims against Hill, but it also helped facilitate corporate governance changes that have been made. The derivative litigation also facilitated efforts to recoup $1.6 million. Further, as a result of the Merger, the Commerce Board is being replaced.

## E.    The Risks of Proving Damages

The risks of establishing damages similarly weigh in favor of final approval. "In making

this inquiry, the Court considers the 'potential damage award if the case were taken to trial against the benefits of immediate settlement.'" *Meijer, Inc. v. 3M*, 2006 U.S. Dist. LEXIS 56744, *49 (E.D. Pa. Aug. 15, 2006) (*quoting Warfarin*, 212 F.R.D. at 256). In this case, the liability and damages risks share much in common. The risks that Plaintiffs faced in challenging the valuation of Commerce, which would be subject to a battle of experts, *see In re Cendant*, 264 F.3d at 239, are addressed in the preceding section. The risks in this case include, *inter alia*, demonstrating that Commerce would have eventually found a merger partner willing to pay a higher premium given that "[t]here are [] few other potential buyers . . . [and] the market was going down and [it is] still not a good market for financials." Tr. at 34:06-34:08.

The challenges to proving damages are illustrated by the issue of whether regulatory actions affecting Commerce branch openings impacted Commerce's value. As an initial matter, Defendants would point out that any such reduction in value might give rise to a derivative claim, but not a class claim. *See In re Syncor Int'l Shareholder Litig.*, 857 A.2d 994 (Del. 2004) (claims against former chairman who was involved in pre-transaction illegal conduct which, when disclosed, reduced merger consideration, were derivative). While Plaintiffs would seek to argue that regulatory actions decreased Commerce's stock price, Defendants would likely argue that the price TD Bank agreed to pay was a premium over that stock price. Defendants would also point to the fact that regulators did in fact approve Commerce branch applications, *see* Commerce's July 24, 2007 8-K, that deposit growth takes time, and that Commerce experienced growth in less profitable high cost deposits. Of course, the uncertain economic environment adds significant risk to proving any damages, either derivatively or on a class basis.

The SLC report also shows the challenges to proving damages. The SLC concluded in large measure that Commerce had not been economically disadvantaged by transactions it

examined. *See generally*, Doc. 85.  Plaintiffs would have to contest these conclusions to show there were in fact damages to the Company.

### F.      The Risks of Maintaining the Class Through the Trial

This factor adds little to the consideration of the Settlement. *See, e.g., In re Safety Components, Inc. Securities Litig.*, 166 F. Supp. 2d. 72, 91 (D.N.J. 2001).  Plaintiffs believe strongly that the Court would have certified a class in this case; however, the Court has the ability to "decertify or modify a class at any time during the litigation if it proves to be unmanageable." *In re Prudential Ins. Co.*, 148 F.3d at 321.  However, there were risks of maintaining the derivative portion of this litigation due to the possibility that the SLC would decline to pursue the claims. *See In re Cendant Corp.*, 232 F. Supp. 2d 327, 335 (D.N.J. 2002) ("The chief risk in maintaining this derivative action is that the Special Litigation Committee might choose to reject the case, thereby potentially putting an end to it.").

### G.      The Ability of the Defendants to Withstand a Greater Judgment

The seventh factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *In re Cendant*, 264 F.3d at 240.  This factor deserves little weight given the risks of continued litigation, discussed above. *See Lazy Oil*, 95 F. Supp. 2d at 318; *Perry*, 229 F.R.D. at 116.  Moreover, irrespective of any ability to obtain a "greater judgment," Plaintiffs' counsel confirmed TD Bank's position that it believes it fully valued Commerce and was unwilling to modify the consideration it is paying.

### H.      The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery

The eighth factor assesses the reasonableness of the Settlement.  "While the court is obligated to ensure that the proposed settlement is in the best interest of the class members by reference to the best possible outcome, it must also recognize that settlement typically represents

a compromise and not hold counsel to an impossible standard." *In re Aetna Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 68, **20-21 (E.D. Pa. Jan. 4, 2001); *see also Gen. Motors*, 55 F.3d at 806 (noting that "after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution"); *Lazy Oil*, 95 F. Supp. 2d at 338-39 (stating that a court "should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and abandoning of high hopes'") (*quoting Cotton v. Hinton*, 559 F. 2d 1326, 1330 (5th Cir. 1977)).

In light of the foregoing, the proposed Settlement is fair, reasonable, and adequate. As the Court has noted, "[t]here are no obvious deficiencies in this Settlement that I can see. It falls within the range of reasonableness. ... And [Plaintiffs' counsel] were able to negotiate more favorable terms for the shareholders reducing the break-up fee and ... tail period, which would make Commerce more attractive to any other potential suitors within the time frame. And they did preserve claims against Mr. Hill and InterArch."[21]  Tr. at 34:02-34:13. Also, the derivative claims resulted, in part, in important corporate reforms and governance changes at Commerce.[22]

---

[21] Courts have also highlighted the preservation of claims against non-settling defendants when reviewing settlements for approval. *See In re Cendant Corp.*, 232 F. Supp. 2d at 336 (noting the significance of the preservation of claims against non-settling defendants under the terms of a settlement).

[22] *See Unite Nat. Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246, **15-16 (D.N.J. Oct. 28, 2005) (finding corporate governance changes "provides immediate and substantial benefits for all parties"); *id.* at *18 (finding a "great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement"); *see also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir.1993) (citing series of cases from other circuits where non-monetary derivative relief found adequate to support settlement); *see generally In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 U.S. Dist. LEXIS 2569, *11 (D.N.J. Jan. 14, 2008) (holding that "corporate governance changes are substantial non-pecuniary benefits to [the company]"); *see also In re Triarc Cos., Inc. Class and Deriv. Litig.*, 791 A.2d 872, 878 (Del. Ch. 2001) (finding non-monetary settlement of corporate disclosures fair and reasonable); *In re Golden State Bancorp Inc. S'holders Litig.*, 2000 Del. Ch. LEXIS 8,

I.      **The Range of Reasonableness of the Settlement Fund in Light of All the Attendant Risks of Litigation**

The ninth factor is similar to the eighth; they "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin*, 391 F.3d at 538.  Many of the risks in this case are discussed above.  In addition, "a future recovery, even one in excess of the proposed Settlement, may ultimately prove less valuable to the Class than receiving the benefits of the proposed Settlement at this time." *In re Rent-Way Secs. Litig.*, 305 F. Supp. 2d 491, 500 (W.D. Pa. 2003).  In the context of unsettled financial markets, without another bidder willing to pay more for Commerce in sight, what exactly happens to Commerce and its shareholders if Plaintiffs succeeded in enjoining the Merger?  At best, the answer to this question is uncertain and speculative.  It is not unreasonable to believe that an injunction of the Merger would have led to Class members receiving *less* value for their shares, and not more.  In this context, the Settlement put the decision to accept or reject the Merger where it belongs, in the hands of Commerce's shareholders, who overwhelmingly approved this Merger.

## IV.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS.

One of this Court's functions in reviewing a proposed class settlement is to determine whether the action may be maintained as a class action. *See Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).  In the settlement context, "the court 'need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.'" *First State Orthopedics v. Concentra, Inc.*, 2007 U.S. Dist. LEXIS 77557, *22 (E.D. Pa. Oct. 16, 2007) (*quoting Amchem*, 521 U.S. at 620), *motion for summary affirmance granted* No. 07-4367,

---

**8-9 (Del. Ch. Jan. 7, 2000) (approving and finding non-monetary settlement fair when disclosures were material to investors voting on proposed merger transaction).

27

slip op. at 1-2 (3d Cir. Mar. 10, 2008).

For the reasons set forth in the brief in support of the Motion for Preliminary Approval of Settlement, as well as those recognized by the Court during the Preliminary Approval hearing, *see* Tr. 33:01-37:05, the Class fully satisfies the requirements of Rules 23(a) and (b) and thus should be finally certified for settlement purposes.

As Plaintiffs' counsel have already demonstrated, the Class's interests have been adequately represented here.  Counsel for all Plaintiffs negotiated the Settlement, including Institutional Plaintiffs' Counsel, who had not asserted any derivative claims.  Moreover, Judge Fratto and this Court have already rejected the suggestion of a derivative/class conflict in this case.  Thus, the interests of the Class have been protected in the way *Amchem* envisions. Further, numerous courts have recognized that derivative and class actions can be consolidated or otherwise proceed as one action without a conflict.  As one Court observed, "the case law is virtually unanimous in holding that one counsel can represent a stockholder bringing *both* an individual and *derivative* action."  *In re Dayco Corp. Derivative Secs. Litig.*, 102 F.R.D. 624, 630 (S.D. Ohio 1984).[23]  In fact, courts commonly consolidate actions brought by shareholders directly, including in the form of class actions, and derivatively.[24]

---

[23] *See also Miller v. Fisco*, 63 F.R.D. 132 (E.D.Pa. 1974) (finding no *per se* rule against plaintiffs' counsel pursuing both derivative claims and class claims); *Keyser v. Commonwealth National Financial Corp.*, 120 F.R.D. 489 (M.D.Pa. 1988) (same);  *Srebnik v. Dean*, 2006 U.S. Dist. LEXIS 59232, **8-9 (D. Colo. Aug. 22, 2006) ("Generally, any 'conflict' that exists in cases where a plaintiff brings both derivative and direct claims is theoretical rather than real.").
[24] *See, e.g., Berlin v. Emerald Partners*, 552 A.2d 482, 484 (Del. 1988) (shareholder brought suit to enjoin merger "individually, and subsequently amended its complaint to allege class and derivative claims"); *In re Tyson Foods, Inc.*, 919 A.2d 563, 571 (Del. Ch. 2007) (shareholder filed action with "both class action and derivative complaints for breaches of fiduciary duty and proxy disclosure violations"); *In re 3COM Corp. S'holders Litig.*, 1999 Del. Ch. LEXIS 215, *3 (Del. Ch. Oct. 25, 1999) ("Plaintiffs sues 1) derivatively for corporate waste and breach of fiduciary duty of loyalty and 2) in a class action, on behalf of all 3COM shareholders, for breach of the 'duty of candor.'"); *Lewis v. Great W. United Corp.*, 1978 Del. Ch. LEXIS 723 (Del. Ch.

Second, certification of this Class under both Fed. R. Civ. P. 23(b)(1)(B) and 23(b)(2) is appropriate here. As this Court noted during the preliminary approval hearing, certifying this Class under Rule 23(b)(1)(B) is appropriate because "there is the risk that adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of the other members not parties to the adjudication." Tr. at 36:18-36:22; *see also Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 475-76 (E.D. Pa. 2007) (same).[25]

The Court also observed that certification under Rule 23(b)(2) was appropriate here because "the party opposing the class has acted on ground generally applicable to the Class." Tr. at 36:22-36:23. "This again is a breach of fiduciary responsibilities common among Defendants and common to all members of the Class." Tr. at 36:24-37:01. In addition, since the "relief sought [is] predominately injunctive or declaratory," *see* Tr. at 37:01-37:02, certification under Rule 23(b)(1)(B) and 23(b)(2) is appropriate.

Furthermore, Delaware courts have found that cases challenging the exercise of fiduciary responsibilities in corporate merger transactions are properly certifiable under Chancery Rules 23(b)(1) and (b)(2).[26] *See Turner v. Bernstein*, 768 A.2d 24 (Del. Ch. 2000); *Nottingham Partners v. Dana*, 564 A.2d 1089, 1094-96 (Del. 1989); *Hynson v. Drummond Coal Co.*, 601 A.2d 570, 578-79 (Del. Ch. 1991). Therefore, given the above, Plaintiffs' claims allow for

---

Mar. 28, 1978) (parties settled action where shareholder filed derivative and class action suit to enjoin proposed merger).

[25] Courts have also recognized in the context of breach of fiduciary duty claims regarding ERISA plans that Rule 23(b)(1)(B) class certification is appropriate when any decision whether defendants breached their fiduciary duty affects *all* members to whom defendants owed a fiduciary duty. *See Mehling*, 246 F.R.D. at 476 (*quoting In re IKON Office Solutions, Inc. Sec. Litig.*, 191 F.R.D. 457, 466 (E.D. Pa. 2000)); *see also Rankin v. Rots*, 220 F.R.D. 511, 523 (E.D. Mich. 2004) (certifying a class in breach of fiduciary duty action under Rule 23(b)(1)(A) and (B), in part, because "failure to certify a class could expose defendants to multiple lawsuits and risk inconsistent decisions.").

[26] Chancery Rule 23 and Federal Rule of Civil Procedure 23 are analyzed by courts in a similar manner. *See Noerr v. Greenwood*, 2002 Del. Ch. LEXIS 134, *20 n27 (Del. Ch. Nov. 22, 2002).

certification of the Class under Rule 23(b)(1)(B) and 23(b)(2).

## V.   THE NOTICE PLAN SATISFIED THE REQUIREMENTS OF DUE PROCESS, AND THE FEDERAL RULES OF CIVIL PROCEDURE

As part of its analysis of the Settlement, the Court must determine whether the Notice was adequate. *See Meijer*, 2006 U.S. Dist. LEXIS 56744, at *30. Here, the requirements of both the Federal Rules of Civil Procedure and due process have been fulfilled.[27] The notice plainly satisfies the content requirement. Further, the notice was sent by first-class mail to all members of the Class as well as all Commerce stockholders as of February 25, 2008. *See, generally*, Affidavit of Kathleen Logan, Exhibit F to the Santillo Aff., Volume I. In addition, on March 10, 2008, Commerce had a summary of the Notice published in a number of newspapers with large circulation both locally and nationally. *Id.* Also, copies of pertinent documents were placed on Commerce's official website as well as the website for Plaintiffs' Liaison counsel. Thus, the parties' efforts to disseminate the notice were more than appropriate. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("First-class mail and publication have consistently been considered sufficient to satisfy the notice requirements of Rule 23(d)(2) and Rule 23(e) for advising class members.").

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion for Final Approval of the Settlement.

Date:   April 4, 2008                    **TRUJILLO RODRIGUEZ & RICHARDS, LLC**

                                         _____
                                         Lisa J. Rodriguez
                                         8 Kings Highway West
                                         Haddonfield, NJ 08033
                                         (856) 795-9002

---

[27] *See* Fed. R. Civ. P. 23(e)(2); Fed. R. Civ. P. 23.1(c); *see also In re Diet Drugs Prods. Liab. Litig.*, 226 F.R.D. 498, 517-18 (E.D. Pa. 2005); 5 MOORE'S FED. PRACTICE (3d) §23.100[4] (2007).

and

Ira Neil Richards
R. Andrew Santillo
TRUJILLO RODRIGUEZ & RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
(215) 731-9004

**LIAISON COUNSEL FOR PLAINTIFFS**

Richard D. Greenfield
GREENFIELD & GOODMAN LLC
780 Third Avenue, 48th Floor
New York, NY 10017
(917) 472-4487

Ann Kimmel Ritter
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29465
(843) 216-9166

**PLAINTIFFS' CO-LEAD COUNSEL**

Jeffrey W. Golan
M. Richard Komins
Beth Targan
Lisa Lamb
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600

William C. Fredericks
David Webber
John Rizio-Hamilton
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Seth D. Rigrodsky
Brian D. Long
RIGRODSKY & LONG, P.A.
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5305

Ann Miller
ANN MILLER LLC
843 Chestnut Street, Suite 206
Philadelphia, PA 19107
(215) 238-0468

Michael DiBenedictis
DeBENEDICTIS & DeBENEDICTIS
41 S. Haddon Avenue, Suite #5
Haddonfield, NJ  08033
(856) 795-2101

Michael L. Testa
BASILE & TESTA, P.A.
424 Landis Avenue
Vineland, NJ 08360
(856) 691-2300

**PLAINTIFFS' COUNSEL**